**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

Nadira Thuneibat                                    :
77 -77A Kronprindsens Gade                          :
Main Street                                         :
St. Thomas, U.S. Virgin Islands                     :
                                                    :
    and                         :
                                                    :
Estate of Lina Mansoor Thuneibat,                   :
by and through Nadira Thuneibat                     :
as Personal Representative,                         :
77 – 77A Kronprindsens Gade                         :
Main Street                                         :
St. Thomas, U.S. Virgin Islands                     :
                                                    :
    and                         :
                                                    :
Estate of Mansoor Al-Thuneibat,                     :          **COMPLAINT**
by and through Nadira Thuneibat                     :
as Personal Representative,                         :
77 – 77A Kronprindsens Gade                         :
Main Street                                         :
St. Thomas, U.S. Virgin Islands                     :
                                                    :
    and                         :
                                                    :
O.M.T,                                              :
by and through Nadira Thuneibat                     :
as next friend,                                     :
77 – 77A Kronprindsens Gade                         :
Main Street                                         :
St. Thomas, U.S. Virgin Islands                     :
                                                    :
    and                         :
                                                    :
Muhammad Mansoor Thuneibat                          :
77 – 77A Kronprindsens Gade                         :
Main Street                                         :
St. Thomas, U.S. Virgin Islands                     :
                                                    :
    and                         :
                                                    :
Tariq Ahmad Khorma                                  :
60 Sutton Place, Apartment 5ES                      :

1

New York, NY 10022                                    :
                                                      :
    and                           :
                                                      :
Estate of Musab Ahmad Khorma,                         :
by and through Tariq Ahmad Khorma                     :
as Personal Representative,                           :
60 Sutton Place, Apartment 5ES                        :
New York, NY 10022                                    :
                                                      :
    and                           :
                                                      :
Samira Fayez Khorma                                   :
60 Sutton Place, Apartment 5ES                        :
New York, NY 10022                                    :
                                                      :
    and                           :
                                                      :
Tatsiana Ahmad Khorma                                 :
60 Sutton Place, Apartment 5ES                        :
New York, NY 10022                                    :
                                                      :
    and                           :
                                                      :
Zeid Ahmad Khorma                                     :
60 Sutton Place, Apartment 5ES                        :
New York, NY 10022,                                   :
                                                      :
                                                      :
                   Plaintiffs,   :
                                                      :
v.                                                    :
                                                      :
                                                      :
SYRIAN ARAB REPUBLIC                                  :
Damascus, SYRIA                                       :
                                                      :
and                                                   :
                                                      :
Syrian Military Intelligence                          :
(al-Mukhabarat al-`Askariya)                          :
Syrian Ministry of Defense                            :
Omayad Square                                         :
Damascus, Syria                                       :
                                                      :
                                                      :
                                                      :

<table>
<tr><td></td><td>:</td></tr>
<tr><td align="center">Defendants.</td><td>:</td></tr>
</table>

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ..........:

### COMPLAINT

Plaintiffs bring this action pursuant to the provisions of the Foreign Sovereign
Immunities Act, 28 U.S.C. § 1602, *et seq*. (hereinafter "FSIA").  This action arises out of
the personal injuries and wrongful deaths of Lina Mansoor Thuneibat and Musab Ahmad
Khorma in the simultaneous terrorist bombings of the Radisson SAS Hotel, the Grand
Hyatt Hotel and the Days Inn in Amman, Jordan, on November 11, 2005.  These
bombings were carried out by a Foreign Terrorist Organization ("FTO") so designated by
the U.S. Department of State, operating with material support and resources provided by
the Syrian Arab Republic ("Syria") as a designated State Sponsor of Terrorism, having
been so designated by the U.S. Department of State in 1979 and having remained so
designated at all times referenced herein.  The terrorists committed, and Lina Mansoor
Thuneibat and Musab Ahmad Khorma were the victims of, acts of "torture" and
"extrajudicial killing" as defined in the Torture Victim Protection Act ("TVPA"), 28
U.S.C. § 1350, and "personal injury" and "death" as required by 28 U.S.C. § 1605A,
thereby entitling the Plaintiffs, and each of them, as American victims of Syrian terrorism
to bring this action and recover damages pursuant to applicable law.

Plaintiffs state in support of their Complaint and allege the following:

### THE PARTIES

**A.**     **The Plaintiffs**

1.     This action is brought by the Plaintiffs, by and through their counsel, in the
individual capacity of each Plaintiff and, as appropriate, in the capacity of each as the

Personal Representative of the estate more particularly described in the caption of this action, for their own benefit, for the benefit of each particular estate and for the benefit and on behalf of all those legally entitled to assert a claim under the FSIA, and state common law and statutory law.

**The Thuneibat Family**

2.      Plaintiff the Estate of Lina Mansoor Thuneibat is represented in this action by and through Nadira Thuneibat, the Administrator of said Estate.  Lina Mansoor Thuneibat was, at the time of the acts alleged, and at all other times relevant hereto, a United States citizen.  Lina Mansoor Thuneibat was, at all times relevant hereto, a victim of "torture" and "extrajudicial killing" as defined in the TVPA and "personal injury" and "death" as required by 28 U.S.C. § 1605A.  Plaintiff the Estate of Lina Mansoor Thuneibat can sue and be sued in this Court.

3.      Plaintiff Nadira Thuneibat was, at all times relevant hereto, the biological mother of Lina Mansoor Thuneibat, and a United States citizen. Nadira Thuneibat  was, at all times relevant hereto, a victim of "personal injury" as required by 28 U.S.C. § 1605A.   Plaintiff Nadira Thuneibat can sue and be sued in this Court.

4.      Plaintiff the Estate of Mansoor Al-Thuneibat is represented in this action by and through Nadira Thuneibat, the Administrator of said Estate.  Mansoor Al Thuneibat was, at all times relevant hereto, the biological father of Lina Mansoor Thuneibat, and a United States citizen. Plaintiff the Estate of Mansoor Al-Thuneibat can sue and be sued in this Court.

5.      Plaintiff O. M. T. was, at all times relevant hereto, the biological brother of Lina Mansoor Thuneibat, and a United States citizen. Plaintiff O.M.T., a minor, is

represented in this action by and through his biological mother Nadira Thuneibat. Plaintiff O.M.T. can sue and be sued in this Court.

6.      Plaintiff Muhammad Mansoor Thuneibat was, at all times relevant hereto, the biological brother of Lina Mansoor Thuneibat, and a United States citizen. Plaintiff Muhammad Mansoor Thuneibat can sue and be sued in this Court.

