**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**


NADIRA THUNEIBAT, et al.,           :
                                          :

        Plaintiffs,                 :
                                          :

                          v.         :      Civil No. 1:12-cv-00020 (BAH)
                                          :

SYRIAN ARAB REPUBLIC, et al.,      :
                                          :

        Defendants.             :
_____  :


**PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR DEFAULT
JUDGMENT AS TO LIABILITY AND DAMAGES**



March 31, 2015                Respectfully Submitted,

                               */s/ Tracy Reichman Kalik*_____
                                Tracy Reichman Kalik (Bar No. 462055)
                                Richard D. Heideman (No. 377462)
                                Noel J. Nudelman (No. 449969)
                                HEIDEMAN NUDELMAN & KALIK, PC
                                1146 19th Street NW
                                Fifth Floor
                                Washington, DC 2008
                                Telephone: 202.463.1818
                                Facsimile: 202.463.2999

                                *Of Counsel for Plaintiffs:*
                                F. R. Jenkins (Maine Bar No. 4667)
                                Meridian 361 International Law
                                Group, PLLC
                                97A Exchange Street, Suite 202
                                Portland, ME 04101
                                Tel: 866-338-7087
                                Facsimile: 202-315-3894

                                *Attorneys for the Plaintiffs*

## TABLE OF CONTENTS

Page

BACKGROUND AND PROCEDURAL HISTORY……………………………………………1

I.   Syria is Liable to Plaintiffs under the FSIA………………………………………………2

A.  Plaintiffs Have Met Their Burden of Proof…………………………………………..2

B.  Service Has Been Made on the Syrian Defendants………………………………………..3

C.  This Court has Jurisdiction Over Syria Pursuant to the State Sponsored Terrorism
Exception of the FSIA…………………………………………………………………4

D.  28 U.S.C. § 1605A(c) Provides a Private Cause of Action for Plaintiffs Who are
American Citizens and Have Brought Claims against the Syrian Defendants for their
Damages…………………………………………………………………………...7

E.  For the Non-Americans, 28 U.S.C. § 1605A Serves as a Jurisdictional "Pass-Through" to
Assert Causes of Action Arising under Non-Federal Law, and the Non-Americans Have a
Cause of Action under Jordanian Law……………………………………………7

1.  District of Columbia Choice of Law Rules……………………………………8

2. Intentional Infliction of Emotional Distress Pursuant to Jordanian Law………….10

F. The Factual Evidence Supports this Court Finding the Syrian Defendants' Liability for
Amman Hotel Bombings………………………………………………………...13

II.  Having Established the Liability of Syria, the Plaintiffs' Are Entitled to Awards for their
Damages……………………………………………………………………………15

A. Economic Damages…………………………………………………………15

1.  The Estate of Lina Mansoor Thuneibat……………………………………16

2.  The Estate Mousab Ahmad Khorma……………………………………16

B. Solatium/Intentional Infliction of Emotional Distress Damages…………………………17

1.  Nadira Thuneibat……………………………………………………..19

2.  Estate of Mansoor Al-Thuneibat…………………………………………..23

3.  O.M.T., a Minor………………………………………………………25

4.  Muhammad Mansoor Thuneibat………………………………………...26

i

## TABLE OF CONTENTS CONT'D

Page

     5. Tariq Ahmad Khorma…………………………………………………………………27

     6. Tatsiana Ahmad Khorma……………………………………………………………..29

     7. Zeid Ahmad Khorma…………………………………………………………………31

     8. Samira Khorma …………………………………………………………………………33

  C. Punitive Damages……………………………………………………………………………35

  D. Prejudgment Interest…………………………………………………………………………39

CONCLUSION………………………………………………………………………………………40

## **APPENDIX**

Declaration of Expert David Schenker……………………………………………………….Exhibit A

Letters for the Special Administrator of the Estate of Lina Mansoor Thuneibat…………….Exhibit B

Letters for the Special Administrator of the Estate of Mansoor Al-Thuneibat……………….Exhibit C

See Letters of Administration for the Estate of Mousab Ahmad Khorma …………………..Exhibit D

Declaration of Expert Yousef S. Khalilieh………………………………………………...Exhibit E

Expert Report of Dr. Stan Smith for the Estate of Lina Mansoor Thuneibat………………..Exhibit F

Expert Report of Dr. Stan Smith for the Estate of Mousab Ahmad Khorma………………..Exhibit G

Curriculum Vitae of Dr. Stan Smith………………………………………………………….Exhibit H

Dr. Stan Smith Index of Cases…………………………………………………………………Exhibit I

Declaration of Nadira Thuneibat……………………………………………………. Exhibit J

Declaration of Tariq Khorma…………………………………………………………………Exhibit K

Declaration of Tatsiana Khorma………………………………………………………...Exhibit L

Declaration of Zeid Khorma………………………………………………………………….Exhibit M

## <u>TABLE OF AUTHORITIES</u>

Page

## <u>Cases</u>

*Acosta v. The Islamic Republic of Iran,*
  574 F. Supp. 2d 15 (D.D.C. 2008)……………………………………………...18, 37
*Arbaugh v. Y&H Corp.,*
  546 U.S. 500, 126 S. Ct. 1235, 163 L. Ed. 2d 1097 (2006)…………………………...38
*Baker v. Socialist People's Libyan Arab Jamahirya,*
  775 F. Supp. 2d 48 (D.D.C. 2011)……………………………………………...37, 38
*Belkin v. Islamic Republic of Iran,*
  667 F. Supp. 2d 8 (D.D.C. 2009)………………………………………………17, 39
*Ben-Rafael v. Islamic Republic of Iran,*
  540 F. Supp. 2d 39 (D.D.C. 2008)……………………………………………………39
*Bodoff v. Islamic Republic of Iran,*
  424 F. Supp. 2d 74 (D.D.C. 2006)……………………………………………………18
*Calderon-Cardona v. Democratic People's Republic of Korea,*
  723 F. Supp. 2d 441 (D.P.R. 2010)………………………………………………………38
*Commercial Bank of Kuwait v. Rafidain Bank,*
  15 F.3d 238 (2d Cir. 1994)……………………………………………………………..2
*Cronin v. Islamic Republic of Iran,*
  238 F. Supp. 2d 222(D.D.C. 2002)…………………………………………………36
*Dammarell v. Islamic Republic of Iran,*
  No. CIV.A. 01-2224JDB, 2005 WL 756090 (D.D.C. Mar. 29, 2005)…………………………9
*Estate of Botvin ex rel. Ellis v. Islamic Republic of Iran,*
  510 F. Supp. 2d 101 (D.D.C. 2007)……………………………………………………..2
*Estate of Doe v. Islamic Republic of Iran,*
  808 F. Supp. 2d 1 (D.D.C. 2011)……………………………………………………….7
*Estate of Heiser v. Islamic Republic of Iran,*
  466 F. Supp. 2d 229 (D.D.C. 2006)……………………………………………...17
*Estate of Heiser v. Islamic Republic of Iran,*
  659 F. Supp. 2d 20 (D.D.C. 2009)……………………………………………………37
*Flatow v. Islamic Republic of Iran,*
  999 F. Supp. 1 (D.D.C. 1998)……………………………………………17, 35, 36
*Gates v. Syrian Arab Republic,*
  580 F. Supp. 2d 53(D.D.C. 2008)…………………………………………13, 14, 38
*Geico v. Fetisoff,*
  958 F.2d 1137 (D.C. Cir. 1992)………………………………………………...8
*Greenbaum v. Islamic Republic of Iran,*
  451 F. Supp. 2d 90 (D.D.C. 2006)……………………………………………………17
*Hercules & Co. v. Shama Rest. Corp.,*
  566 A.2d 31 (D.C. 1989)……………………………………………………………….8
*Hill v. Republic of Iraq,*
  328 F.3d 680 (D.C. Cir. 2003)……………………………………………………...15

## TABLE OF AUTHORITIES CONT'D

Page

*Howard Univ. v. Best*,
  484 A.2d 958 (D.C. 1984)……………………………………………………………18
*Leibovitch v. Islamic Republic of Iran*,
  697 F.3d 561 (7th Cir. 2012)…………………………………………………………...7
*Motion Picture Ass'n of Am., Inc. v. Oman*,
  969 F.2d 1154 (D.C. Cir. 1992)……………………………………………………….39
*Murphy v. Islamic Republic of Iran*,
  740 F. Supp. 2d 51 (D.D.C. 2010)……………………………………………...2, 17, 35
*Oldham v. Korean Air Lines Co.*,
  127 F.3d 43 (D.C. Cir. 1997)………………………………………………………….39
*Oveissi v. Islamic Republic of Iran*,
  573 F.3d 835 (D.C. Cir. 2009)…………………………………………………………8
*Owens v. Republic of Sudan*,
  412 F. Supp. 2d 99(D.D.C. 2006)……………………………………………………...5
*Price v. Socialist People's Libyan Arab Jamahiriya*,
  384 F. Supp. 2d 120 (D.D.C. 2005)…………………………………………...9, 10, 11, 12
*Pugh v. Socialist People's Libyan Arab Jamahiriya*,
  530 F. Supp. 2d 216 (D.D.C. 2008)………………………………………………...39
*Rodgers v. United States*,
  332 U.S. 371, 68 S. Ct. 5, 92 L. Ed. 3 (1947)………………………………………….39
*Salazar v. Islamic Republic of Iran*,
  370 F. Supp. 2d 105 (D.D.C. 2005)…………………………………………………...15
*Taylor v. Islamic Republic of Iran*,
  811 F. Supp. 2d 1 (D.D.C. 2011)………………………………………………………2
*Valore v. Islamic Republic of Iran*,
  700 F. Supp. 2d 52 (D.D.C. 2010)…………………………………………………...15, 17
*Wachsman ex rel. Wachsman v. Islamic Republic of Iran*,
  537 F. Supp. 2d 85 (D.D.C. 2008)………………………………………………...8, 9
*Waldon v. Covington*,
  415 A.2d 1070 (D.C. 1980)…………………………………………………………...18
*Weinstein v. Islamic Republic of Iran*,
  184 F. Supp. 2d 13 (D.D.C. 2002)…………………………………………………...3
*Wultz v. Islamic Republic of Iran*,
  864 F. Supp. 2d 24 (D.D.C. 2012)…………………………………………………….18

## Statutes

18 U.S.C. § 2339A………………………………………………………………….4, 5
22 U.S.C. 2371………………………………………………………………………..6
22 U.S.C. 2780………………………………………………………………………..6
28 U.S.C. § 1350……………………………………………………………………...2
28 U.S.C. § 1605(a)(7)………………………………………………………………...5
28 U.S.C. § 1605A………………………………………………………………..passim

iv

## <u>TABLE OF AUTHORITIES CONT'D</u>

<u>Page</u>

28 U.S.C. § 1608……………………………………………………………………passim
8 U.S.C. § 1101(a)(22)……………………………………………………………….6

**<u>Rules</u>**

Fed. R. Civ. P. 4(j)(1)………………………………………………………………..3
Fed. R. Civ. P. 44.1………………………………………………………………..9

**<u>Regulations</u>**

31 C.F.R. § 596.201 (2005)………………………………………………………….6

COME NOW the Plaintiffs, by and through their undersigned counsel, and respectfully request the Court to enter Default Judgment on behalf of the Plaintiffs, the Estate of Lina Mansoor Thuneibat , Nadira Thuneibat, Estate of Mansoor Al-Thuneibat , O.M.T[1]., and Muhammad Mansoor Thuneibat (collectively "Thuneibat Plaintiffs"),  Estate of Mousab Ahmad Khorma, Samira Fayez Khorma[2],  Tariq Ahmad Khorma, Tatsiana Ahmad Khorma, Zeid Ahmad Khorma (collectively "Khorma Plaintiffs") commensurate with the liability and damages evidence presented herein pursuant to the private cause of action found in 28 U.S.C. § 1605A(c).

