**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

NADIRA THUNEIBAT, *et al.*,

  Plaintiffs,

  v.

SYRIAN ARAB REPUBLIC, *et al.*,

  Defendants.

Civil Action No. 12-cv-00020 (BAH)

Judge Beryl A. Howell

<u>**MEMORANDUM OPINION**</u>

The families and estates of two American citizens, Lina Mansoor Thuneibat and Mousab Ahmad Khorma (the "Victims"), initiated this action, under the Torture Victim Protection Act ("TVPA"), 28 U.S.C. § 1350, and the Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. § 1602, *et seq.*, against two defendants, the Syrian Arab Republic and the Syrian Military Intelligence, for sponsoring the November 9, 2005, terrorist attacks in Amman, Jordan. Compl. (Preamble), ¶¶ 1–21, ECF No. 1. These attacks, coordinated by Al-Qaida in Iraq ("AQI"), resulted in the deaths of approximately sixty civilians, including Lina Thuneibat and Mousab Khorma, and the maiming of over one hundred others. *Id.* ¶¶ 13–14, 28–35. The defendants never entered appearances in, or defended against, this action, and the plaintiffs now seek default judgment for the damages caused by the extrajudicial killings perpetrated by AQI with material support from the defendants. For the reasons discussed below, default judgment is granted.

# I.    BACKGROUND

Summarized below is the factual background leading up to, and resulting from, the terrorist attacks at issue and the procedural history of this case. The background is based upon allegations in the Complaint as well as the detailed declaration of an expert in "Arab politics and counterterrorism," who relies extensively on United States government officials' reports and

statements.  Pls.' Mot. Default Judgment ("Pls.' Mot."), Ex. A (Decl. of David Schenker, dated

March 19, 2015 ("Schenker Expert Decl.")) at 2, ECF No. 26-2.

## A.    SYRIAN SUPPORT OF TERRORISM THREATS IN THE KINGDOM OF JORDAN

In 1994, the Kingdom of Jordan ("Jordan") entered into an "historic peace treaty with

Israel brokered by U.S. President Bill Clinton."  Compl. ¶ 26.  Since then, Jordan has become a

key ally of the United States in the counterterrorism effort, by "sharing intelligence information

with the United States on militant groups" in the Middle East, "prosecut[ing] suspects with ties

to al-Qaeda," *id.*, "provid[ing] crucial logistical support to United States forces in Iraq," *id.* ¶ 27,

and "allow[ing] Amman to be used as a staging base for transit into and out of Iraq," *id.*

In response to Jordan's relationship with the United States and Israel, AQI, an

organization designated as a Foreign Terrorist Organization ("FTO") by the U.S. Department of

State, and its leader, Jordanian national Ahmad Fadil Nazzal Al Khalayleh, also known as Abu

Musab Al-Zarqawi ("Zarqawi"), targeted Jordan for terror attacks.  *Id.* (Preamble), ¶ 29.

Zarqawi and AQI's efforts have been supported by Syria, which has been included on the U.S.

Department of State's list of State Sponsors of Terrorism since 1979 and is known to "'support

groups'" that "'have carried out scores of attacks against Palestinian and other Arab, Turkish,

Israeli, and Western targets . . . .'"  *Id.* ¶ 49 (quoting a U.S. Department of State Bulletin

published in 1987) (ellipsis in the original).

For example, in 1999, Zarqawi allegedly participated in a plot to bomb Jordanian tourist

sites, including one of the three hotels targeted in the November 9, 2005 attacks at issue in this

case.  *Id.* ¶ 29.  In 2002, from his base in Syria, Zarqawi and AQI planned and facilitated the

assassination in Amman, Jordan, of U.S. Agency for International Development ("USAID")

official Lawrence Foley.  *Id.*; Schenker Expert Decl. at 7.  The terrorists allegedly trained in

Syrian military barracks "under the supervision of Syrian soldiers, who instructed them in the use of submachine guns, rifles, pistols and the construction of bombs," and the weapons used to assassinate Foley were allegedly provided by Syria.  Compl. ¶ 54.  Zarqawi, along with two other known associates, were convicted in Jordan and sentenced to death, *in absentia*, for Foley's assassination.  *Id.* ¶ 29; Schenker Expert Decl. at 7.

In 2003, after the United States led a multinational invasion of Iraq, Syria explicitly articulated a policy of defeating the U.S.-led armed forces in Iraq.  Schenker Expert Decl. at 4 (quoting former Syrian Foreign Minister Farouq Shara).  Zarqawi and an Aleppo-based militant Islamist cleric employed by the Syrian government "'co-established . . . the Al-Qaeda branch in Iraq after the US invasion.'"  *Id.* (quoting Sami Moubayed, *the Islamic Revival in Syria*, MIDDLE EAST MONITOR, Sept.-Oct. 2006).  Syria became a crucial base for AQI, and "several of Zarqawi's key deputies and supporters based their operations out of the state."  *Id.* at 5.  The same year, in 2003, Zarqawi and AQI allegedly "attacked the Jordanian embassy in Iraq, killing fourteen and wounding forty."  Compl. ¶ 29.  In a hearing before the Senate Armed Services Committee in 2003, then Deputy Secretary of Defense Paul Wolfowitz testified that several foreign fighters killed by U.S. forces in Iraq went there through Syria, and the entry permits on their passports said "'volunteer for jihad,'" or "'to join the Arab volunteers,'" indicating that Syria was well aware of the jihadi nature of these transient volunteer soldiers as they passed through Syrian borders.  Shenker Expert Decl. at 5 (quoting former Deputy Secretary of Defense Paul Wolfowitz).  Indeed, Zarqawi was aided in fundraising and operational planning by Fawzi Mutlaz al Rawi, who was also appointed by the Syrian President Bashar Assad in 2003 to be the leader of the Iraqi wing of the ruling Syrian Ba'ath party.  *Id.* at 6.  Rawi is financially supported by the Syrian Government and has "'close ties to Syrian Intelligence.'"  *Id.* (quoting U.S.

DEPARTMENT OF TREASURY, TREASURY DESIGNATES INDIVIDUALS WITH TIES TO AL QAIDA,

FORMER REGIME (Dec. 7 2007)).

In 2004, Zarqawi and AQI planned an attack on "several Jordanian and American

targets" in Amman, including the U.S. embassy, involving detonation of "a truck bomb laden

with chemicals that . . . would create a chemical plume" with the capability of "kill[ing] over

100,000" people.  Schenker Expert Decl. at 7; Compl. ¶ 29.  Jordanian forces thwarted the attack

for which Zarqawi later took responsibility, claiming that it was in "retribution for Jordan

housing a 'big database used by the enemy of Islam to track down holy warriors.'"  Schenker

Expert Decl. at 7 (quoting Maggie Michael, *Al Qaeda Operative: Jordan Attack Planned*, AP,

Apr. 30, 2004); Compl. ¶ 30.  According to the confession of a captured terrorist, Zarqawi

"provided the funding necessary for the operation" through a Syrian resident, named Suleiman

Khaled Darwish a/k/a Abu al Ghadiyyeh, who was designated by the United States Treasury

Department in 2005 as a Specially Designated Global Terrorist ("SDGT").  Schenker Expert

Decl. at 5–8.  Ghadiyyeh regularly arranged for jihadis affiliated with AQI and Zarqawi to travel

through Syria into Iraq.  *Id.* at 8.  Yet, even after the United States made numerous requests to

Syria to "'hand over, capture, or kill'" Ghadiyyeh, Syria continued to "provid[e] safehaven for

Ghadiyyeh as a matter of policy."  *Id.* (quoting Pamela Hess, *Syria Raid May Point to a New US

Poster*, AP, October 28, 2008).  In 2008, the United States Special Operations forces killed

Ghadiyyeh in a Syrian village, six miles from the Iraqi border.  *Id.*

The State Department's 2005 Patterns of Global Terrorism publication concluded that

Syria remained a "'facilitation hub for terrorists operating in Iraq . . . .'"  Compl. ¶ 58.  In 2007,

then-General David Petraeus echoed that Syria acts as "critical support for the AQI insurgency in

Iraq," and plays a "pivotal role as the source of foreign fighters entering Iraq."  Schenker Expert
Decl. at 6.

### B.    THE ATTACKS IN AMMAN, JORDAN ON NOVEMBER 9, 2005

On November 4, 2005, Zarqawi sent four AQI suicide bombers into Amman, Jordan.
Compl. ¶ 31.  Five days later, on November 9, 2005, these four suicide bombers, wearing "bomb
belts packed with the powerful explosive RDX and ball bearings, designed to inflict the
maximum number of casualties," entered the lobbies of the Radisson SAS, the Grand Hyatt and
the Days Inn.  *Id.* ¶ 32; Schenker Expert Decl. at 8.  According to a coordinated plan, the suicide
bombers detonated their bombs within minutes of one another, killing a total of fifty-seven
civilians, including the Victims, and wounding 110 others.  Schenker Expert Decl. at 8.

Shortly after the attacks, AQI and Zarqawi "issued several claims of responsibility."
Schenker Expert Decl. at 10–11.  On November 10, 2005, AQI posted two statements in Arabic
on a jihadi website, acknowledging that "the Army of al-Qaeda" carried out the attacks.  *Id.* at
10.  The statements explained that these hotels were targeted because they were "'headquarters,
safe haven, residence and meeting place of the evil state of Jordan, the sons of Alqami [Shiites],
and their guests,'" "'the filthy tourists of the Jews and Westerners.'"  *Id.* at 10–11 (quoting
Appendix B (First AQI Online Statement, dated November 10, 2005) at 21, ECF No. 26-2 and
Appendix C (Second AQI Online Statement, dated November 10, 2005) at 23, ECF No. 26-2)
(alteration in the original).  On November 18, 2005, Zarqawi posted a twenty-seven minute long
video, explaining that "'Al Qaida took this blessed step'" because, *inter alia*, "'[the Jordanian]
army has become a devoted guardian of the Zionist state,'" "'the obscenity and corruption spread
[by the Jordanian government] have turned Jordan into a quagmire of utter profanity and
debauchery, and anyone who has seen the hotels, the houses of entertainment, the dance parties,

the wine bars, and the tourist resorts . . . is wrenched with sorrow,'" and that "'[a]s for the situation in Iraq, Jordan has served and is still serving as a rear supply base for the American army.'" *Id.* at 11–12 (quoting *Al-Qaeda Explains Amman Bombings Threatens: "In a Few Days, the Infidel Leaders Will Witness an Event that Will Make [The Amman Bombings] Seem Insignificant,"* MEMRI SPECIAL DISPATCH NO. 1043, December 8, 2005 (hereinafter "Transcript of Zarqawi Statement, dated November 18, 2005")).  Zarqawi explained that the hotels were chosen specifically in order to "kill as many Americans and Israelis as possible." *Id.* at 12.

### C.      THE TWO VICTIMS AND THEIR FAMILIES

One of the Victims is Lina Mansoor Thuneibat, who was an American citizen and nine years old at the time of her death from the terrorist attacks.  She was sitting at a table inside the ballroom at the Radisson SAS hotel in Amman, Jordan, attending the wedding of her first cousin, when two suicide bombers entered, one of whom "jumped onto a table, and detonated his bomb belt, killing himself, Lina Mansoor Thuneibat and at least thirty-five (35) others, and injuring many others." Compl. ¶ 33.  At the time, Lina was living temporarily in Amman, Jordan, to attend an elite private school. Pls.' Mot., Ex. J ("Nadira Thuneibat Decl.") ¶ 16, ECF No. 26-11.

Lina's mother, Nadira Thuneibat, an American citizen, was standing outside the ballroom at the time of the blast.  She survived but witnessed the death of her uncle, who was struck in the heart with shrapnel, and waded through the chaotic aftermath in the ballroom where "'bodies and blood'" were strewn all over the floor, including people decapitated and disemboweled. *Id.* ¶¶ 23–25.  Most significantly, Nadira lost her daughter that day.  As a result of this traumatic experience, Nadira suffered physical and emotional devastation.  Her menstrual cycle stopped due to shock. *Id.* ¶ 35.  She became depressed, experienced wild mood swings, and developed an eating disorder. *Id.* ¶ 46.