**The Khorma Family**

7.      Plaintiff the Estate of Musab Ahmad Khorma is represented in this action by and through Tariq Ahmad Khorma, the Administrator of said Estate.  Musab Ahmad Khorma  was, at the time of the acts alleged, and at all other times relevant hereto, a United States citizen.  Musab Ahmad Khorma  was, at all times relevant hereto, a victim of "torture" and "extrajudicial killing" as defined in the TVPA and "personal injury" and "death" as required by 28 U.S.C. § 1605A.  Plaintiff the Estate of Musab Ahmad Khorma can sue and be sued in this Court.

8.      Plaintiff Tariq Ahmad Khorma was, at all times relevant hereto, the biological brother of Musab Ahmad Khorma. Plaintiff Musab Ahmad Khorma can sue and be sued in this Court.

9.      Plaintiff Samira Fayez Khorma was, at all times relevant hereto, the biological mother of Musab Ahmad Khorma. Plaintiff Samira Fayez Khorma can sue and be sued in this Court.

10.     Plaintiff Tatsiana Ahmad Khorma was, at all times relevant hereto, the biological sister of Musab Ahmad Khorma. Plaintiff Tatsiana Ahmad Khorma can sue and be sued in this Court.

11. Plaintiff Zeid Ahmad Khorma was, at all times relevant hereto, the biological brother of Musab Ahmad Khorma. Plaintiff Zeid Ahmad Khorma can sue and be sued in this Court.

**B.     The Defendants**

12. Defendant Syria is a foreign state that was designated as a State Sponsor of Terrorism pursuant to section 60 of the Export Administration Act of 1979, 50 U.S.C. App. § 2405, section 620(A) of the Foreign Assistance Act of 1961, 22 U.S.C. § 2371, and section 40 of the Arms Export Control Act, on December 29, 1979, and has remained so designated, continuously, ever since.  Syria has been included on the U.S. State Department's list of State Sponsors of Terrorism longer than any other state.

13. Ahmad Fadil Nazzal Al-Khalayleh (a.k.a. "Abu Musab Al-Zarqawi" or "Zarqawi") was a Jordanian born terrorist.  He founded a number of terrorist organizations, and until his death in June 2006, used terrorism to violently oppose the presence of U.S. and Western military forces in the Arab and/or Islamic world, the democratization and secularization of his native Jordan by King Hussein and his successor King Abdallah, and peace between Jordan and Israel, each of which are allies of the U.S.

14. In July 2004, the U.S. placed a twenty-five million dollar (U.S. $25 million) bounty on the head of Zarqawi, the same level of reward it had offered for Osama bin Laden and Saddam Hussein.  On October 15, 2004, the U.S. State Department designated the terrorist organization formed and led by Zarqawi, Jama'at al-Tawhid wal-Jihad, later known as Al-Qaida in Iraq ("AQI"), as an FTO under Section 219 of the Immigration and Nationality Act, and simultaneously, as a "specially designated global

6

terrorist" under Executive Order 13224.  On October 18, 2004, the United Nations

Security Council added AQI to its Al-Qaida sanctions list maintained under U.N.

Security Council Resolution 1267.  As set forth in this Complaint, Zarqawi and AQI

perpetrated the simultaneous terrorist bombings of the Radisson SAS Hotel, the Grand

Hyatt Hotel and the Days Inn in Amman, Jordan, on November 11, 2005.

15.     Defendant Syria, at all times pertinent to this action, provided material

support and resources to Zarqawi and AQI, and participated directly in their activities,

enabling them to carry out a murderous campaign of terrorism in various places in the

region, including in Jordan.  Syria is and has been a State sponsor of Zarqawi and AQI,

within the meaning of 28 U.S.C. § 1605A and the Flatow Amendment, by providing them

with funding, equipment, arms, direction, logistical support, and/or training for their

terrorist activities.  In 2011, the United States government placed further sanctions on the

Syrian Arab Republic and various leaders of the Syrian government.

16.     Defendant Syrian Military Intelligence ("SMI") is the principal Syrian

intelligence service through which Syria sponsored Zarqawi and AQI.

17.     Defendant Syria and Defendant SMI shall hereinafter be referred to

collectively as the "Syrian Defendants".

18.     President Bashar Al-Assad presently rules Syria as a dictator, and has done

so continuously since 2000.

19.     General Asif Shawkat was named Deputy Director of SMI in 2001.  From

2005-2009, he served as Director of Syrian Military Intelligence. He is now deputy Chief

of Staff of the Armed Forces.  He is married to President Al-Assad's sister Bushra Al-

Asssad.  In January 2006, pursuant to Executive Order 13224, the U.S. Department of the

Treasury named General `Asif Shawkat  a "Specially Designated National" because of his involvement in terrorism, freezing his assets in the United States and banning United States citizens from doing business with him.

20.    President Bashar Al-Assad and General `Asif Shawkat each performed acts within the scope of his respective office, employment and agency which provided material support and sponsorship to Zarqawi and AQI, and caused the extrajudicial killings and personal injuries resulting from the acts of terrorism described herein. Accordingly, as provided in 28 USC § 1605A(c), Defendants Syria and SMI have direct liability for their own acts, and vicarious liability for the acts of President Bashar al-Assad and General `Asif Shawkat.

21.    Defendants Syria and SMI are jointly and severally liable to Plaintiffs for their damages resulting from the acts of despicable and heinous murder and terrorism described herein.

## JURISDICTION AND VENUE

22.    Jurisdiction over the subject matter of this case arises under 28 U.S.C. §§ 1330(a), 1331, 1332(a)(2) and 1605A.

23.    Syria and the SMI are subject to suit in the courts of the United States as sponsors of terrorism and for providing material support to and as participants in Zarqawi and AQI's activities pursuant to the FSIA and related statutes.

24.    Venue is proper in this District pursuant to 28 U.S.C. § 1391(f)(4), which provides, in pertinent part, that a civil action against a foreign state may be brought in the United States District Court for the District of Columbia.

25.    28 U.S.C. § 1605A(c) provides a federal private right of action against a foreign state that is or was a state sponsor of terrorism, and also against any official, employee or agent of that foreign state while acting within the scope of his or her office, employment or agency, for wrongful death, personal injury and related torts caused by an act of torture or extrajudicial killing or the provision of material support and resources for such acts.

## THE NOVEBER 11, 2005 BOMBINGS OF THE GRAND HYATT, RADISSON SAS AND DAYS INN HOTELS IN AMMAN, JORDAN

26.    In 1994, Jordan had broken from its Arab neighbor Syria and from Iran by entering into an historic peace treaty with Israel brokered by U.S. President Bill Clinton. The United States played a decisive role in getting this treaty signed.  Jordan and Israel exchanged Ambassadors, the Jordanian Parliament repealed laws banning contact with Israel, Israel ceded approximately 131 square miles of land to Jordan, and the two countries entered in water sharing arrangements. The peace treaty was also closely linked to ongoing efforts to achieve peace between Israel and the Palestinian Authority. Further, following the attacks of September 11, 2001, Jordan joined the U.S.-led war on terrorism, sharing intelligence information with the United States on militant groups in the Arab world. It also foiled several terrorist plots and prosecuted suspects with ties to al-Qaeda.