### BACKGROUND AND PROCEDURAL HISTORY

On December 5, 2014, the Clerk of Court entered default against the Syrian Arab Republic and the Syrian Military Intelligence ("hereinafter the Syrian Defendants"), after the Syrian Defendants failed to Answer or otherwise plead to the Complaint filed.  In the Complaint, the Plaintiffs have alleged that his action arises out of the personal injuries and wrongful deaths of Lina Mansoor Thuneibat and Mousab Ahmad Khorma in the simultaneous terrorist bombings of the Radisson SAS Hotel, the Grand Hyatt Hotel and the Days Inn in Amman, Jordan, on November 11, 2005.  These bombings were carried out by a Foreign Terrorist Organization, Al Quaida in Iraq ("AQI") so designated by the U.S. Department of State, operating with material support and resources provided by the Syrian Arab Republic ("Syria") as a designated State Sponsor of Terrorism, having been so designated by the U.S. Department of State in 1979 and having remained so designated at all times referenced herein.  The terrorists committed, and Lina

---

[1] O.M.T. is a minor and the brother of Lina Mansoor Thuneibat.  He is represented in this action by his mother, and next of kin, Nadira Thuneibat.
[2] Since the filing of the Complaint, Mousab Khorma's mother, Samira Khorma has passed away.   The family is in the process of opening an estate for Samira Khorma and obtaining letters of administration.  Upon completing the appropriate probate process, Plaintiffs will supplement this pleading with proper documentation to demonstrate the designated representatives of Mrs. Khorma's estate.

Mansoor Thuneibat and Mousab Ahmad Khorma were the victims of, acts of "torture" and "extrajudicial killing" as defined in the Torture Victim Protection Act ("TVPA"), 28 U.S.C. § 1350, and "personal injury" and "death" as required by 28 U.S.C. § 1605A.  The Plaintiffs assert a cause of action under 28 U.S.C. § 1605A, as well as under state law causes of action, including battery, assault, intentional infliction of emotional distress, wrongful death, conspiracy and aiding and abetting.   As shown below, Plaintiffs have submitted evidence and have demonstrated to the Court that in accordance with 28 U.S.C. § 1608(e), Plaintiffs are entitled to recover damages pursuant to applicable law.

## I.   Syria is Liable to Plaintiffs under the FSIA.

A.  Plaintiffs Have Met Their Burden of Proof

28 U.S.C. § 1608(e) provides that "no judgment by default shall be entered by a court of the United States or of a State against a foreign state, a political subdivision thereof, or an agency or instrumentality of a foreign state, unless the claimant establishes his claim or right to relief by evidence satisfactory to the court."  To satisfy this burden, plaintiffs must present evidence concerning their backgrounds and injuries suffered, and also that the Court take judicial notice of prior findings of fact and evidence.  *Taylor v. Islamic Republic of Iran*, 811 F. Supp. 2d 1, 6-7 (D.D.C. 2011).  This allows courts to "rely upon the evidence presented in earlier litigation ... without necessitating the formality of having that evidence reproduced."  *Murphy v. Islamic Republic of Iran*, 740 F. Supp. 2d 51, 55 (D.D.C. 2010).  28 U.S.C. § 1608(e) does not require any more evidence or higher standard of evidence than the Court would ordinarily receive to render a judgment.  *Commercial Bank of Kuwait v. Rafidain Bank,* 15 F.3d 238, 242 (2d Cir. 1994).  To evaluate the plaintiffs' proof the Court can "accept as true the plaintiffs' uncontroverted evidence."  *Estate of Botvin ex rel. Ellis v. Islamic Republic of Iran*, 510 F. Supp.

2

2d 101, 103 (D.D.C. 2007).  Moreover, the plaintiffs may establish their proof by affidavit. *Weinstein v. Islamic Republic of Iran*, 184 F. Supp. 2d 13, 19 (D.D.C. 2002).  Accordingly, Plaintiffs submit the sworn Declarations of Expert David Schenker, Expert Yousef S. Khalielieh, Expert Stan Smith, Nadira Thuneibat, Tariq Ahmad Khorma, Tatsiana Ahmad Khorma and Zeid Ahmad Khorma in support of the Motion for Default Judgment.

B.  Service Has Been Made on the Syrian Defendants

The Syrian Defendants have been served with process pursuant to the provisions of the Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. § 1608, and Fed. R. Civ. P. 4(j)(1), which directs that "service upon a foreign state or a political subdivision, agency or instrumentality thereof shall be effected pursuant to 28 U.S.C. § 1608."  Plaintiffs have effected service under 28 U.S.C. § 1608(a)(3) by causing the Clerk of Court to mail to the Syrian Defendants via DHL the Summons, Complaint and Notice of Suit, together with a translation of each into Arabic, the official language of the Syrian Arab Republic.

On July 18, 2014, the Clerk of Court certified mailing under DHL Waybill 2431185691 of the "summons and complaint, together with a translation of each into the official language of the foreign state" and filed pickup confirmation of the DHL package. [D.E. 20].  Pursuant to the Foreign Sovereign Immunities Act, 28 U.S.C. § 1608(a)(3), the Syrian Defendants have now been served with a copy of the Summons, Complaint, Notice of Suit, and administrative documents, together with a copy of each translated into Arabic, via DHL delivery "to the head of the ministry of foreign affairs of the foreign state concerned."  28 U.S.C. § 1608(a)(3). According to the delivery record provided by DHL, Waybill 2431185691 was delivered to the Syrian Defendants in Damascus, Syria on August 7, 2014. "Mahmoud" accepted and signed for the documents at the Syrian Ministry of Foreign Affairs.  A copy of the DHL delivery record was

filed with Plaintiffs' Notice of Proof of Service.  [D.E. 22]  Accordingly, service was complete

as of August 7, 2014 and the Syrian Defendants had until October 6, 2014 to Answer.  28 U.S.C.

§ 1608(c)(1).  On December 5, 2014 the Clerk of Court entered Default against the Syrian

Defendants.  (D.E. 24).

C.   This Court has Jurisdiction Over Syria Pursuant to the State Sponsored Terrorism Exception
     of the FSIA

The requirements for subject matter jurisdiction under 28 U.S.C. § 1605A allow Plaintiffs

to seek money damages for personal injury or death if the damages were caused by:

1.  the provision of "material support or resources"[3] for hostage taking, torture, and an
    extrajudicial killing;

2.  if the provision of material support was engaged in by an official while acting within
    the scope of his office;

3.  the defendant was a "state-sponsor of terrorism" at the time the act complained of
    occurred; and

4.  the claimant or the victim was a "US national" at the time of the act of terrorism

28 U.S.C. § 1605A(a)(1), (a)(2).  As set forth below, the Court may assert subject matter

jurisdiction over the Syrian Defendants under this statute.

Proof of the first two elements is inextricably intertwined with the evidence of the Syrian

Defendants' liability as shown below.  In support of their Motion for Default Judgment,

Plaintiffs' have presented to the Court evidence that Syria provided material support and

resources, as defined by 18 U.S.C. § 2339A(b), to Zarqawi and AQI and its network of terrorists

---

[3] 28 U.S.C. § 1605A(h)(3) defines "material support or resources" as "the meaning given that term in section 2339A of title 18."  18 U.S.C. § 2339A(b) defines "material support or resources" as "any property, tangible or intangible, or service, including currency or monetary instruments or financial securities, financial services, lodging, training, expert advice or assistance, safehouses, false documentation or identification, communications equipment, facilities, weapons, lethal substances, explosives, personnel."

4

in Syria and the Middle East for hostage taking, torture, and extrajudicial killings on a scale such that the imposition of liability under 28 U.S.C. § 1605A(c) is required.  See Declaration of David Schenker attached hereto as Exhibit A, and incorporated herein by reference.  Proof of aiding and abetting necessarily proves that Syria provided material support or resources to Zarqawi, AQI and its terrorist network.

For the purposes of satisfying the requirements of 28 U.S.C. § 1605A(a)(1), Syria provided safe haven to AQI beginning in 2004. Schenker Decl., Ex. A, p. 4.   When a foreign sovereign allows a terrorist organization to operate from its territory, this meets the statutory definition of "safehouse" under 18 U.S.C. § 2339A(b):

> Insofar as the government of the Republic of Sudan affirmatively allowed and/or encouraged al Qaeda and Hezbollah to operate their terrorist enterprises within its borders, and thus provided a base of operations for the planning and execution of terrorist attacks -- as the complaint unambiguously alleges -- Sudan provided a "safehouse" within the meaning of 18 U.S.C. § 2339A, as incorporated in 28 U.S.C. § 1605(a)(7).

*Owens v. Republic of Sudan,* 412 F. Supp. 2d 99, 108 (D.D.C. 2006) *aff'd and remanded,* 531 F.3d 884 (D.C. Cir. 2008).

Plaintiffs' have also presented the Court with compelling evidence that the Syrian Defendants, by and through the Assad regime and individual members of the Assad regime acting within the scope of their offices, cooperated with and supported Zarqawi, AQI and its terrorist network, for the purposes of launching terrorist attacks to kill and injure Americans, and disrupting any normalization of the relations between the United States and the Arab states, all against the interests of the government of the United States of America.  Schenker Decl., Ex. A. p, 3. Thus, the first and second elements to allow the Court to assert subject matter jurisdiction are satisfied.

The third element required asks whether the defendant foreign sovereign was a "state-sponsor of terrorism" at the time the act complained of occurred.   28 U.S.C. § 1605A(a)(2)(A)(i)(I).   The term "state-sponsor of terrorism" is defined by the statute at 28 U.S.C. § 1605A(h)(6):

> the term 'state sponsor of terrorism' means a country the government of which the Secretary of State has determined, for purposes of section 6(j) of the Export Administration Act of 1979 (50 U.S.C. App. 2405(j)), section 620A of the Foreign Assistance Act of 1961 (22 U.S.C. 2371), section 40 of the Arms Export Control Act (22 U.S.C. 2780), or any other provision of law, is a government that has repeatedly provided support for acts of international terrorism . . . .

Syria has been designated as a state-sponsor of terrorism continuously since December 29, 1979[4] and Syria's continued designation as a state-sponsor of terrorism was noted on May 18, 2004, 69 Fed. Reg. 28,098, 28,100 (2004), and in 2005, as well as at other times.   31 C.F.R. § 596.201 (2005). Moreover, Syria remains on the State Department list of State Sponsors of Terrorism today.  Schenker Decl., Ex. A, p.2.