Lina's father, Mansoor al-Thuneibat, an American citizen, who was not in Amman on the night of the attack, *id.* ¶ 36, was "devastated" by the death of his daughter, *id.* ¶ 37, and became withdrawn and depressed as a result, *id.* ¶¶ 40, 41.  In December 2006, he was diagnosed with brain tumor.  *Id.* ¶ 42.  A year later, in December 2007, following two surgeries to remove the tumor, Mansoor died of a heart attack.  *Id.*  Similarly, Lina's two brothers, O.M.T. and Muhammad Mansoor Thuneibat, both American citizens, also suffered and continue to suffer severe emotional trauma due to their sister Lina's death.  *Id.* ¶¶ 48, 55

The second Victim, Mousab Ahmad Khorma, an American citizen, was a thirty-nine-year-old deputy chairman of the Cairo Amman Bank.  Compl. ¶ 34.  He was waiting for friends in the lobby of the Grand Hyatt in Amman, Jordan, on November 9, 2005, when he was killed in an explosion after a suicide bomber entered the hotel lobby and detonated his bomb belt.  *Id.*  In total, ten people were killed and numerous others were injured.  *Id.*

Mousab is survived by three siblings, two brothers and a sister, and his now-deceased mother, all Jordanian citizens.  Pls.' Mot., Ex. K ("Tariq Khorma Decl.") ¶¶ 5, 6, ECF No. 26-12.  Samira Khorma, Mousab's mother, became inconsolable upon learning of her son's premature death, and, as a result, this once lively sociable woman became "a recluse, refused to leave and house and dressed in black from that moment until she died."  Pls.' Mot., Ex. L ("Tatsiana Khorma Decl.") ¶ 36, ECF No. 26-13.  Mousab's siblings were all devastated as well, and continue to suffer severe mental anguish to this day.  Tariq Khorma Decl. ¶ 63, Tatsiana Khorma Decl. ¶ 34, Pls.' Mot., Ex. M ("Zeid Khorma Decl.") ¶ 56, ECF No. 26-14.

### D.    Procedural History

The plaintiffs filed this lawsuit against the defendants on January 9, 2012.  *See* Compl. After more than two years and numerous attempts to serve the defendants, on August 29, 2014,

the plaintiffs filed a declaration of proof of service, attesting that the defendants were properly

served in accordance with 28 U.S.C § 1608(a), which provides the procedure for completing

service upon a foreign state or political subdivision of a foreign state.  *See* Status Report, dated

October 23, 2012, ECF No. 11; Status Report, dated June 24, 2013, ECF No. 14; Declaration of

Proof of Service ("Decl. Proof of Service"), dated August 29, 2014, ECF No. 22.  The Clerk

entered default against the defendants on December 5, 2014.  Entry of Default, dated December

5, 2014, ECF No. 24.  The plaintiffs subsequently filed the instant motion for default judgment.

*See* Pls.' Resp. to Court's Order to Show Cause, dated January 16, 2015, ECF No. 25; Pls.' Mot.

The plaintiffs' briefing, with over three hundred pages in exhibits, was comprehensive, and, thus,

an evidentiary hearing is unnecessary.[1]

---

[1]     The plaintiffs, in response to the Court's Minute Order, dated April 6, 2015, directing the plaintiffs to submit three proposed dates for an evidentiary hearing, advised the Court that they have submitted sufficient evidence, as part of their motion for default judgment, to satisfy their burden of proof.  Pls.' Resp. to Order at 1, ECF No. 27.  The Court agrees.  To establish the legal and factual bases for their claims, the plaintiffs submitted as evidence four well-supported expert declarations from three eminently-qualified experts on Middle Eastern politics, forensic economics and Jordanian law.  Mr. Schenker, the plaintiffs' proffered expert on "Arab Politics and counterterrorism," is the Director of the Washington Institute's Program on Arab Politics.  Schenker Expert Decl. at 1–2.  Having studied Middle Eastern politics for over two decades, he previously served as the "Levant Director in the Office of the Secretary of Defense," "advising the [S]ecretary and other senior Pentagon leadership on the military and political affairs of Jordan, Syria, Lebanon and the Palestinian territories," for which work he received "the Office of the Secretary of Defense Medal for Exceptional Civilian Service," in 2005.  *Id.* at 2.  The plaintiffs' proffered expert on economic damages, Dr. Stan Smith, is equally impressive.  After earning his Ph.D in economics from the University of Chicago, Dr. Smith has published dozens of articles regarding economic losses in peer-reviewed journals, and testified as a forensic economic expert in numerous lawsuits.  Pls.' Mot., Ex. H ("Smith Curriculum Vitae") at 1–6, ECF No. 26-9.  The plaintiffs have also proffered Mr. Yousef S. Khalilieh as an expert on Jordanian law.  Pls.' Mot. Ex. E ("Khalilieh Expert Decl.") at 1, ECF No. 26-6.  After receiving two law degrees from the University of Westminster and the University of London, respectively, Mr. Khalilieh has been an active member of the Jordanian Bar Association and a practicing attorney in Amman, Jordan, since 1995.  *Id.*  In other words, all of the proffered experts are highly qualified to speak on their areas of expertise.  The plaintiffs also submitted four credible declarations, with corroborating details, from members of the Victims' families, documenting their perspective of the events at issue and the emotional distress and mental anguish they suffered as a result of the attacks.  Consequently, no evidentiary hearing is necessary for further evaluation of the declarations submitted by the plaintiffs, and the uncontroverted facts averred therein are taken as true.  *See Roth v. Islamic Republic of Iran*, 78 F. Supp. 3d 379, 386 (D.D.C. 2015) ("Courts may rely on uncontroverted factual allegations that are supported by affidavits." (citing *Rimkus v. Islamic Republic of Iran*, 750 F. Supp. 2d 163, 171 (D.D.C. 2010))); *Gates v. Syrian Arab Republic*, 580 F. Supp. 2d 53, 63 (D.D.C. 2008) (quoting *Estate of Botvin v. Islamic Republic of Iran*, 510 F. Supp. 2d 101, 103 (D.D.C. 2007)).

## II.   LEGAL STANDARD

Under Federal Rule of Civil Procedure 55(b)(2), the Court may consider entering a default judgment when a party applies for that relief.  *See* FED. R. CIV. P. 55(b)(2).  "[S]trong policies favor resolution of disputes on their merits," and therefore "'[t]he default judgment must normally be viewed as available only when the adversary process has been halted because of an essentially unresponsive party.'"  *Jackson v.  Beech*, 636 F.2d 831, 836 (D.C. Cir. 1980) (quoting *H.F. Livermore Corp. v. Aktiengesellschaft Gebruder Loepfe*, 432 F.2d 689, 691 (D.C. Cir. 1970)).  A default judgment is appropriate when a defendant is "a 'totally unresponsive' party and its default plainly willful, reflected by its failure to respond to the summons and complaint, the entry of default, or the motion for default judgment."  *Hanley-Wood LLC v. Hanley Wood LLC*, 783 F. Supp. 2d 147, 150 (D.D.C. 2011).

"[E]ntry of a default judgment is not automatic," however.  *Mwani v. bin Laden*, 417 F.3d 1, 6 (D.C. Cir. 2005) (footnote omitted).  The procedural posture of a default does not relieve a federal court of its "affirmative obligation" to determine whether it has subject matter jurisdiction over the action.  *See James Madison Ltd. by Hecht v. Ludwig*, 82 F.3d 1085, 1092 (D.C. Cir. 1996).  Additionally, "a court should satisfy itself that it has personal jurisdiction before entering judgment against an absent defendant."  *Mwani*, 417 F.3d at 6.  The party seeking default judgment has the burden of establishing both subject matter jurisdiction over the claims and personal jurisdiction over the defendants.  *See, e.g., FC Inv. Grp. LC v. IFX Mkts., Ltd.*, 529 F.3d 1087, 1091 (D.C. Cir. 2008) ("The plaintiffs have the burden of establishing the court's personal jurisdiction over [the defendants].");  *Khadr v. United States*, 529 F.3d 1112, 1115 (D.C. Cir. 2008) ("[T]he party claiming subject matter jurisdiction . . . has the burden to demonstrate that it exists.").

Finally, when default is sought under the FSIA, a claimant must "establish[] his claim or right to relief by evidence satisfactory to the court."  28 U.S.C. § 1608(e). "This provides foreign sovereigns a special protection akin to that assured the federal government by FED. R. CIV. P. 55(e)," which has been renumbered by the 2007 amendment to Rule 55(d).  *Jerez v. Republic of Cuba*, 775 F.3d 419, 423 (D.C. Cir. 2014); *see also* H.R. REP. No. 94-1487, at 26 (1976) (stating that § 1608(e) establishes "the same requirement applicable to default judgments against the U.S. Government under rule 55(e), F.R. Civ. P.").  While the "FSIA leaves it to the court to determine precisely how much and what kinds of evidence the plaintiff must provide, requiring only that it be 'satisfactory to the court,'" courts must be mindful that Congress enacted Section 1605A, FSIA's terrorism exception, and Section 1608(e) with the "aim[] to prevent state sponsors of terrorism—entities particularly unlikely to submit to this country's laws—from escaping liability for their sins."  *Han Kim v. Democratic People's Republic of Korea*, 774 F.3d 1044, 1047–48 (D.C. Cir. 2014) (quoting 28 U.S.C. § 1608(e)).

With this objective in mind, the D.C. Circuit has instructed that "courts have the authority—indeed, we think, the obligation—to 'adjust [evidentiary requirements] to . . . differing situations.'"  *Id.* (quoting *Bundy v. Jackson*, 641 F.2d 934, 951 (D.C. Cir. 1981)).  Courts must draw their "'findings of fact and conclusions of law from admissible testimony in accordance with the Federal Rules of Evidence.'"  *Id.* at 1049 (quoting *Daliberti v. Republic of Iraq*, 146 F. Supp. 2d 19, 21 n.1 (D.D.C. 2001)).  Uncontroverted factual allegations that are supported by admissible evidence are taken as true.  *Roth v. Islamic Republic of Iran*, 78 F. Supp. 3d 379, 386 (D.D.C. 2015) (citing *Rimkus v. Islamic Republic of Iran*, 750 F. Supp. 2d 163, 171 (D.D.C. 2010)); *Gates v. Syrian Arab Republic*, 580 F. Supp. 2d 53, 63 (D.D.C. 2008) (quoting

*Estate of Botvin v. Islamic Republic of Iran*, 510 F. Supp. 2d 101, 103 (D.D.C. 2007)), *aff'd*

*Gates v. Syrian Arab Republic*, 646 F.3d 1 (D.C. Cir. 2011).

## III.   DISCUSSION

A default judgment may be entered when (1) the Court has subject matter jurisdiction

over the claims, (2) personal jurisdiction is properly exercised over the defendants, (3) the

plaintiffs have presented satisfactory evidence to establish their claims against the defendants,

and (4) the plaintiffs have satisfactorily proven that they are entitled to the monetary damages

they seek.  Each of these requirements is addressed *seriatim* below.

### A.   SUBJECT MATTER JURISDICTION UNDER THE FSIA

The Syrian Arab Republic is indisputably a foreign sovereign and the Syrian Military

Intelligence, which is a "political subdivision" of Syria, is also considered a foreign sovereign for

the purposes of this lawsuit under 28 U.S.C. § 1603(a).  *See Gates*, 646 F.3d at 128 n.1

("The Syrian Military Intelligence and the individual defendants are considered part of the state

itself under the FSIA." (citing 28 U.S.C. § 1603(a),(b); *Cicippio–Puleo v. Islamic Republic of

Iran,* 353 F.3d 1024, 1033–34 (D.C. Cir. 2004), *superseded by statute,* 28 U.S.C. § 1605A; and

*Roeder v. Islamic Republic of Iran,* 333 F.3d 228, 234 (D.C. Cir. 2003))).  This Court may

exercise "original jurisdiction" over a foreign state "without regard to amount in controversy" so

long as the claim is a "nonjury civil action" seeking "relief *in personam* with respect to which

the foreign state is not entitled to immunity either under sections 1605–1607 of this title or under

any applicable international agreement."  *See* 28 U.S.C. § 1330(a) (italics added).  Here, the

plaintiffs have not demanded a jury trial, *see* Civil Cover Sheet at 2, ECF No. 1-1, and bring civil

federal and other tort claims against the defendants as a foreign sovereign for *in personam* relief.

11

Thus, the key question is whether the defendants are entitled to immunity under the FSIA or other international agreement.