27.    Following the invasion of Iraq by a multinational force led by the United States in 2003, Jordan provided crucial logistical support to United States forces in Iraq and allowed Amman to be used as a staging base for transit into and out of Iraq.

28.    Zarqawi and AQI opposed the democratization and liberalization of Jordanian society by King Hussein and his successor King Abdallah, Jordan's entering

into a peace treaty and normalizing its relations with Israel, Jordan's provision of counter-terrorism intelligence to the United States, and Jordan's logistical support of the Western forces that invaded Iraq in 2003.

29.    Accordingly, Zarqawi and AQI repeatedly targeted Jordan with terror operations.  In 1999, Zarqawi participated in the so called "millennium plot" to bomb multiple Jordanian tourist sites, among them the Radisson SAS hotel in Amman, at the millennium.  Jordanian security uncovered the plot, and Zarqawi was convicted and sentenced *in absentia* to fifteen years in prison.  In 2002, Zarqawi and AQI assassinated U.S. diplomat Laurence Foley in Amman.  Zarqawi was later convicted and sentenced *in absentia* to death for his role in the Foley assassination.  In August 2003, Zarqawi and AQI attacked the Jordanian embassy in Iraq, killing fourteen and wounding forty. In early 2004, Zarqawi and AQI attempted to use chemical weapons against the office of the Jordanian Prime Minister, the headquarters of the Jordanian security services, and the American embassy in Amman.

30.    In April 2004, Zarqawi broadcast a 7-minute statement on several Islamic websites.  In this statement, he claimed responsibility for several bombing attempts in Jordan, and stated his interest in attacking Jordan in the future.   "We will have more fierce confrontations with the Jordanian Government. The chapters of some of these confrontations have ended, but what is coming is more vicious and bitter, God willing," he threatened.

31.    On November 4, 2005, Zarqawi dispatched four AQI suicide bombers across the border from Iraq into Jordan.  The AQI suicide bombers stayed in an apartment in western Amman for five days before launching their attack.

32.     Then, on the evening of November 9, 2005, the AQI suicide bombers targeted three of the most important hotels for near simultaneous attacks in Amman, Jordan, to wit, the Radisson SAS, the Grand Hyatt, and the Days Inn.  They wore bomb belts packed with the powerful explosive RDX and ball bearings, designed to inflict the maximum number of casualties.  Two suicide bombers, a husband and wife team, entered the ballroom of the Radisson SAS, one suicide bomber entered the bar of the Grand Hyatt and one suicide bomber entered the restaurant of the Days Inn.  Within minutes of each other, the AQI suicide bombers separately exploded their bombs, ripping through the hotels and murdering and injuring many of the hotel guests and employees in a bloodbath.  Three (3) of the AQI suicide bombers died in the blasts, and one, whose bomb belt malfunctioned, survived.  Approximately sixty (60) innocent civilians were killed, including Lina Mansoor Thuneibat and Musab Khorma, and more than approximately three hundred (300) people were injured.  Among the victims were the elderly, women and children, the youngest a 6 month-old baby.  Amman was placed on a security lockdown.  The streets were closed.  The murderous terrorist attacks were devastating to the victims, the hotels and the country of Jordan.

33.     At the Radisson SAS hotel, hundreds of guests had gathered for the wedding celebration of Ashras Akhras and his bride Nadia Al-Alami.  Plaintiff Nadira Thuneibat is the first cousin of Ashras Akhras, and attended his wedding celebration at the hotel. Nadira also took her daughter Lina Mansoor Thuneibat, an 8 year-old schoolgirl, to the hotel.  It is reported of Lina that although she was only 8 years-old, she was self-assured and full of life.  Younger children were not supposed to attend the wedding, but Lina had insisted.  Lina was celebrating with family and friends inside the hotel's ballroom, and

her mother Nadira was outside the ballroom in the hotel reception area waiting to greet the bride and groom as they arrived at the hotel.  Two suicide bombers entered the crowded hotel ballroom, a husband and wife team, Ali Hussein Ali al-Shamari and Sajida Mubarak Atrous al-Rishawi.  Ali turned off the lights in the ballroom, jumped onto a table, and detonated his bomb belt, killing himself, Lina Mansoor Thuneibat and at least thirty-five (35) others, and injuring many others.  Nadira was devasted as she witnessed the murder of her eight year old daughter.  Sajida's bomb belt malfunctioned.  She survived the blast, and was later convicted by a Jordanian court and sentenced to death for her role in the bombings.  Sajida is the sister of an important AQI terrorist who had been Zarqawi's lieutenant in Anbar Province, Iraq until he was killed by U.S. forces.

34.    The Grand Hyatt is located approximately 500 yards from the Radisson SAS.  Musab Khorma, the 39 year-old deputy chairman of the Cairo-Amman Bank in the Palestinian territories, and the former Chief Executive Officer of PalTel, a Palestinian cellular company, was staying at the hotel, and was due to attend a wedding at a Dead Sea resort the following day.  Mosab Khorma was in the bar of the hotel having a drink, when the suicide bomber exploded his bomb belt, just moments following the explosion at the nearby Radisson SAS.  The explosion killed Musab Khorma and at least nine (9) other people, and injured many others.

35.    The fourth AQI suicide bomber entered the restaurant on the Days Inn Hotel's ground floor.  He had difficulty detonating his bomb belt.  A waiter noticed and called security.  The AQI suicide bomber ran outside the hotel and successfully detonated the belt, killing at least three (3) people and injuring others.

12

36.     These three hotels were highly symbolic targets for Zarqawi and AQI.  They are three of the most important hotels in Amman.  Each of the hotels is regularly frequented by American, Israeli and European tourists, defense contractors, diplomats, journalists and business executives.  Further, Amman is, and therefore the hotels are, a "gateway" for Westerners entering into and departing from Baghdad and Iraq generally.

37.     The date of November 9, 2005 was also a highly symbolic date for Zarqawi and AQI.  In the American shorthand form of dating, the month appears first, followed by the day and year.  Thus, in America, November 9, 2005 is written in short form as 11/9.  However, in the shorthand form of dating used in most other parts of the world, including Jordan, the day number appears first, and is followed by the month number and the year number.  Thus, in Jordan, November 9, 2005 is written in short form as 9/11, the month and date of the infamous September 11, 2001 terrorist attacks upon the United States.  Commentators refer to the Amman hotel bombings as "Jordan's 9/11."