The fourth element required asks whether the victim or claimant was a U.S. national at the time of the act of terrorism.  28 U.S.C. § 1605A(a)(2)(A)(ii).  28 U.S.C. § 1605A(h)(5) defines a U.S. national as defined in 8 U.S.C. § 1101(a)(22), in part, as "a citizen of the United States."  In this case, as shown below, decedents Lina Mansoor Thuneibat and Mousab Ahmad Khorma, victims of the Amman Hotel Attacks, were both U.S. citizens, thus the fourth element for asserting jurisdiction has been met.

D.  28 U.S.C. § 1605A(c) Provides a Private Cause of Action for Plaintiffs Who are American Citizens and Have Brought Claims against the Syrian Defendants for their Damages

Section 1605A(c) provides a private right of action to recover damages for state-sponsored terrorism:

---

[4] http://www.state.gov/s/ct/c14151.htm.

> (c) Private Right of Action-A foreign state that is or was a state sponsor of
> terrorism ... shall be liable to-(1) a national of the United States ... or (4) the legal
> representative of [such] a person, for personal injury or death caused by acts
> described in subsection (a)(1) [i.e., the provision of material support or resources
> for hostage taking, torture, or extrajudicial killing].... In any such action, damages
> may include economic damages, solatium, pain and suffering, and punitive
> damages. In any such action, a foreign state shall be vicariously liable for the acts
> of its officials, employees, or agents.

28 U.S.C. § 1605A(c).  Accordingly, U.S. citizens Lina Mansoor Thuneibat[5], Nadira

Thuneibat, Mansoor Al-Thuneibat[6] , O.M.T., a minor, Muhammad Mansoor Thuneibat

and Mousab Ahmad Khorma[7] all may recover for their damages pursuant to the private

cause of action created.

E.  For the Non-Americans, 28 U.S.C. § 1605A Serves as a Jurisdictional "Pass-Through" to
    Assert Causes of Action Arising under Non-Federal Law, and the Non-Americans Have a Cause
    of Action under Jordanian Law

      Plaintiffs who are not U.S. citizens, and who otherwise would not be entitled to bring suit

pursuant to 28 U.S.C. § 1605A(c) may use section 1605A as a jurisdictional "pass-through" to

assert causes of action arising under non-federal law.  *Estate of Doe v. Islamic Republic of Iran*,

808 F. Supp. 2d 1, 20 (D.D.C. 2011); *Leibovitch v. Islamic Republic of Iran*, 697 F.3d 561, 572

(7th Cir. 2012).  Here, the non-American members of the Khorma family, Samira Khorma,  Tariq

Ahmad Khorma, Tatsiana Ahmad Khorma and Zeid Ahmad Khorma, access the pass-through

provisions of 28 U.S.C. § 1605A in order to assert a claim for intentional infliction of emotional

distress arising under non-federal law. Courts in this Circuit, when considering cases that use the

FSIA as a pass-through to non-federal causes of action, use District of Columbia choice of law

---

[5] Lina Monsoor Thuneibat's interests are represented by a Special Administrator, Frank Schulterbrandt.  See Letters
for the Special Administrator of the Estate of Lina Mansoor Thuneibat attached hereto as Exhibit B.
[6] Mansoor Al-Thuneibat's interests are represented by a Special Administrator, Frank Schulterbrandt.  See Letters
for the Special Administrator of the Estate of Mansoor Al-Thuneibat attached hereto as Exhibit C.
[7] Mousab Ahmad Khorma's interests are represented by the personal representative of his estate, Tariq Ahmad
Khorma.  See Letters of Administration for the Estate of Mousab Ahmad Khorma attached hereto as Exhibit D.

rules to determine what source of state law should govern a plaintiff's claims.  *Oveissi v. Islamic Republic of Iran*, 573 F.3d 835, 841 (D.C. Cir. 2009).

　　1.  <u>District of Columbia Choice of Law Rules</u>

　　When there is a choice of law question presented to a federal court in the District of Columbia, it must engage in a two-step analysis.  In the first step, the court determines whether more than one jurisdiction has an interest in seeing its law applied, and if so, whether the law of the competing jurisdictions is different and creates a "true conflict".  *Geico v. Fetisoff,* 958 F.2d 1137, 1141 (D.C. Cir. 1992).  If there is no "true conflict" because the laws of the competing jurisdictions are essentially the same, then the court applies the law of the District of Columbia.  *Wachsman ex rel. Wachsman v. Islamic Republic of Iran*, 537 F. Supp. 2d 85, 94-95 (D.D.C. 2008).

　　If there is a "true conflict" of laws, then the court proceeds to the second step in the analysis, in order to determine which of the competing jurisdictions has a more substantial interest in applying its law to the case. Id.  The court uses "constructive blending" of two distinct analyses: the "governmental interests" analysis and the "most significant relationship" test.  *Hercules & Co. v. Shama Rest. Corp.,* 566 A.2d 31, 41 n.18 (D.C. 1989).  The governmental interests analysis examines the policies underlying the conflicting laws, and then considers which jurisdiction's policies are most advanced by having its law applied to the facts of the case.  *Hercules & Co.*, 566 A.2d at 40.  In *Wachsman*, this Court explained that the "most significant relationship" test comes from four factors that are contained in the RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 145 (1971).  *Wachsman*, 537 F. Supp. 2d at 95.  These four factors include (1) "the place where the injury occurred" (2) "the place where the conduct causing the injury occurred"; (3) "the domicile, residence, nationality, place of incorporation and place of business

8

of the parties; and (4) "the place where the relationship, if any, between the parties is centered".
*Id.*

In *Dammarell II*, the Court held that District of Columbia choice of law principles would dictate
which source of state law would be applied to each of the plaintiffs, and then applied the law of
the state of domicile to each victim's claims.  *Dammarell v. Islamic Republic of Iran*, No.
CIV.A. 01-2224JDB, 2005 WL 756090, at *21 (D.D.C. Mar. 29, 2005).  Other courts have
utilized the same analysis.  *See Price v. Socialist People's Libyan Arab Jamahiriya*, 384 F. Supp.
2d 120 (D.D.C. 2005) (recognizing the viability of state law as a basis of liability).

There are two potentially "interested" jurisdictions in this case: the Kingdom of Jordan,
which is the place where the Amman Hotel Bombings and the fatal injury to Mousab Khorma
occurred, and where his non-American surviving family members are domiciled, resident and
national; and the District of Columbia, where this case is pending.  The Plaintiffs submit that the
law of intentional infliction of emotional distress is essentially the same in both jurisdictions,
thus there is no "true conflict"  Whether the Court applies District of Columbia law, or,
following *Dammarell II* and *Price*, Jordanian law, to the pass-through intentional infliction of
emotional distress claims of Plaintiffs Tatsiana Ahmad Khorma, Zeid Ahmad Khorma, Tariq
Ahmad Khorma, and the Estate of Samira Khorma, those claims are valid and the Plaintiffs are
entitled to an award of damages.

2. Intentional Infliction of Emotional Distress Pursuant to Jordanian Law

The tort of intentional infliction of emotional distress exists under Jordanian law.  To
assist the Court in its analysis of intentional infliction of emotional distress under Jordanian law,
in accordance with Fed. R. Civ. P. 44.1, Plaintiffs have engaged Yousef S. Khalilieh, an expert

on Jordanian Law.  Mr. Khalilieh's credentials as an authority on Jordanian law are set forth in his Declaration, which is attached hereto as Exhibit E and incorporated herein by reference.

Mr. Khalilieh graduated from the University of Westminster, London, England, with an LL.B. (the primary English law degree), with Honors, in 1992.  Khalilieh Decl., Ex.E, p.1.   He graduated from the School of Oriental and African Studies, University of London, London, England, with an LL.M. in 1993.  *Id.* In 1995 he was admitted to the Jordanian Bar Association and has been engaged continuously and without interruption, in the full time, active practice of law in Amman, Jordan, applying Jordanian law both inside and outside of the Jordanian civil court system, since then.  *Id.* He is currently the Managing Partner of Rajai K. W. Dajani & Associates, a leading law firm in Amman.  *Id.*

Mr. Khalilieh's expert Declaration considers whether, "…as a matter of Jordanian civil law, Tatsiana Ahmad Khorma, Zeid Ahmad Khorma and Tariq Ahmad Khorma, who are the surviving Jordanian national siblings of Mousab Ahmad Khorma, and Mousab's deceased Jordanian national mother Samira Fayez  Khorma, are entitled to damages for intentional infliction of emotional distress in relation to the bombings of the Grand Hyatt in Amman, Jordan, on the 9th day of November, 2005, which resulted in the death of their brother Mousab." Khalilieh Decl., Ex. E, p.2.

Mr. Khalilieh explains that when a criminal offender has caused damage or injury to others, he or she becomes civilly liable to the injured parted and is obligated to compensate the injured party for whatever damage was caused by the wrongful act.  *Id.*  If the wrongful act could also extend to affect others, then the other parties "affected by the wrongful act would also have a separate personal right to that of the original victim's right."  *Id.*  Therefore, when the act causes a death of the victim and that death has affected the immediate family members of the

deceased, then immediate family members have the right to bring a claim for "the loss of their loved one and the pain and emotional distress caused." *Id.*   Mr. Khalilieh explains that this is a "collateral injury to the immediate family members resulting from the wrongful or injurious act." *Id.*  The principle for recovering for these collateral injuries is found in "Article 256 of the Jordanian Civil Code No, 43 of the year 1976 which states as follows: *'every injurious act shall render the person who commits it liable for damages even if he is a non-discerning person'*." *Id.* (Emphasis in the original).

Once liability is found, then similar to the solatium damages that are awarded under U.S. law, Jordanian law permits non-pecuniary damages or "moral damages" to be awarded.  Mr. Khalilieh affirms that, "grief and distress felt by close family members for the loss of a loved one (*solatium doloris)* is included in moral damages, and is a compensable head of moral prejudice. Under Article 267/2 of the Jordanian Civil Code No, 43 of the year 1976 the spouse and close relatives of a death victim are entitled to compensation for moral damage: *'damage may be awarded to spouses and close relatives in the family for the moral damage inflicted upon them by the death of the injured'"*. Khalilieh Decl. Ex.E, p.4, (Emphasis in the original).

As additional support, Mr. Khalilieh describes the Decision of the Court of Cassation No. 1924/2014, where a Jordanian court held that the father, brother and sisters of the deceased could recover for the grief that the death of the deceased caused, and that the "grief and sorrow in their hearts…constitute a moral damage within the meaning of Article (267) the Jordanian Civil Code No, 43 of the year 1976." *Id.*

Therefore, Plaintiffs submit to the Court the professional legal opinion of Yousef S. Khalilieh, wherein he concludes to a reasonable degree of legal certainty, that Jordanian civil law provides a remedy, and permits the recovery of damages for the intentional infliction of

emotional distress/solatium damages by the close family members of someone who was injured or killed as the result of a wrongful act.  Khalilieh Decl. Ex. E, p.5.