Foreign governments are generally immunized from lawsuits brought against them in the United States unless an FSIA exception applies.  *See* 28 U.S.C. § 1604; *Mohammadi v. Islamic Republic of Iran*, 782 F.3d 9, 13 (D.C. Cir. 2015).  The plaintiffs invoke jurisdiction under the FSIA's "terrorism exception," Compl. ¶ 22; Pls.' Mem. Supp. Mot. Default J. ("Pls.' Mem.") at 4, ECF No. 26-1, which provides that "[a] foreign state shall not be immune from the jurisdiction of courts of the United States or of the States in any case . . . in which money damages are sought against a foreign state for personal injury or death that was caused by an act of torture, extrajudicial killing, aircraft sabotage, hostage taking, or the provision of material support or resources for such an act . . . ."  28 U.S.C. § 1605A.  The plaintiffs must prove four elements to establish subject matter jurisdiction under this exception: (1) "the foreign country was designated a 'state sponsor of terrorism at the time [of] the act,'" *Mohammadi*, 782 F.3d at 14 (quoting 28 U.S.C. § 1605A(a)(2)(A)(i)(I)); (2) "the 'claimant or the victim was' a 'national of the United States' at that time," *id.* (quoting 28 U.S.C. § 1605A(a)(2)(A)(ii)); (3) "in a case in which the act occurred in the foreign state against which the claim has been brought, the claimant has afforded the foreign state a reasonable opportunity to arbitrate the claim," 28 U.S.C. § 1605(A)(a)(2)(A)(iii); and (4) the plaintiff seeks monetary damages "for personal injury or death caused by 'torture, extrajudicial killing, aircraft sabotage, hostage taking, or the provision of material support or resources for such an act,' if 'engaged in by an official, employee, or agent' of a foreign country," *Mohammadi*, 782 F.3d at 14 (quoting 28 U.S.C. § 1605A(a)(1)).  These four elements have been satisfactorily proven here.

The plaintiffs indisputably meet the first element.  Syria has been continuously designated a state sponsor of terrorism since 1979.  Schenker Expert Decl. at 4 ("Syria was an inaugural member of the US Department of State's list of State Sponsors of Terrorism in 1979, and remains on this list until today."); *see also Gates*, 646 F.3d at 2 ("Syria has been designated a state sponsor of terrorism since 1979.").

The plaintiffs also meet the second element that the "claimant[s] or victim[s]" must be "national[s] of the United States" at the time of the attacks.  28 U.S.C. § 1605A(a)(2)(A)(ii)(I). Members of the Victims' families have submitted affidavits attesting to the Victims' citizenship at the time of the November 9, 2005, attacks.  *See, e.g.,* regarding Lina Mansoor Thuneibat, Nadira Thuneibat Decl. ¶ 11 ("Our daughter Lina Mansoor Thuneibat was born in . . . 1996. . . . She was a U.S. citizen continuously since her birth, until her death at the age of 9 as a result of the bombings of the Radisson SAS, Grand Hyatt and Days Inn hotels in Amman, Jordan, on November 9, 2005[.]"); regarding Mousab Ahmad Khorma, Tariq Khorma Decl. ¶ 7 ("Mousab was murdered in the Amman Hotel Bombings on November 9, 2005, at the age of 39, and he was a United States citizen at the time of his death.").

Members of the Thuneibat Family, who bring separate claims against the defendants, have also averred to their citizenship at the time of the attacks.  *See* Nadira Thuneibat Decl. ¶ 3 ("I naturalized as a United States citizen on August 17, 1979 . . . . I have been a U.S. citizen continuously since my naturalization."), ¶ 5 ("Mansoor [al-Thuneibat] naturalized as a United States citizen on May 12, 1992. . . . Mansoor remained a U.S. citizen continuously since his naturalization, until the time of his death by heart attack on December 6, 2007."), ¶ 9 ("Our son Muhammad Mansoor Thuneibat was born in . . . 1993. . . . He has been a U.S. citizen

13

continuously since birth."), ¶ 10 ("Our son O.M.T. was born in . . . 1998. . . . He has been a U.S. citizen continuously since birth.").

Mousab's immediate family members, who have asserted their own claims against the defendants, were not U.S. nationals at the time of the attack, however.  Tariq Khorma Decl. ¶ 2 ("I am not a United States citizen."), ¶ 5 ("Both of my parents were subjects of the Kingdom of Jordan, and neither of them was a citizen of the united States."), ¶ 6 ("I have two surviving biological siblings, Zeid Ahmad Khorma . . . and Tatsiana Ahmad Khorma . . . neither is a citizen of the United States.").  Nevertheless, the Khorma family plaintiffs may assert their claims for emotional anguish resulting from Mousab's extrajudicial killing, Compl. ¶ 77, because the victim was a U.S. national at the time of the attacks.  *See Worley v. Islamic Republic of Iran*, 75 F. Supp. 3d 311, 327 (D.D.C. 2014) (holding that foreign plaintiffs may assert claims that are based on "injuries suffered by victims who meet the statute's requirements" (citing *Leibovitch v. Islamic Republic of Iran*, 697 F. 3d 561, 570, 572 (7th Cir. 2012))); *Estate of Doe v. Islamic Republic of Iran*, 808 F. Supp. 2d 1, 13 (D.D.C. 2011); *Owens v. Republic of Sudan*, 826 F. Supp. 2d 128, 149 (D.D.C. 2011).  Consequently, all plaintiffs, including the non-U.S. nationals, satisfy the second element.

The plaintiffs do not need to satisfy the third element here because the terrorist attacks at issue did not occur "in the foreign state against which the claim has been brought."  28 U.S.C. § 1605(A)(a)(2)(iii).  The terrorist acts that took the lives of the Victims occurred in Jordan, and the plaintiffs bring this suit against Syria.  As a result, the plaintiff do not need to "afford the foreign state a reasonable opportunity to arbitrate the claim" before bringing this action here.  *Id.*

Lastly, the plaintiffs have produced satisfactory evidence to establish the fourth element: that their damages arise from the defendants' "provision of material support or resources" for

extrajudicial killings that took the lives of the Victims.  28 U.S.C. § 1605A(a)(1).  "Extrajudicial

killing" has the "meaning given . . . in section 3 of the Torture Victim Protection Act of 1991,"

28 U.S.C. § 1605A(h)(7), which, in turn, defines this term to mean "a deliberate killing not

authorized by a previous judgment pronounced by a regularly constituted court affording all the

judicial guarantees which are recognized as indispensable by civilized people," Pub. L. No. 102-

256, § 3(a), 106 Stat. 73, 73 (1992) (codified at 28 U.S.C. § 1350 note § 3(b)).  Both Victims

were killed at hotels in Amman, Jordan, while engaging in social events, when separate,

coordinated suicide bombers detonated bomb belts.  Nadira Thuneibat Decl. ¶¶ 21, 25; Tariq

Khorma Decl. ¶¶ 24–29, 40–42.  Clearly, both Victims were killed outside the judicial system,

and neither was afforded "indispensable" judicial guarantees.  Thus, the plaintiffs have submitted

credible affidavits, *see supra* n.1, firmly establishing that the instant claims arise from the

extrajudicial killings of the Victims, as defined by Section 1605A.

      In addition, as part of the requisite fourth element for application of the FSIA's terrorism

exception, the plaintiffs have established that these suicide bombers were trained, funded, and

sent by Zarqawi and his organization AQI, which received material support and resources from

the defendants.  Schenker Expert Decl. at 9.  Shortly after the attacks, Zarqawi and AQI claimed

responsibility for the explosions.  *Id.* at 10–11.  Zarqawi expressed regret that "he didn't succeed

in killing more Americans and Israelis."  *Id.* at 12.

      The plaintiffs have supplied satisfactory proof that the defendants provided material

support to Zarqawi and AQI, enabling them to perpetrate these attacks.  The Schenker expert

declaration attests that the defendants provided crucial "material support," defined as "any

property . . . or service,  including . . . financial services, lodging, training, . . . safehouses . . .

facilities . . . and transportation, except medicine or religious materials," 18 U.S.C. §

2339A(b)(1), by (1) providing an established and stable "transit pipeline" such that foreign fighters from other countries were able to enter target countries through Syria, Schenker Expert Decl. at 13, (2) allowing AQI supporters and deputies to operate in Syria unmolested despite government awareness of their presence and terrorist activities, *id.* at 5–8, and (3) providing essential financial services to Zarqawi, who financed the attacks using funds "that moved through Syria," *id.* at 9.  In fact, a key Zarqawi deputy, Fawzi Mutlazq al Rawi, was appointed by the Syrian President in 2003 to lead the Iraqi wing of the Syrian Ba'ath party.  This Zarqawi deputy, whose responsibilities within Zarqawi's terrorist organization are to plan and fund terrorist plots, is "'supported financially by the Syrian Government, and has close ties to Syrian Intelligence.'"  *Id.* at 6 (quoting U.S. DEPARTMENT OF TREASURY, TREASURY DESIGNATES INDIVIDUALS WITH TIES TO AL QAIDA, FORMER REGIME (Dec. 7 2007)).

The plaintiffs' expert further avers that the Syrian government not only condoned Zarqawi and AQI's destabilizing activities but encouraged them.  In 2003, the then-Syrian Foreign Minister declared publicly that "'Syria's interest is to see the invaders defeated in Iraq,'" referring to the multinational armed forces led by the United States.  Schenker Expert Decl. at 4 (quoting former Syrian Foreign Minister Farouq Shara).  This was more than merely a passive statement of interest.  The Syria government "employed local staff—including an Aleppo-based militant Islamic cleric . . . to recruit Syrians and help organize the infiltration into Iraq from Syrian territory."  *Id.*  This same cleric, "[a]s one Assad regime official described it, . . . 'co-established, with Abu Musab Al-Zarqawi, the Al-Qaeda branch in Iraq after the US invasion.'"  *Id.* (quoting *The Islamic Revival in Syria*).  These considerations bolster the plaintiffs' expert's conclusion that "[w]ithout Syria, there would not have been a developed foreign fighter transit pipeline and an advanced funding network underwriting terrorist operations in Iraq, Jordan, and

elsewhere throughout the region . . . . Syrian support for this network led to the deaths of hundreds of Americans in Iraq, and bolstered a terrorist network that killed dozens of Jordanians on November 9, 2005." *Id.* at 13–14. Consequently, the plaintiffs have satisfactorily established that the defendants' material support to Zarqawi and AQI proximately caused the Victims' untimely deaths.

Other courts confronted with similar types of material support have found sufficient causation between the resources provided and the harm eventually inflicted. *See Roth*, 78 F. Supp. 3d at 394 (holding that the plaintiffs have demonstrated "'a reasonable connection'" between defendants' acts and their damages, where the defendants provided "money and training," and "encouraged the escalation of terrorist activities"); *Worley*, 75 F. Supp. 3d at 325 (sovereign immunity is waived where the defendants "provided funding, equipment and training to Hezbollah, thereby assisting it in carrying out the barracks bombings," and the defendants "approved and instigated the attack"); *Wyatt v. Syrian Arab Republic*, 908 F. Supp. 2d 216, 228 (D.D.C. 2012) (allowing suit to continue under Section 1605A where the defendants provided "(1) weapons and ammunition; (2) financial assistance; (3) safe haven and shelter to PKK leadership; and (4) terrorist training by members of the Syrian armed forces and intelligence agencies"); *Gates*, 580 F. Supp. 2d at 67–68 (finding that "Syria in fact did provide material support and resources to Zarqawi and al-Qaeda in Iraq," by serving "as Zarqawi's organizational and logistical hub from 2002 to 2005," and "by providing munitions, training, recruiting, and transportation to him and his followers").

Accordingly, the defendants do not enjoy foreign sovereign immunity from the instant suit, pursuant to 28 U.S.C. § 1605A, and subject matter jurisdiction may be properly exercised pursuant to 28 U.S.C. § 1330(a).

## B.      PERSONAL JURISDICTION

The Court next examines whether effective service has been made, as required by 28

U.S.C. § 1330(b), which governs personal jurisdiction over foreign states.  *See* 28 U.S.C. §

1330(b) (providing that "[p]ersonal jurisdiction over a foreign state shall exist as to every claim

for relief over which the district courts have jurisdiction. . . where service has been made under

section 1608 of this title").  Service may be effected under 28 U.S.C. § 1608 in one of four ways:

(1) by "special arrangement for service between the plaintiff and the foreign state," (2) "in

accordance with an applicable international convention on service of judicial documents," and if

the first two options were not applicable, the service may be completed (3) by "sending a copy of

the summons and complaint and a notice of suit, together with a translation of each into the

official language of the foreign state, by any form of mail requiring a signed receipt, to be

addressed and dispatched by the clerk of the court to the head of the ministry of foreign affairs of

the foreign state concerned," or (4) by requesting the clerk of the court to send the

aforementioned package to "the Secretary of State in Washington, District of Columbia, to the

attention of the Director of Special Consular Services—and the Secretary shall transmit one copy

of the papers through diplomatic channels to the foreign state and shall send to the clerk of the

court a certified copy of the diplomatic note indicating when the papers were transmitted."  28

U.S.C. § 1608(a).