38.     AQI claimed responsibility for the Amman hotel bombings, in a statement posted on a militant Islamic website.  The claim, signed in the name of the spokesman for AQI, stated that Jordan was targeted because it was "a backyard garden for the enemies of the religion, Jews and crusaders…a filthy place for the traitors…and a center for prostitution."  It also stated that the bombings put the United States on notice that the "backyard camp for the crusader army is now in the range of fire of the holy warriors." It threatened the "tyrant of Jordan," a reference to King Abdallah.

39.     The bombings triggered widespread anger at Zarqawi and AQI in the Amman streets, where thousands of protesters chanted, "burn in hell, Abu Musab al-Zarqawi."  The extended family of Zarqawi, from the poor town of Zarqa on the

periphery of Amman, took out half-page advertisements in Jordan's three main newspapers pledging their allegiance to King Abdallah and denouncing Zarqawi, declaring "We sever links with him until doomsday."

40.    Zarqawi responded by posting an audio statement to the Internet. In it, he admitted that he and AQI were responsible for the bombings, but sought to assure the Jordanian street that he had not intended to target "people of Islam" in the bombings, that he had targeted Jordan itself for serving as a "protector" of Israel, for helping the United States military in Iraq, and for becoming a "swamp of obscenity" with alcohol and prostitution in its tourist sites.  "God knows we chose these hotels only after more than two months of close observation that proved that these hotels had become headquarters for the Israeli and the American intelligence."  He also threatened Jordan's King Abdallah: "Your star is fading. You will not escape your fate, you descendant of traitors. We will be able to reach your head and chop it off."

41.    The Iraqi Defense Minister at the time, Saadoun al-Dulaimi, responded to the Amman hotel bombings by directly linking them to Syria and Syrian support of AQI: "Let me tell the Syrians that if the Iraqi volcano explodes no neighboring capital will be saved. We have a 620 kilometer border with this country and we have 620 problems with the Syrians."

## DEFENDANTS' SPONSORSHIP OF, AND PROVISION OF MATERIAL SUPPORT AND RESOURCES TO, ZARQAWI AND AQI

42.    Defendants' sponsorship of, and provision of material support and resources to, Zarqawi and AQI must be understood in terms of the totalitarian nature of the Syrian regime, and in the context of its long history of employing terrorism as a tool for advancing its domestic and international agendas.

14

43.    The Syrian Arab Republic is a republic in name only.  In reality, it is a dictatorship and police state that strategically exhibits only the external forms of a democratic regime.  Its constitution vests one particular party – the Arab Socialist Ba'ath Party – with leadership functions in the State and society.  It also vests broad powers in the person of the President, making him Secretary General of the Ba'ath Party and leader of the National Popular Front, a coalition of smaller minority political parties that are authorized to exist by the regime in order to create the appearance of a multi-party political system.  The President has the power to issue laws, and since 1963 an Emergency Law has been in force that suspends most constitutional protections for Syrians.  The President controls the legislative process.

44.    In 1966, Syrian Ba'athists conducted a coup d'etat.  The Ba'athists eliminated all political parties in opposition.  Hafez Al-Assad was appointed Minister of Defence.  Hafez Al-Assad led another coup in 1970, in which the Ba'ath party was purged of internal opposition, its leaders were jailed, and Hafez Al-Assad installed as President of the police state.

45.    The Al-Assad family has controlled the Syrian regime without interruption for forty years, since 1971. Hafez Al-Assad had a three-decade Presidency, lasting from 1971 to 2000, in which he was confirmed President in unopposed referenda five consecutive times.  He was succeeded by his son Bashar Al-Assad in 2000.   Bashar Al-Assad was confirmed as President, leader of the Ba'ath Party and leader of the Army, for a 7-year term, by an unopposed referendum held in 2001 in which he claimed 97.2% of the vote.  He was re-appointed in another unopposed referendum in 2007, this time claiming 97.6% of the vote.

46.     Members of President Al-Assad's own minority sect, the Al-Awali clan, control most key positions in the Syrian military and Syrian intelligence and security services.  The Ba'ath Party is heavily influenced by the Syrian military and Syrian intelligence and security services, the latter consuming a large share of Syria's economic resources.  The President and his senior aides in the Syrian military and Syrian intelligence and security services make most important decisions in Syrian political and economic life.

47.     There are more than a dozen security services in Syria, some overlapping in their domains, to make sure that the whole of Syrian territory is covered.  These security services answer directly to President Bashar Al-Assad, his brother General Maher Al-Assad, commander of the Syrian Republican Guard, and his brother-in-law General `Asif Shawkat.

48.     Syria is a dictatorship.  It is clear that support for Zarqawi and AQI from Syrian territory or Syrian government actors, on the scale required to facilitate Zarqawi and AQI, could not have been accomplished without the explicit authorization of the Syrian government and Syrian Military Intelligence through President Al-Assad and General Shawkat.  Syria's own Foreign Minister once publicly admitted, with reference to terrorist attacks carried out by the Abu Nidal Organization with Syrian material support and sponsorship, "Whoever knows my government must realize that such attacks could not be carried out without its awareness."

49.     A U.S. Department of State Bulletin published in 1987 states: "Available evidence indicates that Syria prefers to support groups whose activities are generally in line with Syrian objectives rather than to select targets or control operations itself.

Damascus utilizes these groups to attack or intimidate enemies and opponents and to exert its influence in the region. Yet at the same time, it can disavow knowledge of their operations. Such Syrian-supported groups have carried out scores of attacks against Palestinian and other Arab, Turkish, Israeli, and Western targets…"

50.    The Bulletin lists many examples of Syrian sponsorship of terrorism and terrorist organizations.  A sampling of these includes:

a.    The suicide truck bombing of U.S. Marine barracks in Beirut, Lebanon, on October 23, 1983, in which 299 American and French servicemen were killed, an operation attributed by then U.S. Secretary of Defense Caspar Weinberger to "basically Iranians with sponsorship and knowledge and authority of the Syrian government";

b.    The July 1985 assassination of Jordanian diplomat Ziad Sati in Ankara, Turkey. Turkish authorities issued an arrest warrant for the Syrian Embassy Second Secretary, Mohammed Darwichi. The chief defendant in the trial, who was employed as a translator in the Jordanian embassy, carried a Syrian passport. During the trial, he confessed to having worked for Syrian intelligence, stating that his control officer was a Syrian diplomat in Turkey who had given the order to assassinate Sati;

c.    The hijacking of Egypt Air Flight 648 on November 23, 1985;

d.    The simultaneous massacres of air passengers at the TWA and El Al tickets counters at the Fiumicino Airport in Rome, Italy, and the Schwechat Airport in Vienna, Austria, on December 27, 1985;