Mr. Khalilieh also reviewed the Declarations of Tariq Ahmad Khorma, Tatsiana Ahmad Khorma and Zeid Ahmad Khorma, which each of them has rendered for themselves and on behalf of the estate of their deceased mother Samira Khorma.  He states that because Mousab Khorma was killed as a result of the terrorist bombings in Amman, Jordan on November 9, 2005, which is a crime punishable under Article 148[8], Article 326[9]  and Article 328 [10]of the Penal Law of the year 1960, under Jordanian law, the Khorma family would be entitled to recover "the full spectrum of emotional damages and for the grief and sorrow in the hearts that was caused by the injurious act", including "the extreme mental and emotional anxiety, suffering and distress, and loss of enjoyment of life that they suffered as a result of the murder of Mousab."  Khalilieh Decl., Ex. E p.6.

Therefore, even if this Court were to apply Jordanian law, the Court should find that the Defendants are liable to the Plaintiffs for intentional infliction of emotional distress and award the Khorma plaintiffs damages pursuant thereto.

F. The Factual Evidence Supports this Court Finding the Syrian Defendants' Liability for Amman Hotel Bombings

On the evening of November 9, 2005, in Amman, Jordan, three American flagship hotels, the Radisson SAS Hotel, the Grand Hyatt Hotel and the Days Inn, were simultaneously bombed in a coordinated terrorist attack.   Schenker Decl, Ex. A, p.8.  The combined terrorist attack killed 57 and wounded 110 civilians. *Id.* Among those killed were Lina Mansoor Thuneibat, a 9 year-old girl, and United States citizen.  Declaration of Naderia Thuneibat attached hereto as

---

[8] Terrorist acts.
[9] Intentional murder.
[10] The death penalty for murder.

Exhibit J and incorporated herein by reference. Also killed was Mousab Ahmad Khorma, a 31 year-old business executive and also a United States citizen.  Declaration of Tariq Khorma, attached hereto as Exhibit K and incorporated herein by reference.  Following the attack, Abu Musab al-Zarqawi, a Jordanian national and leader of Al Qaida in Iraq (AQI), took responsibility for the terrorist attack.  Schenker Decl., Ex. A, p. 8-9.   In 2004, AQI was designated by the United States State Department as a Foreign Terrorist Organization. Schenker Decl., Ex.A, p, 3. Not only did AQI publish statements claiming responsibility for the Amman Hotel Bombings, Schenker Decl., Ex.A, p.10, but Zarqawi himself made an audio recording wherein he explains in detail why AQI attacked the Amman hotels and the steps that Jordan must take in ending Jordan's relationship with the United States and Great Britain to avoid further attacks on Jordanian soil. Schenker Decl. Ex.A, p. 11.

Syria's sponsorship of AQI and Zarqawi is clear.  As this Court previously found in the *Gates* case, Syria was the critical geographic entry point for Zarqawi and his fighters into Iraq and served as the logistical hub for Zarqawi.  *Gates v. Syrian Arab Republic*, 580 F. Supp. 2d 53, 59 (D.D.C. 2008) *aff'd,* 646 F.3d 1 (D.C. Cir. 2011).  Syria "supported Zarqawi and his organization by (1) facilitating the recruitment and training of Zarqawi's followers and their transportation into Iraq; (2) harboring and providing sanctuary to terrorists and their operational and logistical supply network; and (3) financing Zarqawi and terrorist network in Iraq.  *Id.* Judge Collyer's conclusions are supported by Plaintiffs' own expert on terrorism and Syria's support for Zarqawi and AQI, David Schenker, who has submitted his Declaration and Report in this matter.  Mr. Schenker has previously been accepted by this Court as an expert on Syria's support of Zarqawi and AQI.  *See Gates*, 580 F. Supp. 2d at 56, fn2.

In this case, Mr. Schenker concludes that in his expert opinion (1) the Government of Syria, supported the movement of AQI across Syrian territories; (2) Syria did this as part of its policy to undermine the efforts of the United States to stabilize Iraq; (3) in addition to targeting American interests in Iraq, Syria supported Zarqawi's terror attacks in Jordan; (4) Syria hosted, supported and provided sanctuary to the terrorists associated with the Zarqawi network that were operating within Syrian territory; (5) Zarqawi orchestrated and carried out the Amman Hotel Bombings and (6) Zarqawi and AQI took credit for the Amman Hotel Bombings to influence and end the Jordanian Hashemite Kingdom's relationship with the United States and Great Britain and threatened further attacks on Jordanian soil if further support of the United States was not withdrawn from Jordan.  Schenker Decl. Ex.A, p.3.   He opines, that in his expert opinion, based on his experience and analytical judgement, Zarqawi received substantial material support from Syria including but not limited to: operational and logistical support, safehaven, safe passage and transit across Syrian territory, provision of financial assistance in support of his terrorist network, as a matter of policy before, during, and after the 2005 attacks.  Schenker Decl. Ex.A, p. 13. Moreover, this Court should take judicial notice of the *Gates* findings of fact wherein the Court held that Syria facilitated the recruitment and training of Zarqawi's followers and facilitated their transport within the region by providing passports and free passage along the Syrian and Iraqi border, that Syria provided safe harbor and sanctuary to the Zarqawi and AQI and provided logistical support for its terrorist operations, that Syria provided funds and weapons to the Zarqawi network, and that Syrian President Assad and his brother-in-law, General Shawkat, who controlled Syrian Military Intelligence, were aware of the terrorist activities and plots of Zarqawi and AQI. *Gates*, 580 F. Supp. 2d at 68.

II.  **Having Established the Liability of Syria, the Plaintiffs' Are Entitled to Awards for their Damages**.

14

The Plaintiffs are each entitled to damages against Syria because (1) they are the representatives of the Estate of the decedents, Lina Mansoor Thuniebat and Mousab Ahmad Khorma or (2) they are immediate family members of Lina Mansoor Thuniebat and Mousab Ahmad Khorma, being either the parents or the siblings of the decedents.  In addition, each of them is entitled to an award of punitive damages against Syria, under 28 U.S.C. § 1605A(c), for its sponsorship of Zarqawi and AQI and this heinous act of murder.  In order for a plaintiff to receive damages, the plaintiff must show that her injuries were "reasonably certain" to occur, that is, more likely to occur than not, as a result of the state sponsor of terror's conduct.  *Salazar v. Islamic Republic of Iran*, 370 F. Supp. 2d 105, 115 (D.D.C. 2005) (*quoting Hill v. Republic of Iraq,* 328 F.3d 680, 681 (D.C. Cir. 2003)) (internal quotations omitted).

A. Economic Damages

Economic damages may be awarded to the Plaintiff pursuant to 28 U.S.C. § 1605A(c). Economic damages are available to compensate the estate of the deceased for the victim's lost earning capacity. *Valore v. Islamic Republic of Iran*, 700 F. Supp. 2d 52, 83 (D.D.C. 2010)(explaining that estates of those who did not survive can recover economic losses stemming from wrongful death of the decedent). Plaintiffs have provided evidence of both Lina Mansoors Thuneibat's and Mousab Ahmad Khorma's economic losses by submitting the expert reports of Dr. Stan Smith, an expert in the field of forensic economics.  *See* Expert Report of Dr. Stan Smith for the Estate of Lina Mansoor Thuneibat attached hereto as Exhibit F and incorporated herein by reference, and Expert Report of Dr. Stan Smith for the Estate of Mousab Ahmad Khorma attached hereto as Exhibit G and incorporated herein by reference.  Dr. Smith's experience and expertise in the field of forensic economics is detailed in his curriculum vitae. *See* Curriculum Vitae of Dr. Stan Smith attached hereto as Exhibit H and incorporated herein by

reference. Dr. Smith has testified in approximately 200 state and federal cases nationwide.  *See* Index of Cases attached hereto as Exhibit I and incorporated herein by reference.  His testimony has been accepted by U.S. district and appellate courts as well as in state circuit, appellate and supreme courts.

1.  The Estate of Lina Mansoor Thuneibat

In his report for the Estate of Lina Mansoor Thuneibat, Dr. Smith reviews the methodology of calculation of economic loss. Dr. Smith concludes that assuming Lina Mansoor Thuneibat lived her life and was employed to the age of 67, then total economic loss for lost wages and benefits, net of personal consumption, ranges from $1,123,207 to $1,453,749 as reflected in the Tables 4 and 8, and Summary Table attached to his Report at Ex.F, p.14.  In addition, Dr. Smith opines that that Estate of Lina Mansoor Thuneibat should be compensated for the loss of enjoyment of life, which accounts for the value of life being valued as more than just lost earning capacity, but also the ability to lead a normal life.  Ex. F, p.4.  Dr. Smith calculates these damages to be $6,973,412. See Ex.F Table 11and Summary Table attached to Smith Report at p.15.

2.  The Estate Mousab Ahmad Khorma

In his report for Mousab Ahmad Khorma, Dr. Smith reviews the methodology of calculation of economic loss. Dr. Smith concludes that assuming that Mousab Ahmad Khorma lived his life and was employed to the age of 67, then total economic loss for lost wages and benefits, net of personal consumption, ranges from $13,668,260 to $16,401,923 as reflected in the Tables 9 and 18, and Summary Table attached to his Report at Ex. G, p.15.  In addition, Dr. Smith opines that that Estate of Mousab Ahmad Khorma should be compensated for the loss of enjoyment of life, which accounts for the value of life being valued as more than just lost earning capacity, but also

the ability to lead a normal life.  Ex.G, p.5.  Dr. Smith calculates these damages to be

$4,358,964. See Ex.G, Table 21 and Summary Table attached to Smith Report at p.15.

B.  Solatium/Intentional Infliction of Emotional Distress Damages

Damages for solatium are to compensate for "the mental anguish, bereavement[,] and

grief that those with a close personal relationship to a decedent experience as the result of the

decedent's death, as well as the harm caused by the loss of the decedent['s] society and comfort."

*Valore*, 700 F. Supp. 2d, 85(*citing Belkin v. Islamic Republic of Iran*, 667 F. Supp. 8, 22

(D.D.C. 2009)). The Court has in previous decisions on behalf of victims of state sponsored

terrorism established a standard for solatium damages under the FSIA. The general rule of the

Court is that parents of deceased victims should each receive a baseline award of $5 million in

damages, and siblings should each receive a baseline award of $2.5 million in damages. *Estate of*

*Heiser v. Islamic Republic of Iran*, 466 F. Supp. 2d 229, 269 (D.D.C. 2006).

These amounts may fluctuate from the baselines if there are aggravating circumstances,

such as a "general feeling of permanent loss or change caused by decedent's absence,"*Murphy*,

740 F. Supp. 2d, 79 (*quoting Flatow v. Islamic Republic of Iran*, 999 F. Supp. 1, 31 (D.D.C.

1998)), or other "circumstances that appreciably worsen a claimant's pain and suffering."