The defendants have neither a special arrangement for service with the plaintiffs nor

entered into any international convention governing service.  Consequently, the plaintiffs

attempted to serve the defendants in the latter two ways authorized under Section 1608.

Unfortunately, the plaintiffs were stymied for two and a half years because international delivery

into Syria could not be completed and the United States suspended its embassy operations in

Syria.  *See e.g.*, Status Report, dated Oct. 23, 2012, ECF No. 11; Pls.' Mot. to Extend Time for

Service of Process and to Reissue Summons for Service on Syrian Defendants, ECF No. 17.

Finally, in August 2014, the plaintiffs were able to mail the necessary papers, through DHL, "'to

the head of the ministry of foreign affairs of the foreign state concerned,'" and the package was

accepted by a person at the Syrian Ministry of Foreign Affairs.  Decl. Proof of Service ¶¶ 4, 5

(quoting 28 U.S.C. § 1608(a)(3)); *see also Gates*, 646 F.3d at 4 (finding the plaintiffs effected

service upon Syria where the necessary papers were mailed via DHL, in accordance with 28

U.S.C. § 1608(a)(3)).

Accordingly, the plaintiffs have established that service was properly effected against the

defendants and, thus, personal jurisdiction is properly exercised.

### C.      DEFENDANTS' LIABILITY

The families and estates of the two Victims bring seven claims against the defendants,

including 28 U.S.C. § 1605A(c) and state common law torts for assault, battery, intentional

infliction of emotional distress, wrongful death, conspiracy to sponsor a terrorist organization

and aiding and abetting a terrorist organization, Comp. ¶¶ 69–98, for which claims they seek

economic damages for loss of life, *id.* ¶ 80, emotional and physical pain and suffering endured

prior to death, *id.* ¶ 83, solatium damages, *id.* ¶ 76, and punitive damages, *id.* ¶ 98.[2]  Section

1605A(c) provides a federal private right of action against designated state sponsors of terrorism

for enumerated categories of persons, including "national[s] of the United States," for "personal

injury or death caused by that foreign state . . . for which the courts of the United States may

maintain jurisdiction . . . for money damages."  28 U.S.C. § 1605A(c).  Successful plaintiffs may

recover damages that "include economic damages, solatium, pain and suffering, and punitive

---

[2]      The complaint denominates nine separate counts, but two of these purported claims amount only to requests for relief.  *See* Compl. (Count V—Action for Survival Damages) & (Count IX—Punitive Damages).

damages." *Id*.  The types of claims available to the plaintiffs differ based on their status as

Victims or family members, and their citizenship, as discussed in more detail below.

### 1.      *The Victims' Estates*

The two Victims of the November 9, 2005, attacks, represented in this action by their

respective estates, were American citizens at the time of the attacks and, therefore, are expressly

covered by, and entitled to bring claims under, Section 1605A(c).  *See* 15 V.I.C. § 601 (Virgin

Islands law permitting personal representatives to bring actions on behalf of the decedent);

McKinney's EPTL § 11-3.2 (New York law permitting the same); Pls.' Mot., Ex. C ("Letter of

Administration for Lina Thuneibat") at 2, ECF No. 26-4; Pls.' Mot., Ex. D ("Letter of

Administration for Mousab Khorma"), ECF No. 26-5.  Although Section 1605(A)(c) provides a

private right of action, it provides no guidance on the substantive bases for liability to determine

plaintiffs' entitlement to damages.  Consequently, courts have applied "'general principles of tort

law,'" such as the RESTATEMENT (SECOND) OF TORTS, to determine liability.  *See also Roth*, 78

F. Supp. 3d at 399 (citing *Oveissi*, 879 F. Supp. 2d at 54); *Worley*, 75 F. Supp. 3d at 335.

The Victims may recover for their wrongful deaths if they can establish the defendants

caused their deaths. [3] *See* RESTATEMENT (SECOND) OF TORTS § 925 (1965).  As discussed *supra*

in Part III.A, the plaintiffs have submitted satisfactory evidence demonstrating that the Victims'

deaths were the result of extrajudicial killings perpetrated by Zarqawi and AQI, who received

material support from the defendants, and, as a result, the defendants are liable to the Victims for

"'economic losses which result from [these] decedent[s'] premature death[s.]'"  *Valore v. Islamic*

*Republic Iran*, 700 F. Supp. 2d 52, 78 (D.D.C. 2010) (quoting *Flatow v. Islamic Republic of*

---

[3]     The Victims also assert claims under other tort theories, but, because they are entitled to relief under
Section 1605A(c), these other claims need not be addressed.  *See Kassman v. Am. Univ.*, 546 F.2d 1029, 1034 (D.C.
Cir. 1976) ("Where there has been only one injury, the law confers only one recovery, irrespective of the
multiplicity of parties whom or theories which the plaintiff pursues.").

*Iran*, 999 F. Supp. 1, 27 (D.D.C. 1998)); *see also Worley*, 75 F. Supp. 3d at 335.  The exact

damages due to the estates for these wrongful deaths will be discussed *infra* in Part III.D.[4]

### 2.    *The Thuneibat Family*

The Thuneibat family plaintiffs are the parents and two brothers of Victim Lina

Thuneibat.  As American citizens they may also bring their claims under Section 1605A(c).  This

Victim's parents and siblings seek to recover solatium damages for the defendants' intentional

infliction of emotional distress by providing material support to the terrorists who killed their

daughter and sister.  Compl. ¶ 76.  The defendants are liable for intentional infliction of

emotional distress under Section 1605A(c) if the plaintiffs produce sufficient evidence

demonstrating that the defendants "by extreme and outrageous conduct intentionally or

recklessly cause[d] severe emotional distress to" the plaintiffs.  RESTATEMENT (SECOND) OF

TORTS § 46(1); *see also Roth*, 78 F. Supp. 3d at 400 (quoting *Estate of Heiser v. Islamic*

*Republic of Iran*, 659 F. Supp. 2d 20, 26 (D.D.C. 2009)).  Where the claimants were not the

direct recipient of the "extreme and outrageous conduct," the Restatement permits recovery if

they are members of the Victim's immediate family and "'the defendants' conduct is sufficiently

outrageous and intended to inflict severe emotional harm upon a person who is not present.'"

*Estate of Heiser*, 659 F. Supp. 2d at 27 (quoting DAN B. DOBBS, The Law of Torts § 307, at

834 (2000)); *see also* RESTATEMENT (SECOND) OF TORTS § 46, cmt. l (AM. LAW INST. 1977)

(leaving "open the possibility of situations in which presence at the time may not be required").

---

[4] To the extent that the two Victims seek to recover for any pain and suffering they endured as a result of the terrorist attacks prior to their deaths, which the plaintiffs' frame as a separate survival damages claim, Compl. ¶¶ 81-84, this relief is denied.  The plaintiffs have submitted no evidence, and made no argument in their memorandum, showing that either of the Victims suffered any pain and suffering prior to their deaths in the suicide bombings, but instead, given the Victims' proximity to the suicide bombers, their deaths were more likely instantaneous.  Absent any evidence, no survival damages may be awarded.

The Thuneibat family plaintiffs meet the elements of generalized principles of intentional infliction of emotional distress. They are the parents and siblings of the Victim, and, thus, are members of the Victim's "immediate family." RESTATEMENT (SECOND) OF TORTS §46; *see Roth*, 78 F. Supp. 3d at 400 ("The 'immediate family' requirement is strictly construed in FSIA cases; generally, only spouses, parents, siblings, and children are entitled to recover (citing *Murphy v. Islamic Republic of Iran*, 740 F. Supp. 2d 51, 75 (D.D.C. 2012)). The defendants' conduct in materially supporting known terrorists, who were responsible for similarly heinous crimes in the past, Schenker Expert Decl. at 6–8, was "'sufficiently outrageous and intended to inflict severe emotional harm upon a person who is not present,'" such that the Thuneibat family plaintiffs need not be present to recover for their emotional distress. *Heiser*, 659 F. Supp. 2d at 27 (quoting DAN B. DOBBS, THE LAW OF TORTS § 307, at 834 (2000)); *see also Roth*, 78 F. Supp. 3d at 401; *Worley*, 75 F. Supp. 3d at 336–37; *Wyatt*, 908 F. Supp. 2d at 231. Indeed, "terrorism" is defined to mean "the use of violent acts to frighten the people in an area as a way of trying to achieve a political goal." Terrorism, Merriam-Webster Dictionary Online, http://www.merriam-webster.com/dictionary/terrorism (last visited February 24, 2015).

The defendants' extreme and outrageous conduct enabled Zarqawi and AQI to perpetrate the terrorist attacks that killed Victim Lina Thuneibat, and, as a result, each member of the Thuneibat family suffered severe emotional distress. Nadira, Lina's mother, who accompanied Lina to their cousin's wedding held at the Radisson SAS, witnessed the explosion that killed her daughter and numerous other relatives. She saw her uncle die in front of her eyes as he was struck in the heart by a shrapnel. Nadira Thuneibat Decl. ¶ 24. She waded through the chaos after the suicide bomber detonated his bomb belt in the middle of a wedding party and saw guests decapitated and disemboweled. *Id.* ¶ 25. Most devastatingly, she suffered the senseless

death of her nine-year old daughter, whose future was cut so short.  The trauma Nadira endured

has had significant adverse effects on her physically and mentally.  *Id.* ¶¶ 35, 42–47.

Mansoor, Lina's father, prior to his death in December 2007, *id.* ¶ 42, was similarly

devastated by the loss of his only daughter.[5]  He was home in the United States Virgin Islands

when the attacks happened and flew to Amman two days later.  Mansoor, who always "had a

very soft spot" for his daughter, refused to attend his only daughter's funeral, explaining that

"'[t]here is no way in hell that I am going to let them put her into a grave.'"  *Id.* ¶ 38.  Due to his

overwhelming grief, Mansoor withdrew from his family, became "disproportionately furious" at

small errors, and was prescribed depression medication, which did not appear to help.  *Id.* ¶¶ 39–

41.  His wife, Nadira, claims that after his daughter's death, Mansoor lost his will to live, "lost

interest in his business, his sons," and his wife.  *Id.* ¶ 41.  In December 2006, he was diagnosed

with brain cancer, and he died of a heart attack a year later in December 2007.  *Id.* ¶ 42.

O.M.T., Lina's younger brother, only six years old at the time of the attacks, was in

Amman the night of the attacks, when his house was flooded by "journalists, neighbors and

family members."  *Id.* ¶ 50.  Since his sister's death, O.M.T. changed from a happy child to a

withdrawn one.  *Id.* ¶ 52.  He refuses to listen to authority figures, and, for four years, was unable

to participate in a normal classroom, requiring private, one-on-one tutoring.  *Id.* ¶ 53.  He

received counseling for his behavioral issues, but to no avail.  *Id.* ¶ 52.

Muhammad, Lina's older brother by three and a half years, like the rest of his family,

continues to agonize over the death of his beloved younger sister, whom he had always

protected.  *Id.* ¶ 54.  Upon learning of her death, Muhammad, who was only twelve at the time,

---

[5]       The estate of Mansoor al-Thuneibat has standing to bring his claims on his behalf under Virgin Islands law, which applies because Mansoor was a resident of the Virgin Islands.  *See* 15 V.I.C. § 601 (general survival statute); 5 § V.I.C. § 77 ("A thing in action arising out of . . . a statute imposing liability for such injury shall not abate . . . by reason of the death of the person injured . . . .").

became prone to extreme moods. *Id.* ¶ 55. His grief has manifested itself in anger, for which he received counseling to no avail, and paranoia. *Id.* ¶¶ 56, 58.