17

e.  The March 29, 1986 bombing of the German-Arab Friendship Union in West Berlin, injuring 11 persons, which, according to the sworn statement of one of the convicted terrorists, Amad Hasi, was carried out using a bomb that he picked up at the Syrian Embassy in East Berlin from a Syrian Air Force intelligence officer;

f.  The attempted bombing of El Al Flight 016 on April 17, 1986, which, according to the confession that convicted Jordanian terrorist Nezar al-Hindawi, the brother of Ahmad Hasi, made to British police, was planned with the help of Syrian military intelligence officers (including *inter alia* the Chief of Syrian Air Force Intelligence Brigadier General Nuhammad al-Khuli, one of President Hafez Al-Assad's closest aides), and the Syrian Ambassador in London, who supplied him with a Syrian passport, $12,000, Semtex explosives which he planted in the luggage of his pregnant Irish fiancée and a disguise as a Syrian Arab Airlines crew member;

g.  The attempted bombing of an El Al plane on June 26, 1986, in Madrid, Spain, by a Spanish member of the Syrian sponsored Abu Musa terrorist organization, carrying a Syrian passport; and

h.  Support, sponsorship and safe haven of the Abu Nidal Organization, the Abu Musa Group, the Popular Front for the Liberation of Palestine, the Japanese Red Army, the Kurdish Labor Party, the Armenian Secret Army for the Liberation of Armenia, the Lebanese Armed Revolutionary Faction, among other terrorist organizations.

18

51.   More recently, Syria has provided material support and sponsorship to HAMAS, Hezbollah, Palestinian Islamic Jihad, Zarqawi and AQI, among other terrorist organizations and terrorists.

52.   Many of the twenty-seven (27) terrorists convicted for participating in the 1999 millennium plot were arrested in Syria.

53.   Zarqawi was arrested and imprisoned in Iran for a few weeks in early 2002. The Iranian authorities released him because he had a valid Syrian passport issued by the Syrian authorities, indicating that he worked for Syria.  Syria is Iran's closest ally and the two countries have been partners in terrorism since the early 1980s. Upon his release from Iranian prison, Al-Zarqawi left Iran for Syria.  Syria served as Zarqawi's logistical and operational rear base commencing in early 2002.

54.   In October 2002, Zarqawi and AQI assassinated American diplomat Laurence Foley in Amman, Jordan.  Zarqawi was physically in Syria from May 2002 to October 2002, and planned and directed the assassination from Syria.  The terrorists trained for the Foley assassination in Syrian military barracks under the supervision of Syrian soldiers, who instructed them in the use of submachine guns, rifles, pistols and the construction of bombs.  Syria provided the pistol, silencer and rounds that were used to murder Foley.  From Syria, Zarqawi organized and sent funds to the terrorists to finance the assassination.  Zarqawi traveled freely across the border between Syria and Jordan using a Syrian passport.

55.   On April 6, 2004, the State Security Court of the Hashemite Kingdom of Jordan convicted Zarqawi and sentenced him to death *in absentia* for his leading role in the Foley assassination.  At the same time, the Court convicted nine other members of

AQI for their involvement in the Foley assassination.  In a statement it released at the time of AQI's designation as a foreign terrorist organization in 2004, the U.S. State Department accused Zarqawi and AQI of carrying out the Foley assassination, and it has repeated the accusation in subsequent Country Reports on Terrorism.

56.    One of the AQI terrorists convicted alongside Zarqawi was Shaker al-Absi.  Al-Absi provided financing for the assassination.  The Jordanian government requested his extradition, which Syria refused.  The Syrian government claimed Al-Absi was in detention in Syria, but he was actually protected in Syria and running a training camp in Syria for terrorists who would attack American and other Western forces in Iraq.  The Jordanian Court tried Al-Absi *in absentia*, and he was convicted and sentenced to death.

57.    On March 20, 2003, a multinational force led by the United States invaded Iraq.  The force toppled the regime of Saddam Hussein, and commenced a long-term operation intended to establish the conditions necessary for the creation of a democratic form of government in Iraq.  Syria formally opposed the invasion and occupation.  Syria's foreign minister stated publicly that it was in Syria's interest to see the American invasion of Iraq fail.

58.    Syria allowed Zarqawi to establish AQI's logistical and operational support network in Syria.  Zarqawi appointed his lieutenant Abu Al-Ghaddiyeh ("Ghaddiyeh") to command the support network in Syria.  The United States Department of State in its 2005 Patterns of Global Terrorism concluded Syria was a "facilitation hub for terrorists operating in Iraq . . ."  Zarqawi was frequently present physically in Iraq, but Syria remained his haven. Zarqawi operated in Iraq by staying at the edges of the urban centers

and close to the desert for escape routes.  Therefore it is believed that from time to time he commanded AQI forces in Iraq from within Syrian borders.

59.    Twenty days after Zarqawi's April 2004 conviction and sentencing for the Foley assassination, Jordanian security foiled a chemical weapons attack attempted by Zarqawi and AQI with Syrian support and resources.  In a televised confession, an AQI terrorist described in detail how he had been part of an AQI terror cell led by Zarqawi, plotting to explode chemical bombs at the office of the Jordanian Prime Minister, the headquarters of the Jordanian intelligence services, and the American Embassy in Amman.  From Syria, Ghaddiyeh funded the $250,000 cost of the planed chemical attack, helping the cell to buy all the material it needed to manufacture chemical weapons, to buy vehicles including a truck strong enough to break through the gates of Jordanian intelligence headquarters, and to recruit Syrian messengers and bombers to carry out the chemical attack.

60.    The Syrian Defendants provided material support and resources to Zarqawi and AQI in their campaign to use terrorism to destabilize Iraq and to eject American forces from Iraq by, *inter alia,* (1) harboring and providing sanctuary to AQI terrorists and their logistical and supply network, (2) facilitating the recruitment of AQI terrorists, their training and their transportation into Iraq, (3) facilitating the transfer of weapons through Syria for use by AQI terrorists in Iraq, and (4) facilitating the transfer of funds to Zarqawi and AQI in Iraq. In the words of former Iraqi Defense Minister Saadoun al-Dulaimi: "We know the terrorists have no other gateway into Iraq but Syria."

61.    With the support of the Syrian Defendants, Zarqawi and AQI kidnapped, tortured and publicly executed a number of American civilian contractors in Iraq,

including Nicholas Berg, Eugene Armstrong and Jack Hensley, as well as American military personnel serving in Iraq.

62.     In 2007, United States Senator Joseph Lieberman publicly charged: "Al-Qaida in Iraq is sustained by a transnational network of facilitators and human smugglers, who replenish its supply of suicide bombers – approximately 60 to 80 Islamist extremists, recruited every month from across the Middle East, North Africa and Europe, and sent to meet their al-Qaida handlers in Syria, from where they are taken to Iraq to blow themselves up to kill countless others."