*Murphy*, 740 F. Supp. 2d at 79(*quoting Greenbaum v. Islamic Republic of Iran*, 451 F. Supp. 2d

90, 108 (D.D.C. 2006)).  Aggravating circumstances allow the Court considerable discretion to

increase a plaintiff's damages by substantial amounts. *See Valore*, 700 F. Supp. 2d at 86

(solatium damages increased by 25% due to aggravating circumstances); *Greenbaum*, 451 F.

Supp. 2d at 108 (solatium damages increased by $1 million due to aggravating circumstances).

In *Wultz v. Islamic Republic of Iran*, the court increased the plaintiff's baseline award from $5

million to $7 million because the plaintiff directly witnessed his son's body impacted by

17

shrapnel, and also later suffered Post-Traumatic Stress Disorder ("PTSD"). *Wultz v. Islamic Republic of Iran*, 864 F. Supp. 2d 24, 40 (D.D.C. 2012). There are similar aggravating circumstances in this case which justify an upward departure from the conventional baseline in the solatium damages calculation for each of the surviving parents and each of the siblings of Lina Mansoor Thuneibat and Mousab Ahmad Khorma.

In addition, pursuant to 28 U.S.C. § 1605A, individuals who not only suffered emotional injuries because of the loss of a family member, but also suffered their own emotional distress injuries because they were at the scene and experienced the terrorist event, may recover damages not only for solatium but also for emotional distress. *See Acosta v. The Islamic Republic of Iran*, 574 F. Supp. 2d 15, 30 (D.D.C. 2008)(Plaintiff witnessed her husband's shooting firsthand, and therefore the court made separate awards to her of solatium damages as spouse of a victim, and damages for her own emotional distress, pain and suffering endured by being present during the shooting).

Courts in the District of Columbia have held that a plaintiff is entitled to recover for her own emotional distress when (1) extreme and outrageous conduct on the part of the Defendants (2) intentionally or recklessly (3) causes the plaintiff severe emotional distress. *Howard Univ. v. Best*, 484 A.2d 958, 985 (D.C. 1984)(citations and internal quotations omitted). Actual physical injury is not necessary to establish intentional infliction of emotional distress. *Bodoff v. Islamic Republic of Iran*, 424 F. Supp. 2d 74, 85-86 (D.D.C. 2006); *See also Howard Univ.*, 484 A.2d at 985(*citing Waldon v. Covington*, 415 A.2d 1070, 1076 (D.C. 1980)(noting that "an action for intentional infliction may be made out even in the absence of physical injury or impact")).

    1. <u>Nadira Thuneibat</u>

In the present case, Lina Mansoor Thuneibat's mother, Nadira Thuneibat, experienced and continues to experience severe and unconscionable mental anguish, bereavement, and unbearable grief as a result of her own experiences during the Amman Hotel Bombings that also resulted in her daughter's heinous murder and tragic death, and her corresponding loss of society and comfort. In her Declaration, which the Plaintiffs attach hereto as Exhibit J and incorporate herein by reference, are details of Nadira's anguish and continued grief.

In her Declaration, Mrs. Thuneibat avers that she is a naturalized citizen of the United States, having obtained her U.S. citizenship on August 17, 1979. Nadira Thuneibat Decl., Ex.J, ¶3. She is the mother of Lina Mansoor Thuneibat who was also a United States citizen, having been born on November 22, 1996 in St. Croix, the U.S. Virgin Islands (the "USVI"). Nadira Thuneibat Decl., Ex. J, ¶11. Lina was murdered in the Amman Hotel Bombings on November 9, 2005. *Id.*

Nadira describes Lina as being a typical 9 year-old child, prior to her death. Nadira Thuneibat Decl., Ex. J, ¶12. They had a close mother-daughter relationship, and Nadira was involved in ensuring that Lina and her siblings received the best education and were being raised in a loving and caring household. Nadira Thuneibat Decl., Ex.J, ¶¶12-16. At the time of the Amman Hotel Bombings, the family had temporarily moved from the USVI to Amman, Jordan, so that their children could attend an elite private school and receive the best education they could provide. Nadira Thuneibat Decl. Ex.J, ¶16.

On November 5, 2005, the Thuneibat family was preparing for the wedding of Nadira's first cousin. Nadira Thuneibat Decl., Ex.J, ¶17. Although children were not supposed to be allowed to attend the wedding, Lina begged her mother to attend, as her other cousins were going to attend. Nadira Thuneibat Decl., Ex.J, ¶18. At the last minute, Nadira allowed her daughter to

19

attend the family wedding.  Nadira Thuneibat Decl., Ex.J, ¶20.  Lina wore fancy clothes, clothes that later became bloodstained, and that her mother still keeps to this day, as she cannot bear to part with them.  *Id.*

The wedding took place at the Radisson SAS Hotel. Nadira Thuneibat Decl., Ex. J, ¶33. Nadira brought her daughter into the ballroom and they sat at a table designated for family members.  Nadira Thuneibat Decl., Ex.J, ¶21.  Lina was very excited to be in attendance and sitting with her cousins.  *Id.*  Nadira left Lina at the table and joined the bridegroom and groom in the hall outside, where the bridegroom and groom were standing and about to make their entrance.  Nadira Thuneibat Decl., Ex.J, ¶22.  As a senior family member, Nadira was going to be entering the ballroom with the couple.  *Id.*   As the bridegroom's father started to open the door to the ballroom, there was a tremendous explosion in the ballroom.  Nadira Thuneibat Decl., ExJ.¶23.

Nadira Thuniebat vividly recalls the scene in the ballroom immediately after the explosion occurred.  "[P]eople were screaming and running out of the ballroom bleeding. There was smoke in the ballroom, bodies and blood on the floor, wires and ducting hanging down from the ceiling, glass from the shattered chandeliers and mirrors all over the room, tables splintered, everything was thrown upside down."  *Id.*   Her Uncle, who had opened the door to the ballroom, died in front of her, having been struck in the heart with shrapnel.  Nadira Thuneibat Decl., Ex.J, ¶24.  She immediately began searching for her daughter.  *Id.*   She then saw a young man carrying her daughter.  *Id.*   He told her that Lina had fainted and that he was taking her to the hospital.  *Id.*   When Nadira looked at her daughter, she believed that to be true, as she did not see any blood at first.  *Id.*   The young man put Lina in the ambulance and Nadira, believing her daughter to be okay, went back inside to see if she could help her family members.  *Id.*

20

Inside the ballroom, Nadira learned that one of the bombers had exploded his bomb right next to the table where Lina had been sitting.  Nadira Thuneibat Decl,Ex.J, ¶25.  The people who had been sitting with Lina were either dead or very badly hurt.  *Id.*   Nadira saw someone decapitated and someone disemboweled.  *Id.*   Cousins that had been sitting with Lina were sitting or lying on the floor dead. Nadira Thuneibat Decl., Ex.J, ¶26.  Other cousins were badly burned and injured.  Nadira Thuneibat Decl., Ex. J, ¶¶26-27.

Nadira then called her husband who was working in the USVI at the time.  Nadira Thuneibat Decl.,Ex.J, ¶28.  She then began to try and locate her daughter, who she thought had been taken to the Jordan Hospital, which was the closest hospital to the Radisson hotel.  *Id.* Frantically searching, she could not find her.  "I kept searching in the Jordan Hospital, in all of its halls and rooms, because I had heard that a majority of the ambulances came from there, and it was walking distance to the Radisson hotel, and is a very large hospital.  As I was searching, they tried to hospitalize me, and I refused."  *Id.*

Nadira continued to look for her daughter, but hospital employees told her that they had not seen her.  Nadira Thuneibat Decl., Ex.J, ¶29.  It was then that she started to believe that her daughter had been taken to the al-Bashir Hospital where they were taking the dead.  *Id.*   Nadira made her way to al-Bashir Hospital. When she got there, her cousin who was in the Army, went inside. Nadira Thuneibat Decl. Ex.J, ¶30.  When he came back out he told Nadira that Lina was there and that she was dead. *Id.*   At that point at approximately 2am, Nadira broke down crying and began praying for her dead daughter.  *Id.*

The following day, Nadira returned to al-Bashir Hospital to retrieve her daughter's body and prepare it for burial.  Nadira Thuneibat Decl. Ex.J, ¶31.  Nadira's family prepared the body

for burial and she was buried three days after the bombings, having suffered a massive head and brain injury.  Nadira Thuneibat Decl. Ex. J, ¶32.

Having suffered the trauma of experiencing the bombing herself and having lost her daughter in the Amman Hotel Attacks, Nadira began experiencing her own trauma.  Her menses cycle stopped as she was in shock.  Nadira Thuneibat Decl. Ex.J, ¶35.  Nadira was not able to fully grieve for her daughter, as over the next two years, she dealt with her husband being diagnosed with a brain tumor in December 2006 and dying as a result of a heart attack in December 2007, Nadira Thuneibat Decl. Ex.J, ¶42; her mother's illness with breast cancer and dying three months after the Bombings, Nadira Thuneibat Decl., Ex.J., ¶43; and her father's recurrence of colon cancer and ultimate death in January 2008, just one month after the death of her husband.  Nadira Thuneibat Decl., Ex.J, ¶44.

It was only after the death of her father that she began to process and grieve for her daughter and other relatives that had been killed in the Bombings.  Nadira Thuneibat Decl., Ex.J, ¶45.  Nadira's grief was overwhelming.  Nadira Thuneibat Decl., Ex.J, ¶46.  She became depressed and compensated by eating excessively.  *Id.*  She gained over 100 pounds and became obese.  *Id.*  She would experience extreme mood swings and cry for no reason.  *Id.*

Consequently, Nadira Thuneibat is entitled to receive separate damages awards for the intentional infliction of emotional distress that she experienced having been present at the Radisson Hotel during the Bombings and experiencing the Bombings herself, and also an award of solatium damages to compensate her for her trauma resulting from the death of her child. While the courts typically award a baseline solatium damages award of $5 million for the death of a child, Plaintiffs suggest that Nadira Thuniebat is entitled to a significant upward adjustment

as the Court deems proper for the unbearable loss which Nadira has suffered as a result of Lina's murder.

    2. <u>Estate of Mansoor Al-Thuneibat</u>

    In the present case, Lina Mansoor Thuneibat's father, Mansoor  Al-Thuneibat experienced severe and unconscionable mental anguish, bereavement, and unbearable grief as a result of his daughter's heinous murder and tragic death and corresponding loss of society and comfort. The details of Mansoor's anguish and grief which he experienced before his own death are described in the Declaration of his surviving spouse, Nadira Thuneibat.  See Ex. J.