Nadira Thuneibat's declaration makes clear that each member of her immediate family has suffered the loss of Lina Thuneibat, a beloved daughter and sister. Consequently, the members of the Thuneibat family have satisfactorily established, under Section 1605A(c), the defendants' liability to them for the emotional distress caused by the November 9, 2005, attacks.[6]

### 3.    The Khorma Family

The Khorma family plaintiffs, including the mother and three siblings of Victim Mousab Ahmad Khorma, all reside in and are nationals of Jordan. The Khorma family plaintiffs are not United States citizens and do not fall into any category of persons authorized to bring a claim under Section 1605A(c). Nevertheless, because their claims are based on the death of Victim Mousab Khorma, who was a United States citizen at the time of his death from the terrorist attacks, they are eligible to bring their claims under Counts IV (Intentional Infliction of Emotional Distress), VI (Action for Conspiracy), and VII (Action for Aiding and Abetting), if such a derivative action is authorized under "applicable state and/or foreign law." *Leibovitch*, 697 F.3d at 572; *see also Owens*, 826 F. Supp. 2d at 153–54; *Estate of Doe*, 808 F. Supp. 2d at 20. As the D.C. Circuit explained in *Oveissi v. Islamic Republic of Iran*, although the "FSIA does not contain an express choice-of-law provision," this statute provides, "that a foreign state stripped of its immunity 'shall be liable in the same manner and to the same extent as a private individual under like circumstances,'" 28 U.S.C. § 1606, thereby "ensur[ing] that, if an FSIA exception abrogates immunity, plaintiffs may bring state or foreign law claims that they could

---

[6]    The Thuneibat family plaintiffs' other tort claims need not be addressed because they are entitled to recover the full requested relief under their Section 1605A(c) claims.

have brought if the defendant were a private individual." 573 F.3d 835, 841 (D.C. Cir. 2009)

(quoting 28 U.S.C. § 1606).  This requires that the Court first address which state or foreign law

applies to ascertain whether each Khorma family plaintiff may bring a derivative action, before

turning to whether these plaintiffs have satisfactorily established liability.

### a.      Choice of Law

The law of two jurisdictions may apply to evaluate the availability of suit for the Khorma

family plaintiffs: the law of Jordan, where the terrorist attacks at issue occurred and the

nationality and domicile of the Khorma family plaintiffs, and the law of the District of Columbia,

the forum in which the plaintiffs bring their lawsuit.  *See Owens*, 826 F. Supp. 2d at 154

(acknowledging that "[t]hree conceivable choices of law are presented . . . the law of the forum

state . . . , the laws of the place of the tort . . . , or the law of the domicile state or country of each

plaintiff . . ."); *Estate of Doe*, 808 F. Supp. 2d at 20 (holding the same "three conceivable choices

of law" are available); *Dammarell v. Islamic Republic of Iran*, No. Civ. A. 01-2224JDB, 2005

WL 756090, at * 18 (D.D.C. Mar. 29, 2005)).  Under District of Columbia choice of law rules,

courts must first determine "whether the jurisdictions' laws present no conflict, a false conflict,

or a true conflict." *Barimany v. Urban Pace LLC*, 73 A.3d 964, 967 (D.C. 2013).  "A 'no

conflict' situation arises 'when the laws of the different jurisdictions are identical or would

produce the identical results on the facts presented.'" *Id.* (quoting *USA Waste of Md., Inc. v.

Love*, 954 A.2d 1027, 1032 (D.C. 2008)).  In such a case where no conflict exists, the law of the

forum, the District of Columbia, governs.  *See Pietrangelo v. Wilmer Cutler Pickering Hale &

Dorr, LLP*, 68 A.3d 697, 714 (D.C. 2013) (citing *Fowler v. A&A Co.*, 262 A.2d 334, 348 (D.C.

1970)).  "A 'false conflict' situation arises 'when the policy of one jurisdiction would be

advanced by application of its laws, and the policy of the other jurisdiction would not be

advanced by application of its law.'"  *Barimany*, 73 A.3d at 967 (quoting *District of Columbia v.*

*Coleman*, 667 A.2d 811, 816 (D.C. 1995)).  Finally, "'[a] true conflict arises when both states

have an interest in applying their laws to the facts of the case.'"  *Id.* (quoting *Herbert v. District*

*of Columbia*, 808 A.2d 776, 779 (D.C. 2002)).

> In the event of a true conflict, D.C. utilizes a "governmental interests" approach:

> "'under which [courts] evaluate the governmental policies underlying the
> applicable laws and determine which jurisdiction's policy would be more
> advanced by the application of its law to the facts of the case under review . . . .
> As part of this analysis, [courts] also consider the four factors enumerated in the
> RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 145: a) the place where the
> injury occurred; b) the place where the conduct caused the injury occurred; c) the
> domicile, residence, nationality, place of incorporation and place of business of
> the parties; and d) the place where the relationship is centered.'"

*Jones v. Clinch*, 73 A.3d 80, 82 (D.C. 2013) (quoting *Coleman*, 667 A.2d at 816); *see also*

*Pietrangelo*, 68 A.3d at 714.

Jordanian law and D.C. law appear to conflict on the availability of solatium damages for

immediate family members.  The plaintiffs submitted a declaration from a Jordanian attorney,

the managing partner at a leading Jordanian law firm, attesting that Jordanian law permits the

immediate family members to recover for the "loss of a loved one and the pain and emotional

distress caused," also called "'moral damage.'"  Pls.' Mot., Ex. E (Decl. of Yousef Khalilieh,

dated March 29, 2015 ("Khalilieh Expert Decl.")) at 2, 4, ECF No. 26-6.  By contrast, the

plaintiffs cited no D.C. statutory or caselaw permitting the same.  Instead, the plaintiffs reference

only general "U.S. law."  *See* Pls.' Mem. at 9–12 (discussing the plaintiffs' intentional infliction

of emotional distress claim).  The Court's own review of D.C.'s intentional infliction of

emotional distress law yielded no affirmative support for the plaintiffs' supposition that

"solatium damages" are permitted to compensate an immediate family relative for their grief

arising from the loss of a loved one.  In fact, the D.C. Circuit in *Bettis v. Islamic Republic of*

*Iran*, quoted a brief filed by the amicus curiae, Georgetown University Law Center's Appellate Litigation Program, which had been appointed by the Circuit to present arguments supporting the District Court's judgment given the defendant's absence, stating that "'District of Columbia . . . does not recognize solatium damages in wrongful death causes of action,'" and that "'Amicus is aware of no case in the District of Columbia permitting someone other than the direct victim of the outrageous conduct to recover for intentional infliction of emotional distress.'"  315 F.3d 325, 332, 333 (D.C. Cir. 2003) (quoting Br. of *Amicus Curiae* at 18–21 (citing *Runyon v. District of Columbia*, 463 F.2d 1319, 1322 (D.C. Cir. 1972))).  Hence, Jordanian and D.C. laws do not offer the same remedies for the Khorma family plaintiffs' injuries.[7]

This conflict is a false conflict, however, because only Jordan has an interest in the application of its policies in this case.  To ascertain whether the case presents a false conflict, rather than a true conflict, the Court must determine whether the policy of only one jurisdiction would be advanced by the application of its law, and the contrary policy of the other jurisdiction would not be advanced even if its law were applied.  *Barimany*, 73 A.3d 964 at 967; *In re Estate of Delaney*, 819 A.2d 968, 988 (D.C. 2003).  In order to determine which policy would be advanced, courts look to which party the law of each of the jurisdictions seeks to protect.  For example, in *District of Columbia v. Coleman*, the D.C. Court of Appeals held, in a case where a D.C. police officer was sued for use of excessive force in Maryland when he "intervened to stop

---

[7]         Differing views have been expressed on this Court whether D.C. law permits recovery for emotional distress by immediate family members of the victim.  Some decisions have held or assumed that D.C. law permits immediate relatives of victims to recover solatium damages for the death of loved ones.  *See Mwila v. Islamic Republic of Iran*, 33 F. Supp. 3d 36, 41 (D.D.C. 2014) (finding "D.C. law allows spouses and next of kin to recover solatium damages" (citing D.C. Code § 16-2701)); *Estate of Doe*, 808 F. Supp. 2d at 21 (finding DC Law permits "the award of compensation for . . . emotional distress suffered as a result of the wrongful death or tortious injury of an immediate relative" without citation to D.C. statutory or common law); *Owens*, 826 F. Supp. 2d at 155 (same).  The D.C. Court of Appeals, however, has interpreted D.C. Code § 16-2701 to limit damages for wrongful death to "pecuniary losses" and "the value of lost services" only.  *Herbert*, 808 A. 2d at 778 n.2 & 779 n.3; *see also Runyon*, 463 F.2d at 1322 ("The parties so recovering [under the Wrongful Death Act] may not be compensated for their grief.").

an apparent assault and in the process shot and killed one of the two men involved in the attack,"

that only Maryland had a compelling interest in the application of its law and, therefore,

permitting the assertion of affirmative defenses of contributory negligence and assumption of

risk.  667 A.2d at 814, 817.  D.C. law, which does not permit the defenses of contributory

negligence and assumption of risk in a suit involving a violation of "police regulation concerning

the use of force," is intended "'to promote the safety of citizens by deterring police use of

excessive force'" and, consequently, the "major focus of the policy, then, is on public safety

within the District itself."  *Id.* at 817 (quoting *District of Columbia v. Peters*, 527 A.2d 1269,

1274 (D.C. 1987)).  Conversely, the Court of Appeals found that Maryland law was intended to

promote "public safety in Maryland," by limiting the liability of third parties "who go to the aid

of those in apparent public danger."  *Id.* at 817–818.  Any alleged use of excessive force by the

D.C. police officer occurred in Maryland.  Consequently, the *Coleman* court found D.C. had no

compelling interest because even if D.C. law were applied to disallow the D.C. officer from

asserting affirmative defenses of contributory negligence and assumption of risk, its policy of

protecting D.C. citizens from police brutality would not be promoted.  *Id.* at 817.

 The instant matter presents a mismatch similar to that in *Coleman*.  Jordanian law would

permit the recovery of non-pecuniary damages by the immediate family members of the

deceased victim because that country's civil code views their "grief and sorrow" as "moral

damage" that must be compensated by the attacker.  Khalilieh Expert Decl. at 4–5.  Jordan

naturally has an interest in the application of its law, which benefits the immediate relatives of

Mousab Khorma, who are Jordanian nationals.  D.C. law, by contrast, appears to limit the

liability of a tortfeasor and permits only the direct victim to recover for emotional distress.  As a

result, D.C. law favors the tortfeasor rather than the victim's immediate family members.  The

tortfeasors in this case are not D.C. domiciliaries or residents, however.  Thus, the policy behind

the D.C. law, of limiting the liability of D.C. tortfeasors, would not be advanced even if D.C. law

were applied in this case, whereas the Jordanian policy of compensating the immediate relatives

of deceased victims would be advanced if Jordanian law were applied.  Since only Jordan has an

interest in the application of its law, creating a false conflict, Jordanian law applies to the

Khorma family plaintiffs' claims for solatium damages.[8]

### b.      Liability under Jordanian Law

"In determining foreign law, the court may consider any relevant material or source,

including testimony, whether or not submitted by a party or admissible under the Federal Rules

of Evidence."  FED. R. CIV. P. 44.1.  The Advisory Committee Notes to the 1966 Amendment

clarifies that while "the court is not limited by material presented by the parties," and may

"engage in its own research . . . the court is free to insist on a complete presentation by counsel."

FED. R. CIV. P. 44.1 advisory committee's note to 1966 amendment.  The Khorma family

plaintiffs have submitted a "complete presentation" of their entitlement to the non-pecuniary

damages they seek as the result of the "mental duress and suffering" they endured due to the

---

[8]      Even if D.C. had an interest in the application of its law in this case, such as the generalized interest of the United States in applying its domestic law when American citizens are targeted, *see Estate of Doe*, 808 F. Supp. 2d at 21, and a true conflict existed between D.C. law and Jordanian law, following D.C.'s choice of law rules, Jordan still has the greater governmental interest and the more significant relationship to the case at hand.  The four factors enumerated by the D.C. Court of Appeals—*i.e.*, "a) the place where the injury occurred; b) the place where the conduct caused the injury occurred; c) the domicile, residence, nationality, place of incorporation and place of business of the parties; and d) the place where the relationship is centered"—all favor application of Jordanian law. *Jones*, 73 A.3d at 82.  The terrorist attack occurred and resulted in the death of Victim Mousab Khorma in Jordan, which is also where his family members grieved.  Zarqawi and AQI, with the defendants' support, targeted Jordan specifically due to its relationship with the United States.  *See* Schenker Expert Decl. at 10–11.  By contrast, any interest in applying D.C. law is significantly diminished since no relevant party is a D.C. domiciliary, resident or citizen—the Khorma family plaintiffs are Jordanian nationals domiciled and residing in Jordan, the defendants are Syrian, and the attackers were Iraqi.  *See Estate of Buonocore v. Great Socialist People's Libyan Arab Jamahiriya*, 942 F. Supp. 2d 13, 16 (D.D.C. 2013) (noting that "while the U.S. arguably has an interest in applying its domestic law to its aggrieved domiciliaries, that interest is diminished when those domiciliaries are not U.S. nationals"); *Estate of Botvin*, 684 F. Supp. 2d at 40–41 (holding that Israel, where the plaintiffs were residing and where the terrorist attacks occurred, has the strongest governmental interest in the case); *Dammarell*, 2005 WL 756090, at *19 (finding that, where most plaintiffs and attack at issue were from outside this forum, "District of Columbia can lay claim to very little interest in this case").

death of their son and brother Victim Mousab Khorma, Compl. ¶ 76 (Count III—Intentional

Infliction of Emotional Distress, including Solatium), whose death was caused by the defendants

who either "willfully conspire[d]" with, *id.* ¶ 86 (Count VI—Action for Conspiracy), or "aided

and abetted," *id.* ¶ 90 (Count VII—Action for Aiding and Abetting), Zarqawi and AQI, who

have claimed responsibility for the terrorist attacks.  Schenker Expert Decl. at 10–11.