63.     The U.S. Department of State, in its 2008 Country Reports on Terrorism, stated: "The United States continued its focused efforts to mitigate the threat posed by foreign fighters in Iraq. State sponsors of terrorism, Iran and Syria, continued to play destabilizing roles in the region."  It also noted that "nearly 90% of all foreign fighters entering Iraq are transiting from Syria."

64.     On February 28, 2008, pursuant to Executive Order 13224, the U.S. Department of the Treasury named Zarqawi's lieutenant in Syria, Ghadiyyeh, a "Specially Designated National."  The Treasury designation states that Zarqawi had appointed Ghaddiyeh as AQI's Syrian commander for logistics in 2004, and that from his base in Syria Ghaddiyeh ran the AQI facilitation network, controlling the flow of money, weapons, terrorists and other resources through Syria into Iraq.  It states that Ghaddiyeh obtained and provided false passports, weapons, guides, safe houses and allowances to AQI terrorists in Syria preparing to cross the border into Iraq.

65.     On October 28, 2008, after Syria's repeated refusals to capture, hand over or kill Ghaddiyeh and shut down his AQI logistics network in Syria, U.S. special forces

attacked Ghaddiyeh and the AQI logistics network on Syrian territory.  Rather than

assisting in the attack, the Assad regime condemned the American attack on AQI

terrorists harboring in Syria as "serious aggression."

66.    The U.S. Department of State, in its 2009 Country Reports on Terrorism,

found that Syria continues to embrace terrorism as an instrument of policy.  The report

further noted Jordanian intelligence officials had intercepted AQI agents who were trying

to enter Jordan from Syria to participate in a campaign of terrorism against Jordan.

67.    Syria has continued to be designated as a State Sponsor of Terrorism and

has continued to sponsor designated FTOs in an unrepentant and unapologetic manner,

providing material support, logistics, safe haven and assistance to those who maim and

kill innocent American citizens and others through acts of terrorism.

68.    The provision of material support and resources to AQI, a known and

designated FTO, by the Syrian government, acting directly and by and through individual

governmental leaders, representatives and instrumentalities as named in this Complaint,

constitute violations of applicable and numerous United States laws, thereby rendering

the Syrian Defendants jointly and severally liable for their illegal acts and deeds.

### COUNT  I – BATTERY
**(Under 28 U.S.C. § 1605A(c) and State Common Law)**

69.    Plaintiffs repeat, reallege and incorporate by reference those facts and

allegations set forth in all the foregoing paragraphs as if fully set forth herein.

70.    On November 9, 2005, AQI terrorists led by Zarqawi willfully, violently

and forcefully committed terrorist acts during the bombing of the Radisson SAS, Grand

Hyatt and Days Inn hotels in Amman, Jordan, with the express purpose of inflicting

severe pain and suffering and death.  The willful, wrongful and intentional acts of

Zarqawi and AQI, which were sponsored and materially supported by the Defendants, and each of them, constitute a battery upon the persons of Lina Mansoor Thuneibat and Musab Khorma, causing injury to them as set forth above.

71.   As a direct and proximate result of the willful, wrongful and intentional acts of Zarqawi and the other AQI terrorists, carried out with material support, resources and sponsorship furnished by Syria and SMI, Lina Mansoor Thuneibat and Musab Khorma were injured in that they endured extreme mental anguish, physical injury and pain and suffering, all to their damage.

**WHEREFORE,** Plaintiffs, the Estate of Lina Mansoor Thuneibat, and Estate of Musab Ahmad Khorma, demand that judgment be entered, jointly and severally, against the Defendants for the damages they suffered, including, but not limited to, pain, suffering, mental anguish, and pecuniary losses, in the amount of **EIGHTEEN MILLION U.S. DOLLARS ($18,000,000.00)** for each of them, on this Count I**,** and their costs expended.

## COUNT II – ASSAULT
### (Under 28 U.S.C. § 1605A(c) and State Common Law)

72.   Plaintiffs repeat, reallege and incorporate by reference those facts and allegations set forth in all the foregoing paragraphs as if fully set forth herein.

73.   During the terrorist attacks AQI terrorists led by Zarqawi intentionally and willfully put Nadira Thuneibat, Lina Mansoor Thuneibat and Musab Ahmad Khorma in fear for their lives and apprehension of harm and injury as a direct result of the terrorists' actions in entering peaceful, civilian hotels with deadly bombs and exploding them in plain sight, all to their damage.

74.     As a direct and proximate result of the willful, wrongful and intentional acts of Zarqawi and the other AQI terrorists, carried out with material support, resources and sponsorship furnished by Syria and SMI, Lina Mansoor Thuneibat and Musab Ahmad Khorma were injured in that they endured extreme mental anguish, physical injury and pain and suffering, all to their damage.

**WHEREFORE,** Plaintiffs Nadira Thuneibat, Estate of Lina Mansoor Thuneibat, and Estate of Musab Ahmad Khorma, demand that judgment be entered, jointly and severally, against the Defendants for the damages they suffered, including, but not limited to, pain, suffering, mental anguish, and pecuniary losses, in the amount of **EIGHTEEN MILLION U.S. DOLLARS ($18,000,000.00)** for each of them, on this Count II**,** and their costs expended.

**COUNT III INTENTIONAL INFLICTION
OF EMOTIONAL DISTRESS, INCLUDING SOLATIUM**
**(Under 28 U.S.C. § 1605A(c) and State Common Law)**
**(As to All Plaintiffs)**

75.     Plaintiffs repeat, reallege and incorporate by reference those facts and allegations set forth in all of the foregoing paragraphs as if fully set forth.

76.     The terrorist murders of Lina Mansoor Thuneibat and Musab Ahmad Khorma, and each and all of the acts set forth above, constitute extreme and outrageous conduct with the intent to inflict emotional distress, including solatium, upon them and the members of their families.  Further these acts were undertaken for the purpose of intentionally and without mercy causing mental duress and suffering, including solatium, upon the members of their families.

77.    As a direct result and proximate result of the willful, wrongful and intentional acts of Zarqawi and the other AQI terrorists, carried out with material support, resources and sponsorship furnished by Syria and SMI, Lina Mansoor Thuneibat and Musab Ahmad Khorma, and their families, as above set forth, were each caused to suffer permanent and severe emotional distress, all to their damage.

**WHEREFORE,** Plaintiffs Nadira Thuneibat, Muhammad Mansoor Thuneibat, Tariq Ahmad Khorma, Samira Fayez Khorma, Tatsiana Ahmad Khorma and Zeid Ahmad Khorma, individually, Estate of Lina Mansoor Thuneibat, Estate of Mansoor Al-Thuneibat, Plaintiff Nadira Thuneibat as next friend on behalf of O.M.T., Estate of Musab Ahmad Khorma, demand that judgment be entered, jointly and severally, against Defendants for the damages they suffered, including, but not limited to, pain, suffering, mental anguish, and pecuniary losses, in the amount of **EIGHTEEN MILLION U.S. DOLLARS ($18,000,000.00)** for each of them, on this Count III, and their costs expended;

### COUNT IV – ACTION FOR WRONGFUL DEATH
### (Under 28 U.S.C. § 1605A(c) and State Common Law and State Statutory Law)

78.    Nadira Thuneibat, as the Personal Representative of the Plaintiff Estate of Lina Mansoor Thuneibat, repeats, realleges and incorporates by reference those facts and allegations set forth in each of the foregoing paragraphs as if fully set forth herein.