    In her Declaration, Mrs. Thuneibat avers that Mansoor Thuneibat is a naturalized citizen of the United States, having obtained his U.S. citizenship on May 12, 1992.  Nadira Thuneibat Decl., Ex.J, ¶5.  Mansoor married Nadira Thuniebat on March 22, 1987 in St. Croix, USVI.  *Id.* Mansoor remained a U.S. citizen continuously since his naturalization, until the time of his death by heart attack on December 6, 2007.  *Id.*

    Mansoor and Nadira had three biological children, all of whom were born in St. Croix, USVI and are/were U.S. citizens,  Nadira Thuneibat Decl., Ex.J, ¶¶9-11: Muhammed Mansoor Thuniebat, who was born June 24, 1993,  Nadira Thuneibat Decl., Ex.J,  ¶9;  O.M.T. who was born March 29, 1998, and is still a minor,  Nadira Thuneibat Decl., Ex. J, ¶10;  and Lina Mansoor Thuneibat,  born on November 22, 1996,  Nadira Thuneibat Decl., Ex.J, ¶11.  Lina was murdered in the Amman Hotel Bombings on November 9, 2005.  *Id.*

    In November 1998, Mansoor and Nadira temporarily moved their family from the USVI to Amman, Jordan, so that their children could receive a better education and experience the Arabic culture.  Nadira Thuneibat Decl., Ex.J, ¶15.  They maintained their home and business in the USVI, and Mansoor travelled back frequently to attend to the family business in St. Croix.

23

*Id.* On the night of the Bombings, Mansoor was in the USVI attending to the family business. Nadira Thuneibat Decl., Ex.J, ¶35. Immediately after the Bombings, while his wife was trying to help her relatives who were victims of the Bombing, and while she was trying to locate her daughter, Mansoor received a call from his wife telling him about the Bombings. Nadira Thuneibat Decl. Ex.J, ¶28.

Mansoor immediately travelled back to Amman. Nadira Thuneibat Decl., Ex.J, ¶36. He arrived on Friday, and Lina Mansoor was buried on Saturday. *Id.* Mansoor was devastated by his daughter's murder. Nadira Thuneibat Decl., Ex.J,¶37. "Lina was his baby, his only daughter. Anything she had wanted, she always got from him." *Id.* After Lina's death, Mansoor withdrew from the family. He stayed away from the house where everyone was gathering and grieving, and stayed away from Lina's funeral. Nadira Thuneibat Decl., Ex.J, ¶38 He told his wife, "'There is no way in hell that I am going to let them put her into a grave.'" *Id.* Mansoor never accepted his daughter's death and did not want to show his grief. Nadira Thuneibat Decl. Ex.J, ¶40. Following Lina's death, Mansoor became depressed. Nadira Thuneibat Decl., Ex.J, ¶41. He was prescribed depression medication but it did not help. *Id.* Nadira Thuniebat describes that Mandoor "had no will, lost interest in his business, his sons, me. Everyone who came to see him, and who knew him before the Bombings, could see that he was not the same person." *Id.*

In December 2006, Mansoor was diagnosed with a brain tumor. Nadira Thuneibat Decl.,Ex.J, ¶42. He had two surgeries to remove the tumor, however thereafter he suffered a heart attack and died in December 2007. *Id.*

Consequently, The Estate of Mansoor Al-Thuniebat should receive a baseline solatium damages award of $5 million and such significant upward adjustment as the Court deems proper for the unbearable loss which Mansoor suffered as a result of his daughter Lina's murder.

    3.  <u>O.M.T., a Minor</u>

In the present case, Lina Thuneibat's brother, O.M.T., experienced and continues to experience severe and unconscionable mental anguish, bereavement, and unbearable grief as a result of his sister's heinous murder and tragic death and corresponding loss of society and comfort. The details of O.M.T's anguish and grief are described in the Declaration of his mother, Nadira Thuneibat, his legal representative and next of kin.  See Ex. J .

In her Declaration, Mrs. Thuneibat avers that O.M.T. was born March 29, 1998 and is still a minor.  Nadira Thuneibat Decl., Ex.J, ¶10.  O.M.T. was born in St. Croix, USVI and is a United States citizen.  *Id.*  He has continuously been so since his birth.  *Id.*  O.M.T. is the biological brother of Lina Mansoor Thuneibat.  Nadira Thuneibat Decl.,Ex.J, ¶9.  O.M.T. and Lina attended school together.  Nadira Thuneibat Decl., Ex.J, ¶16.  O.M.T. and Lina were especially close as children and they were less then two years apart in age. Nadira Thuneibat Decl., Ex.J, ¶49. They always did everything together.  *Id.*  The murder of his sister has been extremely emotionally and psychologically devastating for him.  Nadira Thuneibat Decl. Ex.J, ¶48.

On the night of the bombing, O.M.T. did not attend the family wedding and remained at home.  Nadira Thuneibat Decl., Ex.J, ¶50.  As journalists, neighbors and family members began to flood the home, O.M.T. was there without his mother.  *Id.*  He withdrew and ignored the chaos around him.  *Id.*  During the three years that followed the death of his sister, he also experienced the death of his father and grandparents.  Nadira Thuneibat Decl., Ex.J, ¶51.

Because his mother was caring for her dying parents and husband, she was away from O.M.T. for significant amounts of time.  *Id.*   O.M.T. has received some counseling, but his mother does not believe it has helped him.  Nadira Thuneibat Decl., Ex.J, ¶52.  O.M.T. "changed when Lina died. He had been a happy child, but he changed, and now he is always by himself, a withdrawn person."  *Id.*

The Bombings and the loss of Lina have greatly affected O.M.T's studying.  Nadira Thuneibat Decl., Ex.J, ¶53.   For four years following the Bombings, O.M.T. could not learn in the classroom. *Id.*  He refused to listen to his teacher, his principal. *Id.*   He required tutors to teach him 1-on-1.  *Id.*   He required a cousin to be with him in the classroom.  *Id.*

Consequently, O.M.T. should receive a baseline solatium damages award of $2.5 million and such significant upward adjustment as the Court deems proper for the unbearable loss which O.M.T. suffered as a result of his sister Lina's murder.

### 4. Muhammad Mansoor Thuneibat

In the present case, Lina Mansoor Thuneibat's brother, Muhammad. experienced and continues to experience severe and unconscionable mental anguish, bereavement, and unbearable grief as a result of his sister's heinous murder and tragic death and corresponding loss of society and comfort. The details of Muhammad's anguish and grief are described in the Declaration of his mother, Nadira Thuneibat.  See Ex. J.

In her Declaration, Mrs. Thuneibat avers that Muhammad. was born June 24, 1993. Nadira Thuneibat Decl., Ex.J, ¶9.  Muhammad was born in St. Croix, USVI and is a United States citizen.  *Id.*   He has continuously been so since his birth.  *Id.*   Muhammad is the biological brother of Lina Mansoor Thuneibat.  *Id.*   Muhammad and Lina attended school together.  Nadira Thuneibat Decl., Ex. J,¶16.  Muhammad and Lina were especially close as

children and they were three and one-half years apart in age, Muhammad being older. Nadira

Thuneibat Decl., Ex. J, ¶54.   Muhammad was always protective of his sister.  *Id.*   He never

allowed anyone to hurt her, or to speak to her harshly.  *Id.*

Upon Lina's death, Muhammad expressed his pain to his mother.  Nadira Thuneibat

Decl., Ex.J, ¶55.  He cried a lot, screamed, and wanted to find and shoot down Zarqawi. *Id.*  He

hated if anyone would sleep in Lina's room, or touch any of her stuff. *Id.*  He felt overwhelmed

by the news media, and wanted to go back to America. *Id.*   Although Muhammad received

counseling he remained very angry.  Nadira Thuneibat Decl. Ex.J, ¶56.  He would take his anger

out on his cousins and destroy his mother's plants, trees and flowers.  *Id.*

Muhammad continues to miss his sister, thinking about the life she would have led.

Nadira Thuneibat Decl., Ex.J,  ¶57.  He is fearful that the successor terrorist organization to AQI,

the Islamic State of Iraq and Syria (ISIS), will retaliate against him and his family for bringing

this lawsuit. Nadira Thuneibat Decl, Ex.J, ¶58.

Consequently, Muhammad should receive a baseline solatium damages award of $2.5

million and such significant upward adjustment as the Court deems proper for the unbearable

loss which Muhammad suffered as a result of his sister Lina's murder.

5. Tariq Ahmad Khorma

In the present case, Mousab Ahmad Khorma's brother, Tariq Ahmad Khorma,

experienced and continues to experience severe and unconscionable mental anguish,

bereavement, and unbearable grief as a result of his brother's heinous murder and tragic death,

and his corresponding loss of society and comfort. In his Declaration, which the Plaintiffs attach

hereto as Exhibit K and incorporate herein by reference, are details of Tariq's anguish and

continued grief as a result of the death of his brother.

In his Declaration, Tariq avers that he is the son of Samira Ahmad Khorma and Ahmad Korma. Tariq Khorma Decl., Ex.K, ¶5. His brother, Mousab Ahmad Khorma, who was a United States citizen, was murdered in the Amman Hotel Bombings. Tariq Khorma Decl., Ex.K, ¶7. He states that he was very close with his brother Mousab. Tariq Khorma Decl., Ex.K, ¶¶8, 9. As young boys they shared a room. *Id.* Even as adults they remained close, and Mousab was very close to Tariq and Tariq's children. Tariq Khorma Decl. Ex.K, ¶40. Mousab would see them every weekend. *Id.*

On the night of the bombing, Tariq was putting his children to bed when he received a call from his ex-wife telling him about the bombing of three hotels in Amman. Tariq Khorma Decl., Ex.K, ¶41. His mother then called him and inquired if he had heard from his brother. Tariq Khorma Decl. Ex.K, ¶42. He immediately began trying to reach his sister and together they began to try and reach Mousab's fiancée. Tariq Khorma Decl. Ex.K, ¶43. Mousab's fiancée told them that Mousab had been put into an ambulance, but then removed from it and laid on the ground. *Id.* Tariq knew then that his worst fear was true and that his brother was dead. *Id.*

In his Declaration, Tariq recalls the chaos of the night. Tariq Khorma Decl. ¶44. When Tariq and his siblings arrived at the hospital, he was asked with his brother, Zeid, to identify Mousab's body. *Id.* Tariq could not do it, as he did not want the last image of his brother to be one of death. *Id.* He went with his siblings to tell their mother of Mousab's death. Tariq Khorma Decl., Ex.K, ¶47. He also had the difficult task of telling his daughters that their uncle had been killed. Tariq Khorma Decl. Ex.K,¶49. The days that followed were difficult for Tariq as the family prepared for the funeral and burial. Tariq Khorma Decl. Ex.K, ¶51-53, 55-56. It was also difficult for Tariq because of the trauma he watched his mother go through. Tariq

Khorma Decl. Ex.K, ¶59.  "In the aftermath of the Bombings, I watched her age into a bent, old woman overnight."  *Id.*   Since the night of the bombings, Tariq has continued to miss his brother.  Tariq Khorma Decl. ¶62 . He thinks and dreams of him often.  *Id.*   He refuses to remove Mousab's toiletries and clothes from his flat in New York. *Id.* It is a loss that cannot be replaced.

Consequently, Tariq Ahmad Khorma should receive a baseline solatium damages award of $2.5 million and such significant upward adjustment as the Court deems proper for the unbearable loss which Tariq has suffered as a result of Mousab's murder.

6. <u>Tatsiana Ahmad Khorma</u>

In the present case, Mousab Ahmad Khorma's sister, Tatsiana Ahmad Khorma, experienced and continues to experience severe and unconscionable mental anguish, bereavement, and unbearable grief as a result of her brother's heinous murder and tragic death, and her corresponding loss of society and comfort. In her Declaration, which the Plaintiffs attach hereto as Exhibit L and incorporate herein by reference, are details of Tatsiana's anguish and continued grief as a result of the death of her brother.