   In support of the Khorma family plaintiffs' entitlement to relief under relevant Jordanian

law, the plaintiffs submitted an admissible expert declaration, laying out the pertinent law:

Article 256 of the Jordanian Civil Code No. 43 of the year 1976 provides that "'every injurious

act shall render the person who commits it liable for damages even if he is a non-discerning

person.'"  Khalilieh Expert Decl. at 2–3 (quoting Article 256 of the Jordanian Civil Code No. 43

of the year 1976).  In other words, "[t]he wrongdoer will be liable for all harm caused to others

where there is a wrongful act, an injury and a causal link between the act and the injury."  *Id.* at

3.  A causal link may be established upon proof that that a wrongdoer "contributed to the harm."

*Id.* (citing Article 257 of the Jordanian Civil Code No. 43 of the year 1976, which provides "The

injurious act may be direct or causative.  And if it is direct the damages shall be due

unconditionally and if it is causative it shall be subject to the proof of trespass or intent or that

the act led to the injury").  Moreover, immediate relatives of victims who have been killed may

recover "'moral damages,'" *id.* at 4 (quoting Article 267 of the Jordanian Civil Code No. 43 of

the year 1976), which the Jordanian Court of Cassation has defined to constitute the "grief and

sorrow" of those whose immediate relative has been killed by a wrongful act, *id.* (quoting

decision of the Court of Cassation No. 1924/2014).

   The plaintiffs have established all of these elements—wrongful act, the injury, the

defendants' causation, and the Khorma family plaintiffs' recoverable emotional distress.  The

plaintiffs, as discussed *supra* in Part III.A., have submitted satisfactory evidence, in the form of a declaration from an expert on Middle Eastern Affairs, of the defendants' essential and material contribution to a known terrorist Zarqawi and his terrorist organization AQI, which material support contributed to the November 9, 2005, attacks, thereby causing the deaths of nearly sixty civilians, including Mousab Khorma.  Schenker Expert Decl. at 14 (concluding "Syrian support for this network led to the deaths of hundreds of Americans in Iraq, and bolstered a terrorist network that killed dozens of Jordanians on November 9, 2005).

The plaintiffs also submitted declarations from each of the Khorma family plaintiffs, except Mousab Khorma's mother, Samira Khorma who died in 2012, attesting to the tremendous emotional distress endured by each family member as the result of Victim Mousab's untimely death.  Samira Khorma, Mousab's mother, never recovered from the death of her youngest and her most beloved son.  Tariq Khorma Decl. ¶ 58.  On the evening of the attack, she was hit by a car as she ran through the streets to reach the hospital where her son was taken after the attack, but Samira went into such shock that she did not even realize she had been hit.  Tatsiana Khorma Decl. ¶ 23; Zeid Khorma Decl. ¶ 25.  After she returned to her house, she broke down "every 5 minutes."  Tatsiana Khorma ¶ 26.  At Victim Mousab's burial, Samira "threw herself onto the grave, hysterical and crying," asking Mousab to "'Take me with you! Take me with you!'" and leaving the grave only after her other children forcibly dragged her away.  *Id.* ¶ 32.  She went from a lively socialite to a recluse after Mousab's death, refusing to leave her house, except to go to the hospital, to see her grandchildren and to eat.  *Id.* ¶¶ 36, 39.  She became a hypochondriac, going to the hospital "at least 30 different times" in the last two years of her life alone, sometimes returning to the hospital mere days after her release.  *Id.* ¶¶ 40, 41.  She eventually developed diabetes and became dependent on anti-depressants, sleeping pills and other sedatives.

31

*Id.* ¶ 39.  Her despair continued for the next six and a half years before she died in July 2012.  An obituary memorialized her pain thusly: "'This beautiful woman called Samira, suffering for these past 7 years, now can lay down to rest next to her beloved son.'"  *Id.* ¶ 46.

Tariq Khorma, Victim Mousab's older brother, avers that he and Mousab were particularly close growing up because they were the closest in age of four siblings.  Tariq Khorma Decl. ¶ 8.  Tariq admired the entrepreneurship, ambition and determination of his younger brother, who, by the young age of thirty-nine, co-launched music record company, served as the Chief Executive Officer of a telecommunications firm in Palestine, and became, just prior to his death, the Deputy General Manager for Operations and Support Services for the Cairo Amman Bank.  *Id.* ¶¶ 14–17, 20–26.  Tariq, along with his sister Tatsiana Khorma and brother Zeid Khorma, were the first to arrive on the scene after learning of the terrorist attack at Grand Hyatt, but Mousab had already been declared dead and transported to a hospital.  *Id.* ¶¶ 42, 43.  Two days later, Tariq went to another hospital to which Mousab had been transferred, and he saw "garbage bags filled with mutilated body parts," and a room with "over 60 bodies piled on top of each other," a sight that, to this day, he cannot forget.  *Id.* ¶ 50.  Tariq avers that he "still grieve[s] Mousab's death;" he often dreams of Mousab and wakes up in tears.  *Id.* ¶ 63.

Tatsiana Khorma, Mousab's older sister, similarly suffers extreme emotional distress, grieving for the loss of her brother.  She avers that after her brother's burial, she "began to have a fear of seeing people," she "did not want to go out in public," and became withdrawn.  Tatsiana Khorma Decl. ¶ 30.  Tatsiana testifies that "a piece of [her] died with Mousab."  *Id.* ¶ 34.  She became paranoid about the safety of her children, "demanding that they call [her] at all times," and became "terrified" of phone calls at night, always fearing the worst.  *Id.* ¶¶ 48, 49.

Tatsiana's own grief was compounded by becoming the primary caretaker of her mother, who required daily attention, putting a tremendous strain on her marriage.  *Id.* ¶¶ 38–40, 45.

Zeid Khorma, Mousab's elder brother, also testifies to his emotional anguish suffered as a result of his brother's death.  Being the oldest, Zeid was very protective of Mousab growing up and filled in as a father authority when all of the siblings were away at boarding school.  Zeid Khorma Decl. ¶¶ 11, 12.  In adulthood, Zeid and Mousab remained close. *Id.* ¶¶ 18–19.  On the night of the attacks, Zeid identified Mousab at the morgue, lifting up the "white, bloody sheets" from different bodies until he found his brother's.  *Id.* ¶ 29.  Immediately after Mousab's death, Zeid suffered "two severe anxiety attacks." *Id.* ¶ 51.  He never fully recovered from his grief.  When he hears "soft or sad music, or music that reminds [him] of Mousab, . . . he will cry automatically." *Id.* ¶¶ 50, 52.  Moreover, Zeid testifies that he becomes anxiety in public places, always making sure to always face the entrance so that he "can monitor the people coming in," and he has irrational fears about flying on planes or driving under bridges. *Id.* ¶¶ 55, 56.

Based on these uncontroverted factual allegations, the plaintiffs have sufficiently established that, under Jordanian law, the defendants are liable to the Khorma family plaintiffs for "the full spectrum of emotional damages and for the grief and sorrow in the hearts that was caused by the injurious act."  Khalilieh Expert Decl. at 6 (citing 267 of the Jordanian Civil Code, No. 43 of the year 1976 and the decision of the Court of Cassation No. 2460/2012).[9]

Accordingly, the plaintiffs have established the defendants' liability to the estates of the two Victims and to the Thuneibat family plaintiffs under the federal private right of action

---

[9]     Samira Khorma may also recover for her traumatic emotional distress under Jordanian law even though she is deceased and not represented by a legal representative.  The plaintiffs' Jordanian law expert concluded that, under Jordanian law, Samira may recover non-pecuniary damages after reviewing "the Declarations under oath provided by Tatsiana, Zeid and Tariq Khorma," which "describe their and their deceased mother's intimate family relationships with their murdered brother . . . and the extreme mental and emotional anxiety, suffering and distress, and loss of enjoyment of life, that they suffered as a result of it all," and the Court has no reason to disturb the expert's assertion that Samira has standing to recover.  Khalilieh Expert Decl. at 5–6.

against state-sponsors of terrorism, 28 U.S.C. § 1605A(c), and the defendants' liability to the Khorma family plaintiffs for intentional infliction of emotional distress under Jordanian law. The Victims' request, under Section 1605A(c), for damages stemming from "pain, suffering, mental anguish" experienced prior to death, Compl. ¶ 83 is denied.  The damages allowable to the plaintiffs are discussed below.

### D.    DAMAGES

The plaintiffs in this case seek to recover economic, solatium, and punitive damages to compensate for their own losses and to punish the defendants for their heinous actions in support of known terrorists.  Compl. ¶¶ 77, 80, 98.  Normally, damages would be calculated pursuant to the law under which liability was found, in this case federal statutory law and Jordanian law. The non-U.S. nationals Khorma family plaintiffs, however, did not submit evidence regarding how solatium damages are calculated under Jordanian law.  The plaintiffs' Jordanian law expert proffered only his opinion as to whether the Khorma family plaintiffs are entitled to recover damages, not how much they should be awarded.  *See* Khalilieh Expert Decl. at 6.  Given the lack of the information regarding the proper calculation of solatium damages under Jordanian law, the Court will, "in the interest of justice," analyze damages awards under the federal Section 1605A framework.  *See Liebovitch v. the Syrian Arab Republic*, 25 F. Supp. 3d 1071, 1087 (N.D. Ill. 2014) (borrowing from federal law for damages assessment where the plaintiffs "failed to provide the Court with relevant material pertaining to damages award for mental injury under Israeli law" (citing *Oveissi*, 768 F. Supp. 2d at 25–26 (applying the federal standard for solatium damages even though liability was established under French law); *Kirschenbaum v. Islamic Republic of Iran*, 572 F. Supp. 2d 200, 212–13(D.D.C. 2008) (applying federal standard to damages while applying New York law to the underlying tort claims); and *Blais v. Islamic*

*Republic of Iran*, 459 F. Supp. 2d 40, 59–60 (D.D.C. 2006) (applying federal standard to damages and state law to liability))).

As a result, the damages sought by all of the plaintiffs, foreign and domestic, will be analyzed under the federal statutory framework.

### 1.        Legal Standard for Damages under Section 1605A(c)

Congress, in creating a private right of action in Section 1605A(c) for victims of state-sponsored terrorism, also provided, in the same subsection, that such foreign states are liable for money damages, including "economic damages, solatium, pain and suffering, and punitive damages." 28 U.S.C. § 1605A(c).  "'To obtain damages against a non-immune foreign state under the FSIA, a plaintiff must prove that the consequences of the foreign state's conduct were reasonably certain (i.e., more likely than not) to occur, and must prove the amount of damages by a reasonable estimate consistent with this [Circuit]'s application of the American rule on damages.'"  *Roth*, 78 F. Supp. 3d at 402 (quoting *Salazar v. Islamic Republic of Iran*, 370 F. Supp. 2d 105, 115–16 (D.D.C. 2005)) (internal quotations omitted and alteration in the original); *see also Kim v. Democratic People's Republic of Korea*, 87 F. Supp. 3d 286, 289 (D.D.C. 2015) (quoting *Hill v. Republic of Iraq*, 328 F.3d 680, 681 (D.C. Cir. 2003)).  In determining the "reasonable estimate," courts may look to expert testimony and prior awards for comparable injury.  *See Reed v. Islamic Republic of Iran*, 845 F. Supp. 2d 204, 214 (D.D.C. 2012); *Acosta v. Islamic Republic of Iran*, 574 F. Supp. 2d 15, 29 (D.D.C. 2008).