79.    Tariq Ahmad Khorma, as the Personal Representative of the Plaintiff Estate of Musab Ahmad Khorma, repeats, realleges and incorporates by reference those facts and allegations set forth in each of the foregoing paragraphs as if fully set forth herein.

80.    The deaths of Lina Mansoor Thuneibat and Musab Ahmad Khorma, both American citizens, were caused by willful and deliberate acts of extrajudicial killing as

26

they were murdered by AQI terrorists during the course of their terrorist bombings of the

Radisson SAS and Grand Hyatt hotels, carried out with the material support, resources

and sponsorship furnished by Syria and SMI, all to their damage.

WHEREFORE, Plaintiff Estate of Lina Mansoor Thuneibat, and Plaintiff Estate

of Musab Ahmad Khorma, demand that judgment be entered, jointly and severally,

against Defendants for the damages they suffered, including, but not limited to, pecuniary

losses, which include, but are not limited to, the loss of future earnings, and funeral and

burial expenses, in the amount of **EIGHTEEN MILLION U.S. DOLLARS**

**($18,000,000.00)** for each of them, on this Count IV, and their costs expended.

## COUNT V – ACTION FOR SURVIVAL DAMAGES
### (Under 28 U.S.C. § 1605A(c) and State Common Law and State Statutory Law)

81.    Plaintiff Estate of Lina Mansoor Thuneibat, repeats, realleges and

incorporates by reference those facts and allegations set forth in each of the foregoing

paragraphs as if fully set forth herein.

82.    Plaintiff Estate of Musab Ahmad Khorma, repeats, realleges and

incorporates by reference those facts and allegations set forth in each of the foregoing

paragraphs as if fully set forth herein.

83.    Before their deaths, Lina Mansoor Thuneibat and Musab Ahmad Khorma

suffered extreme bodily pain and mental anguish and suffering, entitling their Estates to

compensatory damages.

84.    As a direct result and proximate result of the willful, wrongful and

intentional acts of Zarqawi and the other AQI terrorists, carried out with the material

support, resources and sponsorship furnished by Syria and SMI, Lina Mansoor Thuneibat

and Musab Ahmad Khorma, and their families, as above set forth, were each caused to suffer extreme bodily pain and mental anguish and suffering, all to their damage.

**WHEREFORE,** Plaintiff Estate of Lina Mansoor Thuneibat, and Plaintiff Estate of Musab Ahmad Khorma, demand that judgment be entered, jointly and severally, against Defendants for the damages Lina Mansoor Thuneibat and Musab Ahmad Khorma suffered, including, but not limited to, pain, suffering, mental anguish, and pecuniary losses, in the amount of **EIGHTEEN MILLION U.S. DOLLARS ($18,000,000.00)** for each of them, on this Count V**,** and their costs expended.

### COUNT VI – ACTION FOR CONSPIRACY
**(Under 28 U.S.C. § 1605A(c) and State Common Law)**
**(As to All Plaintiffs)**

85.    Plaintiffs repeat, reallege and incorporate by reference those facts and allegations set forth in each of the foregoing paragraphs as if fully set forth.

86.    Defendants Syria and SMI, did knowingly and willfully conspire with and/or agree to sponsor a terrorist organization within the meaning of 28 U.S.C. § 1605A, which said designated FTO willfully and deliberately committed an act of terrorism, which caused the personal injuries and/or deaths of Plaintiffs, all to their damage.

87.    For the reasons stated above, and having conspired to sponsor and support, aid and assist the terrorist organization that willfully and deliberately committed the acts of terrorism that caused the personal injuries and/or deaths of Plaintiffs, Defendants are jointly and severally liable to Plaintiffs for all damages in this civil action.

**WHEREFORE,** Plaintiffs Nadira Thuneibat, Muhammad Mansoor Thuneibat, Tariq Ahmad Khorma, Samira Fayez Khorma, Tatsiana Ahmad Khorma and Zeid Ahmad Khorma, Estate of Lina Mansoor Thuneibat, Estate of Mansoor Al-Thuneibat, Plaintiff

Nadira Thuneibat as next friend on behalf of O.M.T., Estate of Musab Ahmad Khorma,

demand that judgment be entered, jointly and severally, against Defendants in the amount

of **EIGHTEEN MILLION U.S. DOLLARS ($18,000,000.00)** for each of them, on this

Count VI, and their costs expended.

<u>**COUNT VII – ACTION FOR AIDING AND ABETTING**</u>
**(Under 28 U.S.C. § 1605A(c) and State Common Law and State Statutory Law)**
**(As to All Plaintiffs)**

88.    Plaintiffs repeat, reallege and incorporate by reference those facts and

allegations set forth in each of the foregoing paragraphs as if fully set forth.

89.    Defendants Syria and SMI, did knowingly and willfully provide substantial

assistance to and sponsor a terrorist organization within the meaning of 28 U.S.C. §

1605A, which terrorist organization willfully and deliberately committed acts of

terrorism, which caused the personal injuries and/or deaths of Plaintiffs, all to their

damage.

90.    For the reasons stated above, and having aided and abetted a terrorist

organization which willfully and deliberately committed an act of terrorism which caused

the personal injuries and/or deaths of Plaintiffs, all Defendants are jointly and severally

liable to Plaintiffs for all damages in this civil action.

**WHEREFORE**, Plaintiffs Nadira Thuneibat, Muhammad Mansoor Thuneibat,

Tariq Ahmad Khorma, Samira Fayez Khorma, Tatsiana Ahmad Khorma and Zeid Ahmad

Khorma, Estate of Lina Mansoor Thuneibat, Estate of Mansoor Al-Thuneibat, Plaintiff

Nadira Thuneibat as next friend on behalf of O.M.T., Estate of Musab Ahmad Khorma,

demand that judgment be entered, jointly and severally, against Defendants in the amount

of **EIGHTEEN MILLION U.S. DOLLARS ($18,000,000.00)** for each of them, on this Count VII, and their costs expended.

**COUNT VIII - 28 U.S.C. §1605A(c)**
**(As to All Plaintiffs)**

91.     Plaintiffs repeat, re-allege and incorporate by reference those facts and allegations set forth in all the foregoing paragraphs as if fully set forth herein.