In her Declaration, Tatsiana avers that she is the daughter of Samira Ahmad Khorma and Ahmad Korma.  Tatsiana Khorma Decl., Ex.L, ¶4.  Her brother, Mousab Ahmad Khorma, who was a United States citizen, was murdered in the Amman Hotel Bombings.  Tatsiana Khorma Decl. Ex.L, ¶6.  She states that she was very close with her brother Mousab and was a " second mother for Mousab".  Tatsiana Khorma Decl., Ex.L ,¶¶. 10,11,16,18, 33.  Her close relationship with Mousab continued into adulthood.  Tatsiana Khorma Decl. Ex.L, ¶17, 18, 19.

In her Declaration, Tatsiana describes the horrific details she experienced on the night of Mousab's murder and the subsequent days thereafter.  Tatsiana recalls that on the night of the

Bombings, she received a call from her Mother to advise her that Mousab had just left his mother's house to meet his fiancée at the Hyatt. Tatsiana Khorma Decl. Ex.L,¶21. Originially, Tatsiana thought he would be okay because they had only heard about the explosion at the Days Inn. *Id.* A few minutes went by and she learned that there was an explosion at the Hyatt as well, and her brother Mousab was not answering his phone. *Id.* She immediately called her brothers Tariq and Zeid and went with them towards the Hyatt. *Id.* She then received a call from Mousab's fiancée, telling them that Mousab had been put into an ambulance, and hen removed because he was dead. Tatsiana Khorma Decl., Ex. L, ¶22.

Tatsiana Khorma describes the chaos of the city, and the difficulty in locating the hospital where her brother was taken. Tatsiana Khorma Decl. Ex.L, ¶¶23, 24. She also describes the trauma of seeing her brother dead in the hospital, "I was in a state of shock. 'I have to see my brother…'" Tatsiana Khorma Decl. Ex.L,¶24. After she viewed the dead body of her brother, she, along with her surviving brothers, had the wrenching task of telling their mother that her son, Mousab, was dead. Tatsiana Khorma Decl. Ex.L, ¶25. "I can't describe the way she looked, it was so unbelievable…Mom was uncontrollable." *Id.*

Tatsiana also describes the trauma she experienced relating to preparing her brother's body for burial. Tatsiana Khorma Decl. Ex.L, ¶¶28, 29 . She describes having to take custody of Mousab's bloody clothes. "The clothes smelled terribly, of rotting blood." *Id.* She also was responsible for going to Mousab's house and closing it. Tatsiana Khorma Decl. Ex.L, ¶34.

Tatsiana's trauma was compounded by having to care for and comfort her mother. Tatsiana Khorma Decl. Ex.L, ¶¶35-39, 44-46. The stress of caring for her mother and dealing with her mother's grief also put tremendous strain on Tatsiana's marriage. Tatsiana Khorma Decl., Ex.L, ¶38. She explained that she and her husband "couldn't get back to normal, because

30

I had not been allowed to grieve properly, and I could not leave my Mom." Tatsiana Khorma Decl. Ex.L, ¶46. She also became terrified for her children and obsessed with their safety, needing to know where they were at all times. Tatsiana Khorma Decl., Ex. L, ¶48.

Consequently, Tatsiana Ahmad Khorma should receive a baseline solatium damages award of $2.5 million and such significant upward adjustment as the Court deems proper for the unbearable loss which Tatsiana has suffered as a result of Mousab's murder.

7. _Zeid Ahmad Khorma_

In the present case, Mousab Ahmad Khorma's brother, Zeid Ahmad Khorma, experienced and continues to experience severe and unconscionable mental anguish, bereavement, and unbearable grief as a result of his brother's heinous murder and tragic death, and his corresponding loss of society and comfort. In his Declaration, which the Plaintiffs attach hereto as Exhibit M and incorporate herein by reference, are details of Zeid's anguish and continued grief as a result of the death of his brother.

In his Declaration, Zeid avers that he is the son of Samira Ahmad Khorma and Ahmad Korma. Zeid Khorma Decl., Ex.M, ¶6. His brother, Mousab Ahmad Khorma, who was a United States citizen, was murdered in the Amman Hotel Bombings. Zied Khorma Decl., Ex.M, ¶8. Zeid describes that growing up, he and his brother Mousab were very close. Zeid Khorma Decl., Ex. M, ¶9. "We did everything together." _Id._ The close relationship continued even after Zeid went away to boarding school. Zeid Khorma Decl., Ex.M, ¶10. Eventually Mousab (and his brother Tariq), joined Zeid at boarding school, where Zeid served as his "baby brother's protector" and was a father figure. Zeid Khorma Decl. Ex.M, ¶11, 12. Even after boarding school, Zeid stayed close with Mousab. Zeid Khorma Decl. Ex.M,¶13. They would go off-road motorcycling and hang out together. _Id._ Zeid was very proud of Mousab's achievements in the

31

banking and business world.  Zeid Khorma Decl., Ex.M, ¶¶14-17.   As a young professional,

Mousab would spend time with Zeid and his family, often having dinner together and relaxing

together in Zeid's home.  Zeid Khorma Decl.,Ex.M,¶18.

      In his Declaration, Zeid describes the details and circumstances of the day of Mousab's

death.  He recalls, being at home that day and not feeling well. Zeid Khorma Decl.,Ex.M,¶21.

He then states that on the evening of the Bombings, he received a call from Mousab's fiancée.

She had walked into the Hyatt hotel seconds after the explosion. Zeid Khorma Decl., Ex.M, ¶22.

She had gone to the hotel because she was supposed to meet Mousab there, and she was very

upset because she could not find him.  *Id.*   Zeid stated that he immediately started driving

towards the hotel.  Zeid Khorma Decl.,Ex.M, ¶23.  When he spoke to Mousab's fiancée again,

she told him that Mousab was in an ambulance. *Id.*   At that time, Zeid did not know if his

brother was dead, but he feared the worst.  *Id.*   Zeid then started driving toward the hospital.

Zeid Khorma Decl. Ex.M, ¶24.  He describes experiencing the chaos of the city.  *Id.*

      Zeid also describes the trauma of having to go into the hospital morgue to identify his

brother's body.  Zeid Khorma Decl. Ex.M, ¶29.  "I had to go into the morgue and remove white,

bloody sheets from peoples' faces to find my brother.  I found him."  *Id.*   He then had the very

difficult task of going with his siblings to their mother's house to tell her that her son was dead.

Zeid Khorma Decl., Ex.M, ¶¶30, 31.  Although Zeid had identified Mousab at the hospital, he

later had to go to the official government morgue to officially identify the body so that a death

certificate could be issued.  Zeid Khorma Decl., Ex. M,¶34.  Again, he was forced to view and

identify his brother's dead body.  *Id.*   Following the official identification, Zeid took Mousab's

body to another hospital so that it could be prepared for a proper martyr's burial.  Zeid Khorma

Decl., Ex.M, ¶¶35, 36.

After the death of his brother, Zeid witnessed the decline of his mother. Zeid Khorma Decl., Ex.M, ¶¶40-45, 47-48. Zeid describes his mother as being in a constant state of mourning. Zeid Khorma Decl., Ex.M, ¶47. Zeid also describes how difficult the enjoyment of life has become for him since Mousab's murder. Zeid Khorma Decl., Ex.M, ¶50, 51. Immediately following Mousab's death, Zeid suffered two sever anxiety attacks. Zeid Khorma Decl., Ex.M, ¶51. He describes the difficulty he has experienced because he believes he cannot show weakness in mourning his brother's death. Zeid Khorma Decl., Ex.M., ¶52. He has struggled with depression, and experienced frightening, irrational thoughts. Zeid Khorma Decl., Ex.M, ¶¶53, 56. He has difficulty being in public places and when in public places always is "facing the entrance so I can monitor the people coming in." Zeid Khorma Decl., Ex.M ¶55.

Consequently, Zeid Ahmad Khorma should receive a baseline solatium damages award of $2.5 million and such significant upward adjustment as the Court deems proper for the unbearable loss which Zeid has suffered as a result of Mousab's murder.

8. <u>Samira Khorma</u>

In the present case, Mousab Ahmad Khorma's mother, Samira Khorma, experienced severe and unconscionable mental anguish, bereavement, and unbearable grief from the date of her son's heinous murder until the date of her death on July 21, 2012. Zeid Khorma Decl., Ex.M, ¶6   During the last 7 years of her life, Mrs. Khorma experienced the loss of society and comfort of her cherished son Mousab. Tatsiana Khorma Decl., Ex. L ¶39. The Declarations of Mrs. Khorma's children attached hereto as Exhibits, K, L, and M, contain the details of her anguish and continued grief as a result of the death of her son Mousab.

Tatsiana recalls receiving a call from her mother that on the evening of the Bombings, Mousab had just left his mother's house and was headed to the Hyatt. Tatsiana Khorma Decl.,

33

Ex.L, ¶21.  She tried to calm her mother down and told her not to worry.  *Id.*   However, her mother became hysterical and found a driver to drive her towards the hospital.  Tatsiana Khorma Decl., Ex.L, ¶23.  Because of all the traffic, her mother had gotten out of the car and was running through the streets.  *Id.*   In the process she was hit by a car.  *Id.*   Because of her hysteria, she did not even realize that she had been hit by a car.  Zeid Khorma Decl., Ex.M, ¶25.

After identifying her brother's body, Tatsiana describes how awful it was for their mother when they told her that Mousab had died.  Tatsiana Khorma Decl. Ex.L, ¶25.  Tariq Khorma Decl., Ex.M, ¶47.  She stated that her mother started going crazy and would break down every 5 minutes.  Tatsiana Khorma Decl. Ex. L,¶26.  Each of the siblings describe that following the death of Mousab, their mother was never the same.  Tatsiana Khorma Decl. Ex.L,¶35, Zeid Khorma Decl. Ex.M, ¶40, 41. Tariq Khorma Decl., Ex.K, ¶¶ 58, 59.  Tatsiana describes that after the death of her brother, her mother "was never normal again.  She became a recluse, refused to leave the house and dressed in black from that moment until she died."  Tatsiana Khorma Decl., Ex.L ¶35.   Zeid explained that his mother blamed herself for the death of her son, because she had not asked him to stay with her one hour more. Zeid Khorma Decl. Ex.M, ¶41. She had once been a socialite and that was no longer the case.  *Id.*   Samira would tell people they could "never understand what I am going through."  Zeid Khorma Decl, Ex.M, ¶42.