The plaintiffs have satisfactorily shown that the Victims' deaths and the grief of their respective families were reasonably certain and were actually the intended consequences of the defendants' material support of Zarqawi and AQI.  The defendants knowingly provided shelter and funds to these terrorists.  Schenker Expert Decl. at 4–6 (for example, a crucial AQI figure,

who "specialized in fundraising and operation planning for AQI," was described by the U.S. Department of Treasury as someone "supported financially by the Syrian Government" with "close ties to Syrian Intelligence."). Furthermore, Zarqawi and AQI have demonstrated their willingness to plan attacks with the intent of maximizing civilian injuries. In April 2004, the Jordanian officials foiled a Zarqawi-planned plot to explode, in central Amman, a chemical weapon-laden truck bomb "that the terrorists hoped to kill over 100,000" people. Schenker Expert Decl. at 7. Consequently, the defendants' conduct in supporting Zarqawi and his AQI network in Syria was likely, and intended, to result in the deaths of civilians, such as Victims Lina Thuneibat and Mousab Khorma, and devastate the families of these victims.

Concluding that the plaintiffs have proven that "the consequences of the foreign state's conduct were reasonably certain . . . to occur," the Court next turns to determining whether the plaintiffs have proven that the amounts they seek for economic loss, solatium and punitive damages, are "reasonable estimates." *Roth*, 78 F. Supp. 3d at 402.

### 2. Economic Loss

Section 1605A explicitly provides that foreign state-sponsors of terrorism are liable to victims for economic losses stemming from injuries or death sustained as a result of the foreign state's conduct. 28 U.S.C. § 1605A(c). The estates of the two Victims seek to recover the Victims' "lost earning capacity." Pls.' Mem. at 15. In support, the plaintiffs submitted satisfactory evidence in the form of reports from "an expert in forensic economics," *id.*, who, based on data provided by the National Center for Health Statistics, information submitted by the immediate family members of the two Victims, and his own expertise, calculated the "loss of wages and employee benefits" for each of the two Victims. Pls.' Mot., Ex. F ("Thuneibat

Economic Losses Decl.") at 1, ECF No. 26-7; Pls.' Mot., Ex. G ("Khorma Economic Losses Decl.") at 1, ECF No. 26-8.

The forensic economics expert report estimated Lina Thuneibat's cumulative economic losses to be between $1,123,207 and $1,453,749, depending on the level of education she would have attained, whether stopping with a bachelor's degree or a master's degree, respectively.[10] Thuneibat Economic Losses Decl. at 14.  The forensic economist projected Lina's potential income streams based on the average earnings of all white females with the equivalent postsecondary degree, taking into account growths in income over time.  *Id.* at 3.  To this, he added potential employee benefits "based on data from the U.S. Department of Labor, Bureau of Labor Statistics, Employer Cost of Employee Compensation – December 2014, 2015."  *Id.*  The forensic economist then offset the potential income and benefit streams with estimates of personal consumption, using a study published in the Journal of Forensic Economics, which was based on data from the U.S. Department of Labor, Bureau of Labor Statistics, "Consumer Expenditure Survey, 2005-06."  *Id.*  All of this was then discounted—at a rate of 1.25 percent per year, "based on the rate of return on U.S. Treasury Bills based on Historical H.15 data from the Board of Governors of the Federal Reserve System"—to 2015 dollars.  *Id.* at 2.  These are the

---

[10]     The forensic economics expert report also included an estimate of Lina's loss of enjoyment of life, also known as a loss of value of life, which seeks to calculate what contemporary society would be willing to "pay to preserve the ability to lead a normal life."  Thuneibat Economic Losses Decl. at 4.  The loss of enjoyment of life, however, is not normally considered a type of economic damages that may be awarded to estates of decedents for wrongful death.  *See* RESTATEMENT (SECOND) OF TORTS § 906 (1979) ("Compensatory damages that will not be awarded without proof of pecuniary loss include compensation for (a) harm to property, (b) harm to earning capacity, and (c) the creation of liabilities."); § 925A (summarizing the approaches taken by different state death statutes, all of which approaches closely track probable income, and do not add separate economic losses in the form of loss of employment of life).  Courts awarding economic damages for wrongful death under Section 1605A have limited awards to reasonable loss of income, not including loss of the value of life.  *See Moradi v. Islamic Republic of Iran*, 77 F. Supp. 3d 57, 71 (D.D.C. 2015); *Roth*, 78 F. Supp. 3d at 402; *Owens*, 71 F. Supp. 3d at 258; *Estate of Doe*, 943 F. Supp. 2d at 185; *Belkin v. Islamic Republic of Iran*, 667 F. Supp. 2d 8, 24 (D.D.C. 2009).  The plaintiffs appear to concede this limit on the Victims' damages referencing only that "[e]conomic damages are available to compensate the estate of the deceased for the victim's lost earning capacity."  Pls.' Mem. at 15 (citing *Valore*, 700 F. Supp. 2d at 83).

most reasonable estimates of income and expenditure because Lina Thuneibat was only nine-years old at her death, over a decade before she would have earned her first post-college paycheck.

The estate of Lina Thuneibat is awarded $1,453,749 for economic damages stemming from her wrongful death.  This is the figure estimated by the forensic economist based on the assumption Lina would have achieved a master's degree and worked through the age of 67.  *Id.* at 4.  This is the more reasonable estimate of Lina Thuneibat's potential economic loss than $1,123,207, which assumes that Lina would have achieved only a bachelor's degree and worked through the age of 67, because of information regarding Lina's background.  Both of Lina's parents are well-educated with bachelor's degrees.  *Id.* at 2.  At the time of Lina's death, she was attending an "elite private" school in Amman, indicating her parents' devotion to her successful education and her potential for high achievement.  *Id.* at 3.  Lina's older brother, Muhammad, is currently a "Biology student at the University of the Virgin Islands and plans to go to medical school."  *Id.*  Lina's mother, Nadira Thuneibat, suggests that Lina may have had similar ambitions.  *Id.*  In support, Nadira avers that Lina greatly admired a cousin who was a nurse and had "a scholarship to study for her master's degree in the U.S."  Nadira Thuneibat Decl. ¶ 19.  Moreover, "other family members . . . are studying medicine, and her uncle is a doctor in the United States."  Thuneibat Economic Losses Decl. at 3.  In light of all of these facts, and the aspirations of her family for her, it is reasonable to assume that Lina Thuneibat, had she not been killed in a terrorist attack at the age of nine, would have gone on to earn at least a master's degree.

The forensic economics expert report estimated Victim Mousab Khorma's cumulative loss of wages and employee benefits, less personal expenditures, to be between $13,668,260 and

38

$16,401,923, depending on the size of his annual bonuses.[11]  Khorma Economics Loss Decl. at

15.  Unlike Lina Thuneibat, who was too young to have previous work experience before her

death, Mousab Khorma led a successful career prior to his death.  By the age of thirty-nine,

Mousab had "received a bachelor's and master's degree in Electrical Engineering, and a master's

degree in Business Administration," and was recruited by a Palestinian telecommunications

company to act as its Chief Financial Officer.  *Id.* at 2.  He was promoted to the Acting Chief

Executive Officer.  *Id.*  Less than a year before his death, he transferred to the Cairo Amman

Bank to serve as the General Manager for Operations and Support Services.  *Id.* at 3.  In his last

position, Mousab earned an annual base salary of 127,500 Jordanian Dinars, which is

approximately $179,831 in U.S. dollars.  *Id.* at 3.  Starting from this baseline, the forensic

economist applied the actual wage growth in Jordan for the years 2006 through 2011, based on

data provided in the Decent Work Country Profile for Jordan, compiled by the International

Labour Organization, in the subsection on "Legislators, Senior Officials, and Managers."  *Id.* at

3–4.  Wage growth for the years after 2011 is assumed to be 2.5 percent, based on review of past

annual consumer price changes in Jordan, as published by the World Bank.  *Id.* at 4.  The

forensic economist offset personal consumption costs, which are estimated based on a study

published in the Journal of Forensic Economics.  *Id.* at 5.  The income streams are then

discounted to 2015 dollar based on a discount rate of 1.25.  *Id.* at 2.  The forensic economist

assumed Mousab would work through the age of 67, with a remaining life expectancy of 38.2

years.  *Id.* at 1, 5.

---

[11]     The forensic economist also suggested an amount to compensate for Mousab Khorma's loss of enjoyment of life, or loss of value of life.  As discussed *supra* n.10, loss of enjoyment of life is not compensable as part of damages under Section 1605A(c), and, thus, will not be awarded.

Assuming an annual bonus of two-thirds of base salary, the forensic economist found a total lifetime loss of $13,668,260; and assuming an annual bonus of a hundred percent of base salary, the total lifetime loss amounted to $16,401,923.  While the plaintiffs submitted evidence that Mousab received a year-end bonus of a hundred percent of his base salary while Mousab served as the Chief Financial Officer at the Palestinian telecommunications company, no evidence demonstrated that he received a year-end bonus of a hundred percent of his base salary at his penultimate or ultimate positions.  In fact, his last position was at Cairo Amman Bank, an entirely different employer with a potentially different compensation scheme than that of the Palestinian telecommunications company.  Evidence of his last bonus received at Cairo Amman Bank demonstrates, however, that Mousab would have continued to receive sizeable bonuses.  In light of these facts, the more reasonable estimate of total economic damages to the estate of Mousab Khorma is $13,668,260.

Accordingly, the estate of Lina Thuneibat is entitled to $1,453,749 and the estate of Mousab Khorma is entitled to $13,668,260 for the economic damages as a result of their wrongful deaths.

### 3.     Non-Pecuniary Damages

The immediate relatives of the two Victims seek solatium damages to compensate for "'the mental anguish, bereavement, and grief,'" of losing their loved ones.  Pls.' Mem. at 17 (quoting *Valore*, 700 F. Supp. 2d at 85).  In determining the appropriate amount to compensate for the family members' emotional distress, "the Court may look to prior decisions awarding damages . . . for solatium."  *Acosta*, 574 F. Supp.2d at 29.  Solatium damages, by their nature, are "unquantifiable," *Moradi v. Islamic Republic of Iran*, 77 F. Supp. 3d 57, 72 (D.D.C. 2015), and, therefore, this Court has developed a commonly-accepted standardized framework, known

as the *Heiser* damages framework, for solatium damages, which awards, as a baseline, $5 million to parents of deceased victims and $2.5 million to siblings.  Pls.' Mem. at 17 (citing *Estate of Heiser*, 466 F. Supp. 2d at 269); *Roth*, 78 F. Supp. 3d at 403 (noting the "framework has been adopted by other courts as an appropriate measure of solatium damages for the family members of victims of state-sponsored terror (citing *Valore*, 700 F. Supp. 2d at 85)).

These numbers serve only as a baseline from which the Court may deviate in order to compensate for specific circumstances.  For example, enhancements may be awarded where "'evidence establish[es] an especially close relationship between the plaintiff and decedent, particularly in comparison to the normal interactions to be expected given the familial relationship; medical proof of severe pain, grief or suffering on behalf of the claimant [is present]; and circumstances surrounding the terrorist attack [rendered] the suffering particularly more acute or agonizing.'"  *Roth*, 78 F. Supp. 3d at 403 (quoting *Oveissi*, 768 F. Supp. 2d at 26–27) (alterations in the original).  With this framework in mind, the Court discusses the appropriate damages amount for each member of the Thuneibat and Khorma families.

### a.    Thuneibat Family

Nadira Thuneibat, the mother of Lina Thuneibat, is entitled to an upward adjustment from the $5 million normally awarded to parents of deceased victims.  Nadira not only suffered the loss of her young daughter, with whom she had a close relationship, she was also present at the scene of the attack.  Nadira Thuneibat Decl. ¶¶ 23, 24.  She was not in the ballroom where the suicide bomber detonated his bomb belt, but stood right outside where she witnessed her uncle die in front of her from a shrapnel wound to his heart.  *Id.* ¶ 24.  Thereafter, she saw her own daughter carried out of the ballroom into an ambulance and multiple dead and injured bodies of many of her relatives in attendance at the family wedding.  *Id.* ¶¶ 24–27.  As a result of

this emotional trauma, Nadira continues to suffer from severe physical and emotional difficulties. *Id.* ¶¶ 35, 46.

Family members present at the scene of the attack may recover for the emotional distress suffered due both to the loss of a loved one and to enduring the terrorist attack, which is a separate harm. *See Acosta*, 574 F. Supp. 2d at 30 (awarding the spouse of a surviving victim $500,000, or roughly 17%, more to compensate for her "own pain and suffering endured by being present during the shooting"). Nadira's presence at the scene of the attack and the extremity of her mental distress, as evidenced by her physical ailments, warrant an upward departure of approximately 25%. An upward departure of 25% is well within the parameters of prior opinions of this Court involving similar special circumstances. *See Flanagan v. Islamic Republic of Iran*, 87 F. Supp. 3d 93, 118 (D.D.C. 2015) (awarding a 25% enhancement to the baseline for each member of the victim's family where his "unexpected death was devastating," and the plaintiffs experienced "extraordinarily severe pain and suffering following [the victim's] death"); *Baker v. Socialist People's Libyan Arab Jamahirya*, 775 F. Supp.2d 48, 83 (D.D.C. 2011) (departing upward by 25% in light of evidence that the brother of the victim was so traumatized that he "turned to self-destructive behavior to cope with his pain"); *Valore*, 700 F. Supp. 2d at 86 (awarding an upward departure of 25% from baseline due to the plaintiff's "uniquely acute suffering"). Thus, Nadira Thuneibat is entitled to a total of $6,250,000 million dollars.