92.     On November 9, 2005, AQI terrorists led by Zarqawi, and supported and aided by the Defendants, willfully, violently and forcefully committed terrorist acts at the Radisson SAS, Grand Hyatt and Days Inn hotels in Amman, Jordan with the express purpose of inflicting, personal injury, severe pain, suffering, death and severe emotional injuries.

93.     In addition, the acts of assaulting Nadira Thuneibat and assaulting and murdering Lina Mansoor Thuneibat and Musab Ahmad Khorma, and each and all of the acts set forth above, constituted extreme and outrageous conduct with the intent to inflict emotional distress upon them and emotional distress, including solatium, upon members of their families.  Further, these acts were undertaken for the purpose of causing severe mental duress and suffering, including solatium damages, upon the members of their families.

94.     The willful, wrongful and intentional acts of the AQI terrorists led by Zarqawi were sponsored, supported, aided, assisted and directed by Syria and  SMI.

95.     As a direct and proximate result of the willful, wrongful and intentional acts of the AQI terrorists led by Zarqawi, whose acts were materially supported, sponsored, aided and directed by Defendants, Lina Mansoor Thuneibat and Musab

Ahmad Khorma were assaulted and killed, and they and their families endured extreme mental anguish, physical injury and pain and suffering, all to their damage.

**WHEREFORE,** Plaintiffs Nadira Thuneibat, Estate of Lina Mansoor Thuneibat, Estate of Musab Ahmad Khorma, demand that judgment be entered, jointly and severally, against Defendants for the damages suffered by <u>Nadira Thuneibat</u>, Lina Mansoor Thuneibat and Musab Ahmad Khorma, including, but not limited to, pain, suffering, mental anguish, and pecuniary losses, in the amount of **ONE HUNDRED MILLION U.S. DOLLARS ($100,000,000.00)** for each of them, on this Count VIII, and their costs expended; as to each of their spouses, mothers, fathers, sisters, brothers, daughters and sons above named, above in the amount of **EIGHTEEN MILLION U.S. DOLLARS ($18,000,000.00)** for each and every one of them, on this Count VIII, and their costs expended, including attorneys' fees.

### COUNT IX – PUNITIVE DAMAGES
**(Under 28 USC 1605A(c), P.L. 104-208, 110 Stat. 3009-172)**
**(As to All Plaintiffs)**

96.    Plaintiffs repeat, reallege and incorporate by reference those facts and allegations set forth in each of the foregoing paragraphs as if fully set forth.

97.    The actions of AQI and Zarqawi, as set forth above, were intentional and malicious, and in willful, wanton and reckless disregard of the rights and wellbeing of all Plaintiffs.  All of the acts of AQI and Zarqawi were facilitated by funding, training, and other material support, aid, assistance, resources and sponsorship provided by Syria and SMI.

98.    The Defendants and each of them rendered material support to Zarqawi and the AQI terrorists actually carrying out the terrorist acts above described.  Under 28

U.S.C. § 1605A(c), the Plaintiffs are entitled to an award of economic damages, solatium, pain and suffering, as prayed for above and herein; and are further entitled to an award of punitive damages, designed to punish the Defendants, and each of them, jointly and severally, for their heinous sponsorship and support of terrorism over a prolonged period of time and for their heinous conduct in sponsoring and supporting the acts of terrorism that killed Lina Mansoor Thuneibat and Musab Ahmad Khorma, and caused irreparable harm, loss, pain, suffering, anguish, mental suffering and solatium to each of the individual Plaintiff family members of the two decedents, each of whom are entitled to an award of punitive damages against the Defendants, and same is hereby requested against the Defendants, jointly and severally, in accordance with the provisions of 28 U.S.C. § 1605A(c) making both a state that has been designated as a "state sponsor of terrorism" under § 6(j) of the Export Administration Act of 1979, and an official, employee, or agent of such a state, liable for economic damages, solatium, pain, and suffering, and punitive damages as to each of the Plaintiffs.

**WHEREFORE,** Plaintiffs Nadira Thuneibat, Muhammad Mansoor Thuneibat, Tariq Ahmad Khorma, Samira Fayez Khorma, Tatsiana Ahmad Khorma and Zeid Ahmad Khorma, individually, Estate of Lina Mansoor Thuneibat, Estate of Mansoor Al-Thuneibat, Plaintiff Nadira Thuneibat as next friend on behalf of O.M.T., Plaintiff Estate of Musab Ahmad Khorma, demand that judgment be entered, jointly and severally, against Defendants in the amount of **THREE HUNDRED SIXTY MILLION US DOLLARS ($360,000,000.00)** for each act of murder, separately for the family of Lisa Monsoor Thuneibat and for the family of Musab Ahmad Khorma, and each said family, on this Count IX, and their costs expended. The award of punitive damages, as

Case 1:12-cv-00020-BAH   Document 1   Filed 01/09/12   Page 33 of 34

requested, is to punish Defendants for their conduct in supporting terrorism and the terrorist murderous acts described herein, and to send a message to them and others that the United States of America and its citizens will never countenance or ignore the lawless acts of terror and murder inflicted upon American victims of terrorism, and will respond to them with the application of orderly justice.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, request joint and several judgment against the Defendants as follows:

1.   Awarding Plaintiffs compensatory and solatium damages against Defendants in amounts set forth herein and as shall be determined at trial;

2.   Awarding Plaintiffs punitive or exemplary damages against Defendants, jointly and severally, according to proof to be presented at trial;

3.   Awarding Plaintiffs prejudgment interest and post judgment interest as computed and calculated at the maximum rate allowable by law;

4.   Awarding Plaintiffs their costs and disbursements and reasonable allowances of fees for Plaintiffs counsel and experts and reimbursement of expenses;

5.   Allowing a lis pendens notice of action to issue and be noted and enforced by the Court as against each of the Defendants and their instrumentalities.

6.   Leave to amend this Complaint as interests of justice may allow; and

7.   Granting any and all such further relief as the Court may deem just and proper.

DATED:                              Respectfully Submitted,

January 9, 2012


                                     _/s/Richard D. Heideman_____
                                     Richard D. Heideman (No. 377462)
                                     Noel J. Nudelman (No. 449969)
                                     Tracy R. Kalik (No. 462055)
                                     Matthew S. Apfel (No. 989610)
                                     HEIDEMAN, NUDELMAN, KALIK, PC
                                     1146 19th Street, NW, 5th Floor
                                     Washington, DC 20036
                                     Telephone: 202-463-1818
                                     Telefax:     202-463-2999



                                     F. R. Jenkins, of counsel to Plaintiffs
                                     (Maine Bar No. 4667)
                                     Meridian 361 International Law Group, PLLC
                                     97A Exchange Street, Suite 202
                                     Portland, ME 04101
                                     Telephone: 866-338-7087
                                     Facsimile: 202-315-3894