Following the death of her son, Samira Khorma required constant care and became dependent on Zanax, sleeping pills and sedatives.  Tatsiana Khorma Decl., Ex.L, ¶38.  She became addicted to them.  Zeid Khorma Decl., Ex.M, ¶43.  She lost her will to live. Tatsiana Khorma Decl., Ex.L, ¶38.  She constantly was being admitted in and out of hospitals.  Tatsiana Khorma Decl., Ex.L, ¶¶39-41.  She could not enjoy her grandchildren because she felt guilty giving them more attention than she could give to the children of Mousab, had he had them, and

34

therefore she shunned her grandchildren.  Zeid Khorma Decl., Ex.M, ¶47.  She became

dependent on her children for every aspect of her life.  Tatsiana Khorma Decl., Ex.L, ¶44, Zeid

Khorma Decl., Ex. M, ¶48.  After her death, a newspaper published an article which

acknowledged her long suffering in the seven years since her son Mousab's murder.  Tatsiana

Khorma Decl. Ex.L, ¶45.

Consequently, Samira Khorma, through her legal heirs and representative should receive

a baseline solatium damages award of $5 million and such significant upward adjustment as the

Court deems proper for the unbearable loss which Samira suffered as a result of her son

Mousab's murder.

## C.  Punitive Damages

Punitive damages serve to "punish and deter the actions for which they are awarded."

*Murphy*, 740 F. Supp. 2d at 80.  Four factors determine the amount of punitive damages: "(1) the

character of the defendants' act, (2) the nature and extent of harm to the plaintiffs that the

defendants caused or intended to cause, (3) the need for deterrence, and (4) the wealth of the

defendants."  *Id.*  Punitive damage awards under the FSIA serve multiple purposes:

> [b]y creating these rights of action, Congress intended that the Courts impose a
> substantial financial cost on states which sponsor terrorist groups whose activities
> kill American citizens. This cost functions both as a direct deterrent, and also as a
> disabling mechanism: if several large punitive damage awards issue against a
> foreign state sponsor of terrorism, the state's financial capacity to provide funding
> will be curtailed.

*Flatow*, 999 F. Supp. at 33.

28 U.S.C. § 1605A(c) specifically allows the award of punitive damages for personal

injury or death resulting from an act of state-sponsored terrorism.  In recognition of the difficulty

of bringing terrorists to justice personally, Congress created jurisdiction over, and rights of

action against, their foreign state sponsors.   Punitive damage awards under the FSIA serve
multiple purposes:

> [b]y creating these rights of action, Congress intended that the Courts impose a
> substantial financial cost on states which sponsor terrorist groups whose activities
> kill American citizens. This cost functions both as a direct deterrent, and also as a
> disabling mechanism: if several large punitive damage awards issue against a
> foreign state sponsor of terrorism, the state's financial capacity to provide funding
> will be curtailed.

*Flatow*, 999 F. Supp., 33.   Therefore, in addition to the traditional focus of punitive damages
upon individual punishment and general deterrence, this law emphasizes specific deterrence of
the transgressing state sponsors of terrorism so that future sponsorship may be prevented.

In this case, the evidence shows Defendants supported, protected, harbored, aided,
abetted, enabled, sponsored, conspired with and subsidized a known terrorist organization whose
modus operandi included the targeting, brutalization and murder of American citizens and others
at American flagship hotels.   The character of these acts requires an award of punitive damages.
*E.g., Cronin v. Islamic Republic of Iran*, 238 F. Supp. 2d 222, 235 (D.D.C. 2002) *abrogated by
Cicippio-Puleo v. Islamic Republic of Iran*, 353 F.3d 1024 (D.C. Cir. 2004)(finding the character
of the defendant's act—where the defendant provided material support and resources to terrorist
organizations to carry out acts such as kidnapping and torture—supported a punitive damage
award of $300,000,000.00).

Premeditated violence against civilian targets is not a legitimate action by any
government.   It does not matter whether such violence is undertaken directly or indirectly.
Civilized society cannot tolerate states whose partnership with terrorist surrogates, like Zarqawi
and AQI, is formed for the purpose of achieving foreign policy goals through the murder and
torture of innocent civilians. Thus, in deciding that an award of punitive damages is necessary,

this Court is especially cognizant of the purpose of the state-sponsor of terrorism exception to the FSIA.

Specifically, in recent cases that have calculated the punitive damages for state sponsors of terrorism, such as *Acosta*, 574 F. Supp. 2d, 31, this Court held that a three times multiplier should be applied to the state sponsor of terrorism's annual budget for terrorism in order to determine an appropriate punitive damage award to adequately deter state sponsors of terrorism. Moreover, in *Estate of Heiser v. Islamic Republic of Iran*, 659 F. Supp. 2d 20, 30-31 (D.D.C. 2009)(Chief Judge Lamberth), the court saw no reason to depart from the *Acosta* methodology in calculating punitive damages as this methodology was considered to have the requisite deterrent effect. *See Id.*

In *Valore*, this court upheld the methodology in *Heiser* and *Acosta* but used a five times multiplier of annual state sponsored terrorism expenditures, rather than the three times multiplier used in *Heiser* and *Acosta*.   The court held specifically that two numbers are at issue: the multiplicand-the amount of [the state sponsor of terrorism's] annual expenditures on terrorist activities-and the multiplier-the factor by which the multiplicand should be multiplied to yield the desired deterrent effect. *Id.* Chief Judge Lamberth awarded one billion dollars in punitive damages against Iran in *Valore*.

Syria, as a state sponsor of terrorism, spends between U.S. $500,000,000 (at a minimum) and U.S. $700,000,000 annually on terrorism-related expenditures.  *Baker v. Socialist People's Libyan Arab Jamahirya*, 775 F. Supp. 2d 48, 85 (D.D.C. 2011).  Accordingly, using a three to five times multiplier of these amounts would result in a punitive damages range of $1.5 billion to $3.5 billion. It should also be noted that even in cases where a state sponsor of terrorism's expenditures are not known, punitive damages of up to $300 million dollars have been awarded.

*See Calderon-Cardona v. Democratic People's Republic of Korea*, 723 F. Supp. 2d 441 (D.P.R. 2010).

In *Gates*, the measure applied by the court in awarding $300 million dollars was $150 million dollars per family for each of the two families.  Judge Collyer found that with regard to Syria's sponsorship of terrorism in the year of 2004, "[p]remeditated violence against civilian targets is not a legitimate action by any government. Civilized society cannot tolerate states whose partnership with terrorist surrogates…is formed for the purpose of achieving political victory through heinous acts of barbarism". *Gates*, 580 F. Supp. 2d, 74. Courts have used a multiplier of three to five times the amount of compensatory damages awarded to determine an appropriate punitive damages amount.  *Arbaugh v. Y&H Corp.*, 546 U.S. 500, 126 S. Ct. 1235, 163 L. Ed. 2d 1097 (2006).

This Court has considered various methods, each of which are valid, as set forth in the cited opinions, for assessing punitive damages against Syria.  Recently, this Court considered the appropriate amount of punitive damages to award against Syria in *Baker v. Socialist People's Libyan Arab Jamahiriya*.  Taking into account all of the above considerations the court in *Baker* made a determination that the appropriate amount for punitive damages was $150 million per victim and their families.[11]

Therefore, given the heinous nature of these Amman Hotel Attack, the Court should find that the range of appropriate punitive damages can be found in such awards as *Heiser*, *Acosta* and *Valore*, which used the multiplier of terrorism related expenditures ranging from three to five times the annual expenditure on terrorism.

---

[11] "Syria's recent engagement with these cases indicates that there may be some chance, as in *Valore*, that punitive damages could have the desired effect. Thus, I will award $150 million in punitive damages to each of the victims of the hijacking and their families, for a total of $450 million." *Baker*, 775 F. Supp. 2d 48

D.  Prejudgment Interest

When a statute is silent on the issue of pre-judgment interest, there is a federal common law rule that a court should ordinarily award it.  *Motion Picture Ass'n of Am., Inc. v. Oman*, 969 F.2d 1154, 1157 (D.C. Cir. 1992) *citing Rodgers v. United States*, 332 U.S. 371, 373, 68 S. Ct. 5, 92 L. Ed. 3 (1947).  The discretion to make such an award however rests in the hands of the district court subject to equitable considerations.  *Oldham v. Korean Air Lines Co.*, 127 F.3d 43, 54 (D.C. Cir. 1997) *citing Motion Picture Ass'n of Am., Inc.*, 969 F.2d at 1157.  Prejudgment interest is awarded not for the punitive value but to fully compensate and to deny the defendant the time value of the money which rightly belonged to a plaintiff from the date of the wrong.  Such interest compensates a plaintiff for the lost time value of the money.

An award of prejudgment interest is especially appropriate under the circumstances in this case and indeed in those found in most cases brought against state sponsors of terrorism.  *Belkin*, 667 F. Supp. 2d, 24*; Ben-Rafael v. Islamic Republic of Iran*, 540 F. Supp. 2d 39, 59 (D.D.C. 2008); *Pugh*, 2008 U.S. Dist. LEXIS 4290 at *129-36 ("courts in this Circuit have awarded prejudgment interest in cases where plaintiffs were delayed in recovering compensation for their injuries -- including, specifically, where such injuries were the result of targeted attacks perpetrated by foreign defendants"); *Dammarell*, CA 01-2224, 2006 U.S. Dist. LEXIS 63263(D.D.C. September 7, 2006) " \s "WSFTA_2dbd4dd41626453da054db3864f87d26" \c 3 2006 U.S. Dist. LEXIS 63263 at *1, n.2 (D.D.C. September 7, 2006) (awarding prejudgment interest to families of U.S. citizens killed in 1983 bombing of the United States Embassy in Beirut).  To deny prejudgment interest would allow the state sponsor of terrorism to profit from its terrorist acts.  *Pugh v. Socialist People's Libyan Arab Jamahiriya*, 530 F. Supp. 2d 216, 264

(D.D.C. 2008).   Accordingly, this Court should award each of the Plaintiffs' prejudgment interest for their losses from the date of the Amman Hotel Bombings.


## CONCLUSION

WHEREFORE, for the reasons set forth above, Plaintiffs respectfully request that pursuant to 28 U.S.C. § 1605A, this Court enter default judgment in their favor and find liability of the Defendants for the terrorist attack that murdered Lina Mansoor Thuneibat and Mousab Ahmad Khorma; and award each of the Plaintiffs damages for their solatium loss under 28 U.S.C. § 1605A(c); and award Nadira Thuneibat damages for her emotional distress; and award to the Estates of Lina Mansoor Thuneibat and Mousab Ahmad Khorma damages for their economic losses; and award appropriate prejudgment interest thereon; and make an award to each of the Plaintiffs, in such amount as the Court deems appropriate and just, an assessment of punitive damages against the Syrian Defendants.

March 31, 2015                    Respectfully Submitted,


/s/ Tracy Reichman Kalik_____
Tracy Reichman Kalik (Bar No. 462055)
Richard D. Heideman (No. 377462)
Noel J. Nudelman (No. 449969)
HEIDEMAN NUDELMAN & KALIK, PC
1146 19th Street NW
Fifth Floor
Washington, DC 2008
Telephone: 202.463.1818
Facsimile: 202.463.2999

Of Counsel for Plaintiffs:
F. R. Jenkins (Maine Bar No. 4667)
Meridian 361 International Law
Group, PLLC
97A Exchange Street, Suite 202
Portland, ME 04101

40

Tel: 866-338-7087
Facsimile: 202-315-3894