Lina Thuneibat's father, Mansoor al-Thuneibat, likewise suffered extreme emotional distress following Lina's death, warranting a 25% upward departure. Mansoor was particularly close to Lina, his only daughter. Nadira Thuneibat Decl. ¶ 37. Mansoor was so devastated that he withdrew from society, even staying away from Lina's funeral, and "lost interest in his

business, his sons," and his wife.  *Id.* ¶¶ 38, 39, 41.  Mansoor became depressed to the point of

requiring medication.  *Id.* ¶ 41.  In December 2006, he was diagnosed with brain cancer,

requiring two surgeries, and he died of a heart attack in December 2007.  These averments from

his wife regarding Mansoor's last days portray a man changed and severely deflated by the death

of his only daughter.  For these reasons, the estate of Mansoor al-Thuneibat is entitled to a total

of $6,250,000 million dollars, reflecting a 25% upward adjust.  *See Estate of Brown v. Islamic*

*Republic of Iran*, 872 F. Supp. 2d 37, 43 (D.D.C. 2012) (awarding an enhanced award of $3

million to the sister of the deceased victim where she "suffered a nervous breakdown . . . for

which she sought medical treatment and was prescribed medication for approximately one

year"); *Baker*, 775 F. Supp. 2d at 83 (awarding an upward departure of 25% where the sister of

the deceased victim "had to be hospitalized for asthma and shock . . . and has battled depression

ever since).

Lina Thuneibat is survived by her two brothers.  Each was close in age and relationship

to Lina.  *See* Nadira Thuneibat Decl. ¶ 49 ("O.M.T. and Lina were only a little less th[a]n two

years apart in age, and they were especially close as children.  O.M.T. was the baby.  Lina was

protective of him.  They always did everything together."), ¶ 54 ("Muhamm[a]d . . . was three

and one-half years older than Lina.  He was always protective of her.  He never allowed anyone

to hurt her, or to speak to her harshly.").  Each clearly suffered greatly in the death of their only

sister.  O.M.T. and Muhammad were only six and twelve when their sister died, and this loss,

due to their young age, had a lasting impact on their development.  For four years after the

terrorist attacks, O.M.T. became unable to learn in a classroom setting, requiring one-on-one

instruction for two-thirds of his curriculum.  *Id.* ¶ 53.  Muhammad became prone to violent

outbursts.  In the immediate aftermath of the terrorist attacks, "he cried a lot, screamed, and

wanted to find and shoot down Zarqawi." *Id.* ¶ 55. He became angry and "would take his anger

out on his cousins, or destroy [his mother's] plants, trees and flowers." *Id.* ¶ 56. Due to their

serious emotional behavioral difficulties, both brothers received counseling, though with little

result. *Id.* ¶¶ 52, 56. Taking into consideration the brothers' "uniquely acute suffering," the

effect on their development, and the tender age at which the traumatic event occurred, O.M.T.

and Muhammad Thuneibat are each entitled to $3,125,000, reflecting an upward adjustment of

25% from the baseline of $2,500,000 for each sibling. *See Flanagan*, 87 F. Supp. 3d at 118

(awarding 25% enhancement); *Oveissi*, 768 F. Supp. 2d at 29–30 (awarding a 50% enhancement

to the grandson of the deceased victim because he was very young at the time of his

grandfather's death, who had taken care of him as a father, and who "changed significantly,

turning from a happy and outgoing boy to a withdrawn and solemn figure," suffering from "fits

of anger").

### b.   Khorma Family

Samira Khorma, the deceased mother of Victim Mousab Khorma, had an unusually close

relationship to Mousab, her favorite son. Tariq Khorma Decl. ¶ 58. The effect of Mousab's

death on her mental state was dramatic, turning her from a lively socialite to a complete recluse,

hypochondriac, with a dependency on drugs for sleep. Tatsiana Khorma Decl. ¶¶ 36, 39, 40, 41.

Samira never recovered from the sudden and unexpected death of her son, grieving for him for

nearly seven years before her own death. *Id.* ¶ 46. For Samira Khorma's utter devastation, she is

awarded a 25% departure for a total of $6,250,000 in solatium damages. *See Valore*, 700 F.

Supp. 2d at 86; *Estate of Brown*, 872 F. Supp. 2d at 43.

Each of Mousab's siblings, Tariq, Tatsiana and Zeid Khorma, also suffered immensely at

the loss of their brother, with whom they were all very close. Tariq Khorma Decl. ¶ 8; Tatsiana

Khorma Decl. ¶ 7; Zeid Khorma Decl. ¶ 11.  For each, the memory of Mousab still looms very large, and his death is still felt very intensely.  Tariq Khorma Decl. ¶¶57–60, 63; Tatsiana Khorma Decl. ¶ 34; Zeid Khorma Decl. ¶¶ 50, 52.  Fortunately, they were able to cope with their difficult loss with the support of their families and the mental fortitude they enjoyed due to their mature age at the time of the attacks.  For these reasons, they are each awarded $2,500,000 for the death of their brother.

### 4.    Punitive Damages

The plaintiffs also seek punitive damages, which are allowable under Section 1605A(c).  Punitive damages are awarded not to compensate the victims, but to "'punish outrageous behavior and deter such outrageous conduct in the future.'"  *Kim*, 87 F. Supp. 3d at 290 (quoting *Bodoff v. Islamic Republic of Iran*, 907 F. Supp. 2d 93, 105 (D.D.C. 2012) (internal quotations omitted)); *see also* RESTATEMENT (SECOND) OF TORTS § 908(1) (1977).  Punitive damages are warranted where "defendants supported, protected, harbored, aided, abetted, enabled, sponsored, conspired with, and subsidized a known terrorist organization whose modus operandi included the targeting, brutalization, and murder of American citizens and others."  *Baker*, 775 F. Supp. 2d at 85 (D.D.C. 2011).  The defendants' conduct in sheltering and sponsoring Zarqawi and AQI, known terrorists whose stated mission is to devastate those who support Americans, certainly justifies the imposition of punitive damages here.  *See also Gates*, 580 F. Supp. 2d at 74 (finding that "Syria supported, protected, harbored, and subsidized a terrorist group," Zarqawi's AQI, "whose modus operandi was the targeting, brutalization, and murder of American and Iraqi civilians").

Various approaches have been articulated for calculation of the appropriate amount of punitive damages in state-sponsored terrorism cases. One approach is to multiply the foreign

state's "annual expenditures on terrorism" by a factor between three and five.  *See Baker*, 775 F.

Supp. 2d at 85 (citing to *Valore*, 700 F. Supp. 2d at 88-90; *Estate of Heiser*, 659 F. Supp. 2d at

30-31; *Acosta*, 574 F. Supp. 2d at 31); *Beer v. Islamic Republic of Iran*, 789 F. Supp. 2d 14, 26

(D.D.C. 2011).  Alternatively, punitive damages have been awarded based on "the ratio of

punitive to compensatory damages set forth in earlier cases," if similar conduct has been

previously litigated.  *See Spencer v. Islamic Republic of Iran*, 71 F. Supp. 3d 23, 31 (D.D.C.

2014); *Goldberg-Botvin v. Islamic Republic of Iran*, 938 F. Supp. 2d 1, 11–12 (D.D.C. 2013).  A

third approach awards a fixed amount of $150,000,000 per victim.  *See Wyatt*, 908 F. Supp. 2d at

233 (awarding $300 million in total two the estates of two victims and their families); *Bodoff*, at

106 (awarding $300 million in total to a single victim and his family); *Baker*, 775 F. Supp. 2d at

86 (awarding $150 million to each family of three deceased victims); *Gates*, 580 F. Supp. 2d at

75 (awarding $150 million each to the estates of two victims).

      The defendants here are estimated to spend between $500 million to $700 million

annually to support terrorism.  *See Baker*, 775 F. Supp. 2d at 85.  Multiplying the average of

$600 million by even the lower multiplier of three would result in an award of $1.8 billion.  This

amount would exceed the punitive damages awarded in other cases against the Syrian

government by $1.5 billion and is even more than the plaintiffs demand.  *See* Compl. ¶ 98

("Plaintiffs….demand that judgment be entered, jointly and severally, against defendants in the

amount of THREE HUNDRED SIXTY MILLION US DOLLARS ($360,000,000.00).").  The

defendants' conduct in providing material support to the terrorist group that perpetrated the

attacks here is indeed outrageous, and the results are indisputably tragic.  The conduct here,

however, is not more outrageous and the results are not more tragic than the events at issue in

other cases.  In *Gates*, for example, two American civilians working in Iraq were brutally

decapitated and their deaths videotaped to be broadcast to the world.  580 F. Supp. 2d at 55.  In *Baker*, terrorists, who hijacked a Cairo-bound plane, shot "execution-style" three Americans on board the flight.  775 F. Supp. 2d at 55.  Mindful of these precedents and the plaintiffs' demand, and the lack of prior cases arising out of the same conduct, this Court opts to award $150,000,000 to each of the estates of the two victims in punitive damages, for a total of $300,000,000.

### 5.       Prejudgment Interest

The plaintiffs have also requested prejudgment interest, Compl. (Prayer for Relief); Pls.' Mem. at 45–46, but this request is denied.  Three types of damages are awarded here: pecuniary damages, nonpecuniary damages, and punitive damages.  First, the total economic damages awarded to the estates of the two Victims are already discounted to present value, and, therefore, a separate award of prejudgment interest would be duplicative.  *Roth*, 78 F. Supp. 3d at 407.  Second, nonpecuniary damages, such as solatium damages, do not typically require prejudgment interest because they are "designed to be fully compensatory."  *Wyatt*, 908 F. Supp. 2d at 232; *Roth*, 78 F. Supp. 3d at 408; *Wultz v. Islamic Republic of Iran*, 864 F. Supp. 2d 24, 42 (D.D.C. 2012); *Oveissi*, 879 F. Supp. 2d at 59–60 ("When this Court applies the *Heiser* damages framework—as it did in the underlying solatium award here—it has consistently refused to award prejudgment interest").  Some courts have awarded prejudgment interest on nonpecuniary awards, however, noting the loss of the use of money had the plaintiffs been able to bring the suit closer to the triggering event.  *See Owens*, 71 F. Supp. 3d at 261; *Estate of Doe*, 943 F. Supp. 2d at 184 n.1.  The plaintiffs did not submit any evidence that the delay between 2005, when the terrorist attacks occurred, and 2012, when the instant suit was filed, was due to any nefarious interference by the defendants or anyone else.  Therefore, the solatium damages awarded are

complete and prejudgment interest is not necessary to make the plaintiffs whole.  Third, prejudgment interest does not apply to punitive damages because "prejudgment interest is an element of complete compensation" and punitive damages are non-compensatory.  *Wultz*, 864 F. Supp. 2d at 42 (quoting *Pugh v. Socialist People's Libyan Arab Jamahiriya*, 530 F. Supp. 2d 216, 264 (D.D.C. 2008)).

Accordingly, plaintiffs are awarded monetary damages in the amounts established above, without prejudgment interest.

## IV.    Conclusion

For the reasons outlined above, the plaintiffs' motion for default judgment is granted. The defendants are jointly and severally liable for the deaths of Lina Thuneibat and Mousab Khorma, and the injuries to their immediate family members.  The plaintiffs are awarded monetary damages in the following amounts: the estate of Lina Thuneibat is entitled to $1,453,749 in economic losses and $150,000,000 in punitive damages; the estate of Mousab Khorma is entitled to $13,668,260 in economic losses and $150,000,000 in punitive damages; Nadira Thuneibat and the estate of Mansoor al-Thuneibat are entitled to $6,250,000 each in solatium damages; O.M.T. and Muhammad Thuneibat are entitled to $3,125,000 each in solatium damages; Samira Khorma is entitled to $6,250,000 in solatium damages; and Tariq, Tatsiana and Zeid Khorma are each entitled to $2,500,000 in solatium damages.  Thus, the total damage award is $347,622,009.

An appropriate order will accompany this Memorandum Opinion.

Date: March 1, 2016

_____

BERYL A. HOWELL
United States District Judge